J5tnweg1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KAREN WEGMANN,

                    Plaintiff,

             v.                              15 Civ. 03815 (KPF)

YOUNG ADULT INSTITUTE, INC., et al.,

                    Defendants.

------------------------------x
                                         New York, N.Y.
                                         May 29, 2019
                                         8:30 a.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                         District Judge

                              APPEARANCES

ZABELL & ASSOCIATES, LLP
        Attorneys for Plaintiff
BY:  SAUL D. ZABELL
     RYAN BIESENBACH

GROOM LAW GROUP, CHARTERED
        Attorneys for Defendants
BY:  EDWARD J. MEEHAN
     PAUL RINEFIERD

ALSO PRESENT:
Russell Miness, Of Counsel, YAI.org

J5tnweg1

```
 1              (Case called).

 2              MR. ZABELL:  For the plaintiff, Saul Zabell.

 3              Good morning, your Honor.

 4              THE COURT:  Good morning, sir.

 5              MR. ZABELL:  Here with me at the table is my client,

 6    Ms. Wegmann.

 7              THE COURT:  Good morning and thank you.

 8              MR. ZABELL:  And Mr. Biesenbach.  He is an attorney in

 9    my office, although he is not admitted in the Southern

10    District.  He is here just to assist me.

11              THE COURT:  Just to assist.  You are not going to let

12    him speak on the record?

13              MR. ZABELL:  Neither I nor you will, yes.

14              THE COURT:  I was going to say I can admit him pro hac

15    if you are making the application.

16              MR. ZABELL:  I would love that.  Thank you very much

17    for the offer.

18              THE COURT:  There is an oral application, sir, that

19    you be admitted pro hac vice.  For purposes of this trial and

20    this trial only, you are admitted pro hac vice.  Do you

21    understand?

22              MR. BIESENBACH:  Yes, your Honor.

23              THE COURT:  Thank you very much.  You all can be

24    seated.

25              MR. MEEHAN:  Good morning, your Honor, Edward Meehan.
```

J5tnweg1

| | |
|---|---|
| 1 | With me at counsel table is Paul Rinefierd and Russell Miness, |
| 2 | and Russell I believe the court will recall is the general |
| 3 | counsel at YAI. |
| 4 | THE COURT:  Good morning to all of you and thank you. |
| 5 | Mr. Meehan, let me speak with you for a moment sir. I |
| 6 | understand there is an actuarial witness who is in the |
| 7 | courtroom, is that correct? |
| 8 | MR. MEEHAN:  Yes.  Victor Harte, who has now just |
| 9 | stood up. |
| 10 | THE COURT:  Yes.  Mr. Harte, good morning to you, sir. |
| 11 | I think I have your declaration. |
| 12 | It is my understanding, Mr. Meehan, that the parties |
| 13 | have agreed that Mr. Harte may remain in the courtroom through |
| 14 | the testimony of others. |
| 15 | Am I understanding that correctly? |
| 16 | MR. MEEHAN:  That is correct, your Honor.  We |
| 17 | consulted in advance and we have agreed Mr. Harte may stay, if |
| 18 | that is acceptable to the Court and that the fact witnesses, |
| 19 | Mr. Connors and Ms. Fava, will be sequestered. |
| 20 | THE COURT:  All right. |
| 21 | Mr. Zabell, may I please confirm with you that that is |
| 22 | the agreement you have with Mr. Meehan. |
| 23 | MR. ZABELL:  That is the agreement. |
| 24 | THE COURT:  All right.  It is unusual.  I understand |
| 25 | the process here, so I will allow it.  Thank you very much. |

J5tnweg1

1          Mr. Zabell and Mr. Meehan we as a group are aware of

2    what the issues are in this case.  I had not thought about

3    opening statements, but if you have made them, you have been

4    prepping them all week, I certainly want to hear from you.

5    Otherwise I think we should begin with witness testimony,

6    Mr. Zabell.

7          MR. ZABELL:  May I just turn to my adversary for a

8    moment on this?

9          THE COURT:  Of course, you may.

10          MR. ZABELL:  Not unlike your Honor, my adversary and I

11    did not anticipate opening statements, so we --

12          THE COURT:  That's terrific.  Let's begin.

13          MR. ZABELL:  Very good.  At this time I would like to

14    call the plaintiff, Karen Wegmann.

15          THE COURT:  Thank you very much.

16          Ms. Wegmann, would you approach the witness stand,

17    please.

18          Please be careful of the various electronic equipment.

19          MR. ZABELL:  Can I have her walk through the --

20          THE COURT:  If that is safer, yes.

21          MR. MEEHAN:  Your Honor if I may, one other

22    housekeeping matter just occurred to me.

23          Sitting next to Mr. Harte is a legal assistant from

24    our firm, Andy Shahalanari.  I wanted to identify him for the

25    Court so your Honor would know who he is.  I appreciate that.

1    Thank him for coming, and I won't be surprised if he's running

2    back and forth to help you out with this matter

3             MR. MEEHAN:  That is possible, yes.

4     KAREN WEGMANN,

5         the plaintiff, having been duly sworn,

6         testified as follows:

7    DIRECT EXAMINATION

8    BY MR. ZABELL:

9             THE COURT:  Counsel, you may begin.

10            MR. ZABELL:  Thank you, your Honor.

11            THE COURT:  It is my understanding -- well, maybe I

12   could do this.

13            Do you wish to show her her affidavit and have her

14   adopt it?

15            MR. ZABELL:  I do.

16            THE COURT:  I'll let you do that.

17            MR. ZABELL:  Thank you, your Honor.

18   BY MR. ZABELL:

19   Q.  Ms. Wegmann, please take a look at that document.

20            Ms. Wegmann, do you know what that document is?

21   A.  Yes, this is my affidavit.

22   Q.  Is it true and accurate?

23   A.  Yes, it is.

24            MR. ZABELL:  Thank you.

25            I tender the witness.

1          THE COURT:  Thank you very much.  Let me ask counsel,

2     what is your preference with respect to the marking of these

3     affidavits as exhibits?  Either Plaintiff's or Court, or do you

4     just want them admitted as the affidavits?  I have no

5     preference.

6          MR. MEEHAN:  Your Honor, I think that we can just have

7     the affidavit for Ms. Wegmann and the others as well when their

8     time comes simply admitted together with all their exhibits.

9     That's something we had discussed also in advance to try to

10    move this along, if that's OK with the Court.

11         THE COURT:  That is fine with me, as long as we are

12    all aware that each of the affidavits that is admitted at this

13    trial, it sounds like all of them will be --

14         MR. MEEHAN:  Yes.

15         THE COURT:  -- are basically exhibits in the case.

16         MR. MEEHAN:  Yes.

17         THE COURT:  That is fine.

18         MR. MEEHAN:  Together with all of the exhibits

19    attached to those affidavits, we have already agreed they may

20    simply go in.

21         THE COURT:  That is fine by me.  Thank you very much.

22         All right.

23         Mr. Meehan, do you intend cross-examination, sir?

24         MR. MEEHAN:  Yes, I do.

25         THE COURT:  Please begin.

J5tnweg1                         Wegmann - Cross

1    CROSS-EXAMINATION

2    BY MR. MEEHAN:

3              MR. ZABELL:  Your Honor?

4              THE COURT:  Yes, sir.

5              MR. ZABELL:  I just conferred with Mr. Meehan.  With

6    regard to the exhibits, we both tried to make sure that the

7    exhibits appended to them correlate to the exhibits numbered

8    and lettered in the joint pretrial order.

9              THE COURT:  Thank you.  OK.  Understood.

10             MR. MEEHAN:  Your Honor, I guess I will make this a

11   housekeeping matter also.  If it's OK with the Court, I have

12   approached the podium because I know that makes it easier for

13   everyone to hear me with the microphone.  I may on occasion go

14   back to counsel table just to grab a document, so you may see

15   me shuttle back and forth, if that's OK.

16             THE COURT:  Of course there's standing permission to

17   go back and forth as needed to both sides.  Additionally if it

18   is your intention to approach the witness, I am giving you

19   permission to approach the witness to hand the witness a

20   document if there's one that you wish to hand to the witness.

21             MR. MEEHAN:  We will actually get to a point before

22   long -- what we did, we thought it was most convenient for

23   everyone, is the exhibits that we intend to show Ms. Wegmann we

24   have culled out from our entire group of defendants' exhibits

25   and put them in a separate binder that we will give to

J5tnweg1                        Wegmann – Cross

1    Ms. Wegmann, and she will then be able to follow along as we go

2    through.  We think that will make it a lit the easier.

3              THE COURT:  I completely agree.

4              Thank you very much.  Off the record.

5              (Discussion off the record)

6              THE COURT:  OK.  Mr. Meehan when you are ready we are

7    back on the record.

8              MR. MEEHAN:  Thank you, your Honor.

9    BY MR. MEEHAN:

10   Q.  Good morning, Ms. Wegmann.

11   A.  Good morning.

12   Q.  Ma'am, what I'd like to begin with is I am going to try to

13   get an understanding from you as to when it is, if ever, that

14   you believe you became a participant in this SERP.  I'm

15   mentioning that in advance because sometimes I am going to try

16   to telegraph with you the subject I am going to cover.  The

17   reason I am going to do that is I want to make sure always we

18   are on the same page.  If at any time I confuse you, please

19   raise your hand and point that out.  Is it agreeable with you

20   the way I've suggested that we proceed?

21   A.  Yes.

22   Q.  All right.  When is it, if ever, that you determined, at

23   least in your own mind, that you had become a participant in

24   this SERP that we are arguing about in this case?

25   A.  It was my understanding that by dedicating my career and

1  throughout my role at YAI, starting with assistant controller

2  and 27 and a half years advancing to the chief financial

3  officer, chief business officer, that I would participate in

4  the pension plan.

5  Q.  When was it, ma'am, that you first saw a copy of the SERP?

6  A.  I was the controller of the organization, and the -- I was

7  given a copy of the SERP.

8  Q.  OK.  And just to maybe move us along, I know you have your

9  affidavit in front of you, and if it helps, in paragraph 18 of

10  your affidavit, you indicate it was as my time as controller

11  between July 1, 1992, through June 30, 2003, that I first

12  recall seeing a copy of the SERP plan document.

13         Does that sentence accurately reflect your best

14  recollection today as to when you first saw the SERP plan

15  document?

16  A.  Yes.  That's my best recollection.

17  Q.  All right.  And is that accurate in setting forth the dates

18  when were you controller, July 1, 1992 through June 30, 2003?

19  A.  Yes, I believe so, yes.

20  Q.  All right.  That is an 11-year period.  Is there any way

21  you could be more precise today as to when in those years you

22  believe you saw that SERP plan document for the first time?

23  A.  I -- actually, no.

24  Q.  Do you recall that I met you by taking your deposition

25  in --

J5tnweg1                         Wegmann - Cross

1    A.  Yes.

2    Q.  Yes.  All right.  And I can show you a copy of your

3    deposition if need be, but what I was going do is I am going

4    read a question and an answer from that deposition and see if

5    that helps us pin this down more precisely when you first saw

6    the SERP plan document.  I'm going to be referring to page 162,

7    lines 12 through 16.  I will wait a moment for counsel to get

8    that.  OK.

9           Ma'am, I will read this, but if you need me to give

10   you a copy, don't hesitate to ask.  I will be happy to show

11   you.

12          Page 162, line 12, I asked you a question that was

13   following up on our discussion of this 1985 SERP as we were

14   calling it at the deposition and exactly when you first saw it.

15   So I said:  So you believe sometime in the '90s you saw the

16   1985 SERP?

17          You paused.

18          Mr. Zabell indicated you have to answer.

19          Your answer:  Yes.

20          So does hearing that question and answer help you

21   today pin down more precisely that you actually saw the SERP

22   plan document for the first time sometime in the 1990s?

23   A.  Truthfully it doesn't.  And I just -- it was perfunctory.

24   I just received a copy of it.  It wasn't --

25   Q.  I understand, and I won't belabor the point, but I'm trying

1    to basically just determine, is there any reason you have in

2    your mind today that would suggest that your answer at the

3    deposition, which was sometime in the '90s, is not accurate?

4              MR. ZABELL:  Objection.

5              THE COURT:  I will allow.

6    A.  No, I don't have any -- I knew it was within the time

7    period when I was the controller.  And I really -- I

8    couldn't -- can't pinpoint it.

9    Q.  OK.  But do you agree with me that at the deposition you

10   gave the answer to the question that I read that it was

11   sometime in the '90s?  Do you agree with me that was the answer

12   you gave at the deposition?

13   A.  Yes.

14   Q.  And at your deposition you understood that you were there

15   to tell the truth as best you could, correct?

16   A.  Yes, yes.

17   Q.  Now, let's talk about your understanding.  When you first

18   looked at this SERP plan document, what was your understanding

19   of what you needed to do to become a participant?

20   A.  To be part of the executive management, to dedicate my

21   career, as I said, at least 15 years, and to also not have my

22   compensation -- to not have the Social Security benefit system

23   applicable to all of my compensation.

24   Q.  And in your own understanding, you became a participant in

25   the SERP once you had the 15 years, your Social Security

1    compensation met the criteria, and that took place in 2001 in

2    your mind, right?

3    A.  Yes.

4    Q.  So just to make sure I've got this building block, in your

5    mind, at the time you believed you became a participant in this

6    SERP, in 2001 once you had attained the 15 years, you were in

7    your view a management employee and your Social Security wages

8    met the trigger, right?

9    A.  Yes.  That was the beginning.

10   Q.  All right.  When that happened in 2001, you did not tell

11   anyone at YAI that it was your view that you were now a

12   participant in the SERP?

13   A.  Not -- no.

14              THE COURT:  I'm sorry.

15              What was that answer, please?

16              THE WITNESS:  No.

17              THE COURT:  No, you did not.

18              OK.  Thank you.

19   BY MR. MEEHAN:

20   Q.  No meaning you did not tell anyone that, correct?

21   A.  Meaning my -- my thought process was that it was ongoing,

22   and these were the parameters of the plan, not that it was a

23   reason to trigger anything.

24              THE COURT:  Counsel, may I inquire?

25              MR. MEEHAN:  Yes, of course.  At any time, your Honor,

J5tnweg1                      Wegmann - Cross

1    whatever makes sense.

2              THE COURT:  So in 2001 you hit 15 years, yes?

3              THE WITNESS:  Yes.

4              THE COURT:  All right.  You were what then?  Were you

5    controller then or were you chief financial officer or were you

6    something else?

7              THE WITNESS:  2001 I was the controller.

8              THE COURT:  All right.  You believed that to be an

9    executive position?

10             THE WITNESS:  Yes.  Absolutely.

11             THE COURT:  As defined in the plan?

12             THE WITNESS:  Yes.  The -- Joe Rut, who was my

13   predecessor, was in the plan, and he was the controller.

14             THE COURT:  All right.

15             THE WITNESS:  So, you know, over the course of the

16   decades, the titles changed somewhat so the -- I'll call it the

17   senior financial personal in the older beginning years of the

18   organization was the controller, and then as we expanded

19   they -- it was a CFO.  So, in other words, the head of the

20   finance was considered the management employee.

21             THE COURT:  OK.  So you were controller which you

22   believed to be an executive appointment?

23             THE WITNESS:  Yes.

24             THE COURT:  You had been there 15 years.  You had the

25   requisite treatment with respect to Social Security.  And so

J5tnweg1                        Wegmann - Cross

1    would this have happened -- when did you hit 15 years?  What

2    month did you begin?

3             THE WITNESS:  Well, I started in December of 1986.

4    So --

5             THE COURT:  OK.  So December of 2001.

6             THE WITNESS:  2001.

7             THE COURT:  December 2001 happens, you think to

8    yourself sometime in the month of December I am now a

9    participant in the SERP, you believe that?

10             THE WITNESS:  Yes.

11             THE COURT:  Full stop?

12             THE WITNESS:  Yes.

13             THE COURT:  You believe nothing else had to be done?

14             THE WITNESS:  I had conversations with my --

15             THE COURT:  No.

16             THE WITNESS:  Sorry.  No, nothing.

17             THE COURT:  Nothing else had to be done, and you

18    believed that everybody around you in the YAI organization knew

19    and understood exactly what you knew and understood, which was

20    that you were a member of the SERP?

21             THE WITNESS:  Not everyone in the organization, just

22    the executive.

23             THE COURT:  The people who should have known, the

24    people who either were themselves SERP participants or had some

25    knowledge of or involvement in the SERP plan you believed in

J5tnweg1                    Wegmann – Cross

1    December of 2001 that they all shared your view that you were a

2    member?

3              THE WITNESS:  Yes.  That I was qualified, yes.

4              THE COURT:  Not that you were qualified.  Were you

5    actually a member of the SERP at that point?

6              THE WITNESS:  Yes.

7              THE COURT:  Nothing else had to be done?

8              THE WITNESS:  I think -- the only other thing was a

9    formality, as Joel explained to me, which is that he would put

10   me in the plan, you know.

11             THE COURT:  But that suggests you weren't in the plan.

12             THE WITNESS:  Meaning starting a calculation.

13             THE COURT:  All right.

14             Thank you, counsel.

15             MR. MEEHAN:  OK.

16   BY MR. MEEHAN:

17   Q.  Ma'am, your view was that right from the beginning, in your

18   very first position at YAI as assistant controller, you were

19   considered a management employee for the purposes of this SERP,

20   correct?

21   A.  That's correct.

22   Q.  And it was your view that you were a management employee

23   for purposes of the SERP every day that you worked at YAI, the

24   approximately 27 and a half years that you were there, right?

25   A.  That I was a participant, yes.

J5tnweg1                      Wegmann - Cross

1   Q.  And it was your understanding that others at YAI throughout

2   the time you worked there referred to you as a management

3   employee?

4   A.  Yes.

5   Q.  OK.  To put a sharper point on what the Court was just

6   going through with you, in your own understanding, once you hit

7   this 15-year period and had met the other criteria, it was

8   automatic that you were in the SERP as of 2001, right?

9   A.  Yes.

10  Q.  At no time from 2001 to 2006, when you became CFO, did you

11  tell anyone at YAI it was your view that you had automatically

12  become a participant in the SERP, correct?

13  A.  Correct.

14  Q.  And going past that time period, 2006 right through 2014,

15  when you left employment at YAI, you did not tell anyone at YAI

16  it was your view that you had already been automatically made a

17  participant in the SERP, correct?

18  A.  My conversations were with Joel, with my boss.

19  Q.  OK.

20  A.  They were very seldom.

21          THE COURT:  Just so that I am clear.

22          THE WITNESS:  Just so I --

23          THE COURT:  No, no.  I didn't mean to cut you off.  I

24  want to make sure I am understanding what you're saying because

25  ultimately I am going to be deciding factual issues based on

J5tnweg1                         Wegmann - Cross

1    this.

2              THE WITNESS:  Uh-huh.

3              THE COURT:  How many people at YAI did you have

4    conversations with about the SERP?

5              So Mr. Levy?  Is that his name?

6              THE WITNESS:  Yes.

7              THE COURT:  So Joel Levy was one.

8              THE WITNESS:  Yes.

9              THE COURT:  Anybody else?

10             THE WITNESS:  Over the course of --

11             THE COURT:  Yes.

12             THE WITNESS:  Joel Levy, Herb Devos when I first

13   started.  And I'm trying to think of -- you know, Mike Connors.

14   Other -- Craig Miller, you know.

15             THE COURT:  OK.  So Mr. Devos, is that his name?

16             THE WITNESS:  Yes.

17             THE COURT:  D-e-v-o-s?

18             THE WITNESS:  Yes.

19             THE COURT:  OK.  Those conversations were when you

20   began.  So that as you were embarking on your career with

21   YAI --

22             THE WITNESS:  Right.

23             THE COURT:  -- you had a sense of what awaited you in

24   the future.

25             After you started at YAI, did you not -- did you have

J5tnweg1                    Wegmann - Cross

 1   any conversations with Mr. Devos about the SERP?

 2            THE WITNESS:  No, not in detail.

 3            THE COURT:  No.  Well, that's not my question.

 4            THE WITNESS:  I'm sorry.

 5            THE COURT:  Ever.

 6            THE WITNESS:  Just I think just that one that stays in

 7   my memory.

 8            THE COURT:  OK.

 9            THE WITNESS:  When I started he had said that I can

10   make, you know, a good career here, it was a good organization,

11   and he was kind of explaining it as a mentor and that he had

12   started later and would only be there for five years, so there

13   was a supplemental retirement for just the executives and that,

14   you know, that would be available to me.

15            THE COURT:  OK.

16            THE WITNESS:  So --

17            THE COURT:  OK.  And then in the later -- so you had

18   conversations which we will talk about with Mr. Levy, Joel

19   Levy, correct?

20            THE WITNESS:  Yes.

21            THE COURT:  He has a brother, a Philip Levy.

22            THE WITNESS:  Philip Levy yes.

23            THE COURT:  Did you speak about the SERP with Philip

24   Levy if you can recall?

25            THE WITNESS:  Yes.  That would have been, again,

J5tnweg1                          Wegmann - Cross

1    towards the end of my tenure, after Joel had retired.

2              THE COURT:  OK.  You spoke with Mr. Connors?

3              THE WITNESS:  Yes.

4              THE COURT:  You spoke with Mr. Miller, you've just

5    said.

6              THE WITNESS:  Craig -- yes, Mr. Miller, yes.

7              THE COURT:  Ms. Fava?

8              THE WITNESS:  I don't recollect if we had a

9    conversation regarding that, retirement.

10             THE COURT:  Anyone else that you can recall?

11             THE WITNESS:  Oh, Joe Rut when he.

12             THE COURT:  Mr. Rut?

13             THE WITNESS:  Mr. Rut.

14             THE COURT:  When did he pass?

15             THE WITNESS:  2006.

16             THE COURT:  Thank you.  OK.

17             All right.  Mr. Meehan.

18             THE WITNESS:  I think that's it.

19             THE COURT:  Thank you.

20             Mr. Meehan.  Thank you.

21             MR. MEEHAN:  OK.

22   BY MR. MEEHAN:

23   Q.  Let's run through the names just to be sure that we have

24   what conversations or communications you do recall.

25             So you indicated in your affidavit what I take to be

1    the substance of your communications with Joel Levy.  Other

2    than what is set forth in your affidavit, was there anything of

3    substance at any time that you discussed with Joel Levy

4    concerning your participation in the SERP?

5         THE WITNESS:  Well, as I said, we did not have

6    numerous conversations.  It was the benefit that was available,

7    and I really was concentrating on my work.

8    Q.  All right.  So I understand that.  I don't mean for you to

9    feel that you need to explain your answers at any time.  Feel

10   free, and if I want an explanation, I'll ask.  But I'm really

11   now just trying to make sure that there is nothing else of

12   substance about the actual content of your conversations with

13   Joel Levy that you recall beyond what you set forth in your

14   affidavit.

15   A.  No, sir.

16   Q.  All right.  Let me read you something from Mr. Joel Levy's

17   deposition because I would like to get your reaction to it.

18        MR. ZABELL:  I am going to object to the reading in of

19   deposition testimony of Joel Levy.

20        THE COURT:  I agree.

21        MR. MEEHAN:  Well, it's already been admitted.

22        THE COURT:  Well, I understand.  I am not sure this

23   witness is competent to speak to it, sir.

24        Is there a section you want to direct my attention to?

25        MR. MEEHAN:  Yes.  It would be page 6 of Mr. Levy's

J5tnweg1                    Wegmann - Cross

1   deposition, lines 3 through 21.

2            THE COURT:  Excuse me, please.

3            MR. MEEHAN:  I can skip the reading and put the

4   question in a different way, if that's easier.  We also

5   referred to this in our pretrial submissions and quoted it.

6            THE COURT:  Tell me again, please, the page, sir.

7            MR. MEEHAN:  It should be at page 6, beginning at line

8   3, running through 21.

9            THE COURT:  Yes.

10            Counsel, I will allow to you inquire to see if this

11   refreshes her recollection about conversations that she may

12   have had with Mr. Levy.

13            MR. MEEHAN:  Thank you.

14            THE COURT:  I am not saying that you will, but I'm

15   letting you offer it for that purpose.

16            Thank you.

17            MR. MEEHAN:  Thank you, your Honor.

18   BY MR. MEEHAN:

19   Q.  OK.  Let me read this and then I will ask you exactly that,

20   whether this refreshes your recollection about any

21   communications you had with Joel Levy.

22            There is a SERP agreement, a SERP document, and the

23   document has eligibility.  And Karen as the first requirement

24   has to meet that eligibility, which she certainly did.  She met

25   all of criteria in the sense that she was a long-term employee,

1   she was critical to the agency, her performance was good, and

2   that she was on the management team.  And, if she made the

3   commitment, that I would recommend her -- you know, if she made

4   the commitment to the agency, which she essentially did, that I

5   would recommend her to Marci, the chairman of the board, which

6   I did, to the executive compensation committee, which I did,

7   and that -- on several occasions over the years, and that, that

8   it would require their approval.

9           Does that bring any memory of a conversation along

10  these lines you had with Joel Levy at any time?

11          MR. ZABELL:  Objection, your Honor.

12          THE COURT:  I will allow it.  Thank you.

13          Were you able to hear counsel?

14          THE WITNESS:  Yes.

15          THE COURT:  All right.

16          THE WITNESS:  Thank you, yes.

17  A.  So the -- as Joel explained it to me, for what he thought,

18  I was in the SERP and that the process, if you will, or the

19  administration -- that's why I would talk to him about it,

20  besides the fact that he was also my boss, that he would

21  process it with the board and so he -- so it was a process, and

22  I agreed to that.

23  Q.  And so you say you agreed to that process.  Did you

24  understand that part of that process was that Dr. Levy would

25  recommend you to the board, but the board would ultimately have

J5tnweg1                        Wegmann - Cross

1    to approve it, as I read?

2             MR. ZABELL:  Objection, your Honor.

3             THE COURT:  I will allow it.

4             Do you understand the question?

5             THE WITNESS:  I believe I do, yes.

6             THE COURT:  OK.

7             THE WITNESS:  Yes.

8             THE COURT:  Counsel, if I may, Mr. Levy was deposed

9    and he has his recollection and you have yours, and he has a

10   recollection of discussing with you a need for board approval.

11            Do you have that recollection?

12            THE WITNESS:  My recollection is that Joel would bring

13   it to the board for approval, and he assured me that it would

14   be approved.

15            MR. MEEHAN:  All right.

16   BY MR. MEEHAN:

17   Q.  So did you then understand -- you had Dr. Joel Levy's

18   support, right?

19   A.  Correct.

20   Q.  He was on your side, and he was your advocate, correct?

21            THE WITNESS:  Yes.

22            MR. ZABELL:  Objection, Judge.

23            THE COURT:  I will allow.

24            Although, counsel, there's no jury here.  So, careful

25   where you go.

1          MR. MEEHAN:  Sorry.  Fair enough.  Sometimes I worry

2     that the points I see are not being perceived, but I should --

3     I'll bear in mind that I am sure the Court is seeing what I am

4     seeing.

5          THE COURT:  You will have to trust me, sir.

6          MR. MEEHAN:  OK.  If I may?

7          THE COURT:  You may continue.

8          MR. MEEHAN:  OK.

9     BY MR. MEEHAN:

10    Q.  Just to sharpen that up, since I put it out there, you did

11    understand that Dr. Joel Levy was your advocate to become part

12    of the SERP, correct?

13    A.  Yes.  I mean, he was the CEO.

14    Q.  But you also understood that he was not on the board,

15    right?

16    A.  No.

17         THE COURT:  I'm sorry.  I don't know what "no" means.

18         THE WITNESS:  No, he was not on the board.

19         THE COURT:  You understood that he was not on the

20    board?

21         THE WITNESS:  Correct.

22         THE COURT:  Thank you.

23    BY MR. MEEHAN:

24    Q.  So you understood when he was telling you, in effect, yes,

25    Karen, I will go to bat for you, he couldn't guarantee it,

1    right?

2    A.   Right.  He explained to me that he would process it with

3    the board and that I would be fine and I would be in the plan.

4              THE COURT:  Did he ever discuss with you the

5    possibility that the board might disagree?

6              THE WITNESS:  Absolutely not.

7              THE COURT:  All right.

8              But you understood that the board had to do something?

9              THE WITNESS:  Yes, yes.  I understand --

10             THE COURT:  OK.

11             THE WITNESS:  -- that the board had a process, and

12   that what each of the individuals that Joel put -- because Joel

13   managed the SERP, each of the individuals that Joel put forth

14   to be processed in the SERP were processed in the SERP.

15             THE COURT:  If I may --

16             THE WITNESS:  Yes.

17             THE COURT:  -- I don't quite understand the word

18   "process," and it seems to me unlikely that your conver -- but

19   maybe it was -- that your conversations with -- he's Dr. Levy

20   and I've been calling him Mr. Levy all this time, please excuse

21   me -- Joel Levy, that he actually sat with you and said, look,

22   Karen, there's a process that we have to go through.  It

23   sounded more like he was saying that I'm going to go to the

24   board, they'll approve it, and that will be it.

25             Do you actually remember the words that he used?

1              THE WITNESS:  He used the word "process."

2              THE COURT:  He used the word "process"?

3              THE WITNESS:  Yes.

4              THE COURT:  So, may I understand -- again, to the best

5     of your recollection -- how this conversation went?

6              THE WITNESS:  Right.

7              I mean, one of the ones I can remember is in his

8     office.  He was on the phone with Marci, and he -- and he was

9     talking to me and he said, you know, we have to process

10    Karen --

11             THE COURT:  We have to --

12             THE WITNESS:  -- in the plan.

13             THE COURT:  OK.

14             We have to process Karen in the plan?

15             THE WITNESS:  Yes.

16             THE COURT:  That's your recollection?

17             THE WITNESS:  Yes.

18             THE COURT:  OK.  I understand.

19             Thank you, counsel.

20    BY MR. MEEHAN:

21    Q.  Just to clarify, as far as Ms. Fava, who was the chair of

22    the board during this time period, you never had a direct

23    conversation with her about being processed into the SERP,

24    correct?

25    A.  Correct.

```
 1            THE COURT:  Ms. Wegmann, so that I am clear, when
 2   Dr. Levy spoke of the need to process you, did you understand
 3   that process to be some sort of approval, or was it supposed to
 4   be something else?  I mean, what did you understand the process
 5   was that the board was going to do?
 6            THE WITNESS:  Right.  Well, I mean, the -- this
 7   particular time -- in the morning I would stop into Joel's
 8   office, and, you know, before the day got going, and he was on
 9   the phone with Marci.  And I guess they were discussing various
10   things, and then he looked up and he said to me, Oh, Hi, Karen,
11   to that extent -- you know something to that extent.
12            THE COURT:  Sure.
13            THE WITNESS:  And then he said, you know, Marci, we
14   have to process Karen, meaning he would bring it to the
15   board -- what it meant to me was he would -- as the others, he
16   would bring it to the board and the board would recommend
17   and --
18            THE COURT:  What was the board going to do?
19            THE WITNESS:  Approve it.
20            THE COURT:  OK.
21            Counsel?
22   BY MR. MEEHAN:
23   Q.  Just so it doesn't get muddied, you did understand that the
24   board has a responsibility to use their best judgment on any
25   matter brought in front of them to make a decision yea or nay,
```

1    right?

2    A.  Yes.

3    Q.  So you understood it was possible that the board could say

4    no on this issue, correct?

5              THE COURT:  I will allow it.  Whatever you understood.

6    A.  I did not know.  I thought it was -- I -- given everything

7    and how it had always proceeded prior to me, this was exactly

8    the steps.  These were exactly the steps.

9    Q.  Prior to your candidacy here for the SERP -- I will

10   rephrase it.  Prior to 2001, when you believed you had become a

11   participant in the SERP, it was correct that no one had been

12   added to the SERP since 1993, right?

13   A.  Yes.

14             THE COURT:  You knew that?

15             THE WITNESS:  I know that, you know, from obviously

16   refreshing my memory with all the documentation.  There also

17   was no -- there was --

18             THE COURT:  Let me stop you.  I want to actually have

19   an answer to the question that he asked.

20             THE WITNESS:  Yeah.

21             THE COURT:  In 2001, you were aware that no one had

22   been admitted since 1993?  Not what you've learned afterwards,

23   not what you have learned --

24             THE WITNESS:  Yes.

25             THE COURT:  -- in connection with this lawsuit; in

J5tnweg1                        Wegmann - Cross

1    2001.

2              THE WITNESS:  Yes.

3              THE COURT:  Thank you.

4              THE WITNESS:  Thank you.

5              THE COURT:  OK.  Counsel, please continue.

6    BY MR. MEEHAN:

7    Q.  In 1993, you were the controller, correct?  That's what you

8    have told us in your paragraph 18 in your affidavit.

9    A.  Yes.

10   Q.  Mr. Joseph Rut was not the controller in 1993 when the

11   board passed the resolution adding him to the SERP, right?

12             THE COURT:  If you know?

13             THE WITNESS:  I'm not -- I don't rec -- I mean I'm not

14   precisely sure so I don't want to make a wrong answer.

15   Q.  Were you and Mr. Rut both the controller in 1993?  It was

16   only one of you, right?

17   A.  Right.  No -- yes, that's correct.  Yeah.

18   Q.  So in 1993 he was actually the CFO, was he not?

19   A.  OK.  Yes, if I became the controller, when I became the

20   controller he became the CFO.

21             THE COURT:  So when Mr. Rut was admitted into the

22   SERP, he was admitted as CFO and not as controller, because he

23   was the '93 admission wasn't he?  If you know.

24             THE WITNESS:  You know, your Honor, I don't know his

25   exact title at that particular moment.

1          THE COURT:  OK.

2     BY MR. MEEHAN:

3     Q.  It is fair to say all you do know is he could not be the

4     controller because you were the controller in 1993, is that

5     fair?

6     A.  We weren't both the controller at the same time.  I just

7     don't know the exact dates.

8          THE COURT:  OK.

9          MR. MEEHAN:  OK.  All right.

10          Pardon me.

11          THE COURT:  Bless you.

12     BY MR. MEEHAN:

13     Q.  And were you aware in 2001 that in 1993 Mr. Rut was made a

14     participant along with Mr. Freeman and Mr. Dern?

15          THE COURT:  I'm sorry the last name, please.

16     Q.  Dern, D-e-r-n, along with Freeman, F-r-e-e-m-a-n, were you

17     aware of that?

18     A.  I don't know when I became aware, but I doubt it was 1993.

19     But I became aware that they had been processed.

20     Q.  OK.  And when you be--

21     A.  And the procedures had been carried out for them.

22     Q.  When you became aware that there were these processes for

23     certain individuals in 1993, did you also learn that some of

24     those individuals were being deemed in this plan when they

25     achieved 15 years, that some of them had not yet achieved 15

1   years but were being approved for when they achieved the 15

2   years?

3   A.  That I did not know.

4   Q.  OK.  I think now I understand your understanding of when

5   you became a participant and how that worked, so I want to move

6   on to a related but different topic.

7        Let's talk about the financial aspects.  You've given

8   certain information about what you believe you would be owed

9   here, and so I want to talk about that topic, all right?

10  A.  Yes.

11  Q.  OK.  All right.  Now, ma'am, in your affidavit you set

12  forth in certain paragraphs, beginning I guess at paragraph 45

13  where you start to talk about the substance of it, and then you

14  go forward in several paragraphs thereafter where you give

15  numbers.  Are you with me on that?

16  A.  Yes.

17  Q.  OK.  Can you explain to me -- and feel free to look at your

18  affidavit, if it helps you -- how is it that you computed what

19  you believe you are owed under this SERP.

20  A.  Well, I looked up my -- my W-2s and I took -- do you want

21  me to walk through the mech -- OK, the mechanics of it.

22  Q.  If you could describe the process without numbers and then

23  we can get into some numbers, that will probably be easiest.

24  A.  OK.  All right.  Well, I looked at the document, and then I

25  looked at my W-2s and my -- my earnings information, W-2s and

1    1099s, and I calculated, you know, I looked at the calculation,

2    and used the 3 percent times years of service.  I had the years

3    of service 27.54 -- excuse me -- and I relied on the actuary's

4    factor because there are different factors about mortality and,

5    you know, present values, so I just utilized those numbers as

6    they were given to me because I don't know those.

7    Q.  If I may stop you just briefly.

8    A.  Yes.

9    Q.  When you say you relied upon the actuary, to whom are you

10   referring?

11   A.  In my affidavit I utilized I think Mr. Harte.

12   Q.  The actuary that YAI is bringing for this trial today?

13   A.  Yes.

14   Q.  And then if you could complete the description of the

15   process you followed.

16   A.  Sure, OK.  And so I did the calculation, and then there are

17   several offsets to the net earnings and so I got those amounts,

18   I had the amounts as of June 30, 2014, and then those are

19   trended forward.  And again I used Mr. Harte's factor because

20   the compounding and the actuarial part of it, I don't have

21   those tables or that expertise, so I utilized that to divide

22   that lump sum that was trended forward in order to get an

23   annual amount, because you need to apply the annual amount to

24   the highest net earnings figure as a deduction to come to a net

25   figure.

1    Q.  Is there anything else about the process that you followed?

2    A.  I don't believe so.

3    Q.  OK.  You referred to looking at the document.  What

4    document or documents did you look at?

5    A.  Oh, the documents I looked at were the SERP documents and

6    the actuarial document that Mr. Harte prepared.

7    Q.  OK.  And the SERP document was what exactly?

8    A.  The SERP document was the 1980 -- I believe it's 1985

9    document and the amendment.

10   Q.  The amendment was what we call the 2008 amendment?

11   A.  Yes.

12   Q.  OK.  Can you explain why you consulted the 2008 amendment.

13   A.  Well, one of the reasons I looked at the 2008 amendment was

14   to be clear on what the net earnings were.  Because the

15   original document just said earnings.  I am not -- I don't know

16   verbatim, but it didn't really have a definition, whereas the

17   amendment gave better information about what was includable and

18   excludable.

19   Q.  Is it your understanding that the 2008 amendment is part of

20   your agreement with YAI concerning this SERP?

21   A.  I mean, the amendment is part of the SERP documents, so --

22   Q.  Do you believe it applies to you?

23   A.  Yes.

24   Q.  Have you always believed that?

25   A.  Yes.

J5tnweg1                      Wegmann - Cross

1  Q.  Have you a memory today as to when you first saw the 2008

2  amendment?

3  A.  I mean the memory I have today is 2010.

4  Q.  And we'll get to that I believe a little later, but that's

5  when Mr. Miller sends you an e-mail and he provides certain

6  documents?  Is that what you're recalling?

7  A.  Yes.  Yes, he asked me to pass along certain documents.

8  Q.  OK.  We'll get to that.  That is an exhibit that I think

9  everybody is probably familiar with.

10 A.  Yes.

11 Q.  I would like to clarify one thing then.  Is it your

12 understanding that in computing what I'll call your damages

13 here under the SERP the only disagreement that you have with

14 what Mr. Harte has done is in how to define what goes into the

15 total annual earnings?

16 A.  Yes.  I relied on his factor.

17 Q.  OK.

18 A.  And so the only other differential is the earnings number.

19 Q.  In paragraph 72 of your affidavit --

20 A.  72?

21 Q.  72, yes.

22 A.  OK.

23 Q.  You say, when you are talking about this process, you refer

24 to using the conversion factor of 11.9909 dash, which was also

25 used by defendants' expert Victor P. Harte, and then you go on.

1           That phrase where you say, which was also used, do you

2      mean that you independently derived that number or simply that

3      you were adopting Mr. Harte's factor?

4      A.  I'm just utilizing Mr. Harte's factor.

5      Q.  OK.  So you did not attempt to replicate how he got to

6      11.9909 in this conversion factor?

7      A.  No, sir.  It's actuarial.  I mean, I read his footnote and

8      it referred to tables that looked reasonable, but I am not an

9      expert as an actuary.

10     Q.  OK.  Would you agree that, whatever your skills may be in

11     many areas, you are not an actuary?

12     A.  That is correct.

13     Q.  All right.  And it's beyond your experience and training to

14     derive this conversion factor, is that also correct?

15     A.  Yes.

16           THE COURT:  The point counsel is making is --

17           THE WITNESS:  Yeah.

18           THE COURT:  -- either you replicated the calculations

19     that led to that number or --

20           THE WITNESS:  Oh, OK.

21           THE COURT:  -- you just adopted his number.

22           THE WITNESS:  I see.

23           THE COURT:  I thought I understood you to be saying

24     because you do not consider yourself to be an actuary, you

25     simply adopted certain factors or certain figures that

1    Mr. Harte created, is that correct?

2              THE WITNESS:  That's precisely it.  Thank you.

3              THE COURT:  Thank you for letting me know.

4    BY MR. MEEHAN:

5    Q.  We'll segue briefly to another actuarial calculation that

6    was submitted to the Court, and then I'm going to come back.

7    So the other one I'm referring to was at one point offered as

8    Plaintiff's Exhibit 18.  It's actually not in front of the

9    Court, and I believe it was withdrawn and in any event was

10   ruled out, but I do want to ask you a little bit about the

11   process by which that was prepared.

12             THE COURT:  Counsel, then it's going to come in.

13             MR. MEEHAN:  Well, I can do it -- I will do it in a

14   way respectful of all of that.

15   BY MR. MEEHAN:

16   Q.  Was there a time, ma'am, when in connection with settlement

17   there was a document that was provided that set forth what you

18   then believed your damages to be?  This would be fall of 2018.

19             THE COURT:  Sustained.  Don't answer.

20   Q.  At any prior time, ma'am, had you attempted to compute your

21   damages on your own?

22   A.  Not totally on my own because I don't know exactly how to

23   do all the actuarial work.  But I had asked Craig Miller, you

24   know, I -- you know, I wondered approximately what it might be,

25   but nothing -- there's not numerous occasions, and I -- you

J5tnweg1                          Wegmann - Cross

1   know.

2   Q.  Are you aware that in your -- do you know what a pretrial

3   memorandum is?

4             MR. ZABELL:  Objection.

5             THE COURT:  I will allow it.  Do you know what a

6   pretrial memorandum is?

7             Yes or no.

8             THE WITNESS:  No.

9             THE COURT:  Thank you.

10  BY MR. MEEHAN:

11  Q.  Are you aware that your counsel made certain submissions to

12  the Court before the trial setting forth what you alleged your

13  damages to be?

14  A.  Yes.

15  Q.  Are you aware --

16            THE WITNESS:  Can I explain?

17            THE COURT:  Yes or no.  Thank you.

18  Q.  And are you aware that in certain submissions your damages

19  were set forth as being on a present-value basis, a lump sum of

20  approximately $5.5 million?

21            THE COURT:  I will allow.  Overruled.

22            Are you aware of that?

23            THE WITNESS:  Yes.

24  BY MR. MEEHAN:

25  Q.  Did you derive that number?

J5tnweg1                          Wegmann - Cross

1   A.  Yes.

2   Q.  Did you do that by yourself?

3   A.  No.

4   Q.  Can you tell me what calculations, if any, you performed in

5   deriving that $5.5 million number?

6   A.  OK.  So that calculation was, as opposed to Mr. Harte's

7   calculation is a present value or an annuity amount, annual,

8   that calculation was a lump-sum amount.  And again, there are

9   factors that the actuarials -- actuaries provide me, so Craig

10  gave me the template, if you will, and again I took the

11  earnings -- I mean I did the rest of the calculation myself

12  with the earnings and the percentage and the values of the

13  offset plan similar to what I just described, but this time it

14  has to be compounded, excuse me, to a gross -- you know, to a

15  lump-sum amount, future value.

16  Q.  OK.  Can you tell me exactly what work you personally and

17  individually did to help derive the $5.5 million figure that

18  was presented to the Court in the pretrial submissions?

19  A.  Right.

20  Q.  I'm talking about you individually --

21  A.  Right.

22  Q.  -- what you personally did?

23  A.  Excuse me.  It was very similar to the other calculation I

24  did.  I got the net earn -- my highest net earnings.  I had my

25  W-2s and my 1099s, as I said before, and then I had the

J5tnweg1                          Wegmann – Cross

1    amounts, the values of the other offset plans as of June 30,

2    and I applied the factor that Craig provided me with and I

3    calculated the 5.5 million.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J5TsWEG2                          Wegmann - Cross

1  BY MR. MEEHAN:

2  Q.  OK.  Do you know what conversion factor Mr. Miller provided

3  to you in connection with that five and a half million dollar

4  estimate?

5  A.  Um, I don't want to misquote the number.

6  Q.  OK.  But in any event, you got the conversion factor from

7  Mr. Miller?

8  A.  Yes.

9  Q.  You didn't do it yourself, right?

10  A.  Correct.

11  Q.  All right.  And the amount of these offsets that you talked

12  about, that also came from Mr. Miller, not from you, correct?

13  A.  Um, I -- I had the amounts and then he gave me the

14  compounding.

15  Q.  Did he also give you the interest rate to use?

16  A.  Yes.

17  Q.  And did he identify the mortality table that you used?

18  A.  As I said, he gave me the actuary piece, which would

19  include that.

20  Q.  All right.  So then is it correct that what you did was to

21  run the formula against your highest annual earnings?

22  A.  Right.  I, you know, I filled out the worksheet.

23          THE COURT:  Counsel, your point has been made.

24          MR. MEEHAN:  Thank you, your Honor.  I will move on.

25  Q.  OK.  Now we'll circle back to where you are today because

1      your numbers are set forth in your affidavit.

2              It's your affidavit that you consider now to be your

3      position as to what your damages are, right?

4      A.  Yes.

5      Q.  OK.  So not anything earlier submitted to the court, you're

6      relying on your affidavit, right?

7      A.  Yes.

8      Q.  With respect to this 2008 amendment that you said you've

9      accepted, when it first came --

10             MR. ZABELL:  Objection.

11             MR. MEEHAN:  Well --

12             THE COURT:  She said she believed it applies to her.

13     That's the testimony.  Thank you.

14     BY MR. MEEHAN:

15     Q.  OK.  Ma'am, do you recall your reaction when you first read

16     this 2008 amendment?

17             Do you recall how you felt about it?

18             THE COURT:  Did you have a reaction?

19     A.  I mean, at the time I remember thinking, OK, I've got --

20     I'll have to talk to Joel or I have to figure this out.  But we

21     were -- I was so engrossed in the *qui tam*, in the work that was

22     going on, I honestly, knowing that I wasn't retiring anytime

23     soon and just would come back to it.

24             THE COURT:  May I stop you for a moment, please?

25             Ms. Wegmann, did you see the 2008 amendment at or

J5TsWEG2                        Wegmann - Cross

1   shortly after the time it became effective?

2            THE WITNESS:  No.

3            THE COURT:  When did you see it, in 2010?

4            THE WITNESS:  Yes.

5            THE COURT:  Thank you.

6            Again, its enactment in 2008 -- let me back up.  2008

7   it was enacted, correct; we agree it is 2008?

8            THE WITNESS:  Yes.

9            THE COURT:  OK.  On the date it was enacted, you

10  didn't know about it?

11           THE WITNESS:  No.

12           THE COURT:  Before it was enacted, you didn't know

13  about it?

14           THE WITNESS:  No.

15           THE COURT:  At any time prior to some date in 2010,

16  you didn't know about it?

17           THE WITNESS:  I did not.

18           THE COURT:  You saw it in 2010?

19           THE WITNESS:  Yes.

20           THE COURT:  Your reaction was interesting, I have to

21  talk to Joel, but I've got a *qui tam* that is really occupying

22  my thoughts?

23           THE WITNESS:  Yes.

24           THE COURT:  I'm not going to retire today, I don't

25  need to decide it today?

J5TsWEG2                          Wegmann - Cross

1              THE WITNESS:  Yes, that's correct.

2              THE COURT:  Thank you.

3              THE WITNESS:  Thank you.

4              THE COURT:  Counsel, you may inquire.

5    BY MR. MEEHAN:

6    Q.  Ms. Wegmann, do you recall any more precisely what your

7    reaction to reading that 2008 amendment was whenever you first

8    read it?

9    A.  What I just stated.

10   Q.  OK.  Isn't it correct that you had a reaction of being not

11   happy with this amendment?

12   A.  Yes, I didn't feel happy.

13   Q.  OK.  And, in fact, your reaction was that you were upset

14   about this 2008 amendment, correct?

15   A.  I think I would -- I was upset about the process taking

16   this long.

17   Q.  In fact, ma'am, you were upset because you knew that

18   language in the 2008 amendment was saying that you were not and

19   would not be a participant in the SERP, is that right?

20             MR. ZABELL:  Objection.

21             THE COURT:  I'll allow it.

22   A.  It said that, according to the criteria, I was includable,

23   and then it named individuals.  And so it was definitely

24   something that was not -- it wasn't -- it didn't reconcile, so

25   I was -- I did feel upset.  I would have to, you know, deal --

1    address it.

2              THE COURT:  OK.  I think you used a very interesting

3    word here, if I can just interrupt for a moment.  You said

4    includable.

5              Does that mean based on the criteria set forth, you

6    thought, I was part of it, you were part of it, correct?

7              THE WITNESS:  Yes.

8              THE COURT:  Then you saw a list of people that didn't

9    include your name, correct?

10             THE WITNESS:  Yes.

11             THE COURT:  So you thought that, at least in this

12   document you were includable, but not included, at least in

13   this document?

14             THE WITNESS:  Yes.

15             THE COURT:  Thank you.

16             Counsel, you may continue.

17   BY MR. MEEHAN:

18   Q.  Ma'am, you saw that there were names set forth as to who

19   the participants were, right?

20   A.  Yes.

21   Q.  And you saw that your name was not there, right?

22   A.  Yes.

23   Q.  And you understood from that that this amendment was saying

24   that you were not and would not be a participant?

25             MR. ZABELL:  Objection, asked and answered.

1    A.  No.

2              THE COURT:  I'll allow it.  I know counsel is going to

3    move on.

4              MR. MEEHAN:  I believe the witness said no.

5              THE COURT:  Yes, she did.

6    BY MR. MEEHAN:

7    Q.  OK.  If I could remind you, I did take your deposition.  I

8    would like to read you a question and an answer from the

9    deposition, and then give you an opportunity to explain it.

10             I'll go to page 168, beginning at line 16, going

11   through line 23:

12   "Q.  And you were upset because you knew that this language was

13   saying you were not and would not be a participant, right?

14   "A.  Yes and yes."

15   Q.  Did you give that answer to that question at your

16   deposition, ma'am?

17   A.  Yes.

18   Q.  OK.  Do you see that there is a discrepancy between that

19   answer and the answer you've just given here today?

20             THE COURT:  Sustained.

21             All right.  I got the point, counsel.

22             MR. MEEHAN:  OK.

23   Q.  Just to round that out, different issue but related.

24             When you saw what you read in the 2008 amendment, did

25   you take any action in response to reading that language which

1    named others but excluded you?

2    A.  No.

3              THE COURT:  Did I understand you correctly,

4    Ms. Wegmann, to be saying that because of the press of the qui

5    tam matter, you in your mind decided to deal with this after

6    the qui tam matter?

7              THE WITNESS:  Yes.

8              THE COURT:  Did a time come when you could address the

9    issue?

10             Let me try to ask the question better, please.

11             I can understand if on the day you were reading this

12   amendment you said, Oh, this is something I must decide with

13   Joel Levy, but I can't do it today.

14             When could you discuss it with him?  Did that day ever

15   come, is really what I'm asking?

16             THE WITNESS:  Well, you know, again, as I was, you

17   know, when I was leaving the agency, I addressed it with the

18   executives.

19   Q.  That was approximately 2014?

20   A.  2014.

21   Q.  OK.

22   A.  In between, you know, I may have -- I'm sure I had a

23   couple -- I just don't remember detailed conversations, but a

24   couple of conversations with, you know, Joel or Mike, Craig.

25   I'm sorry.  Mike Connors, but Craig Miller more about, you

J5TsWEG2                       Wegmann - Cross

1     know, preparing -- working on my calculations.  And, again,

2     your Honor, it wasn't -- I was not of for most of my mind,

3     because I was there for three years.

4               THE COURT:  Of course.  Listen, all I want is what

5     happened.  You don't have to explain it to me.  I just want to

6     understand your best recollection of what happened.

7               THE WITNESS:  OK.

8               THE COURT:  So don't read into my questions any

9     recrimination or concern.  I have none.  I just want to know

10    what happened.

11              Did you discuss with Joel Levy the 2008 amendment?

12              If you don't recall, that's fine.

13              THE WITNESS:  I don't recall precisely.

14              THE COURT:  That's fine.  That's fine.

15              Did you discuss with Mr. Miller the 2008 amendment?

16              THE WITNESS:  No.

17              THE COURT:  Did you discuss with Mr. Connors the 2008

18    amendment?

19              THE WITNESS:  I don't know.

20              THE COURT:  Do you recall discussing with anyone the

21    2008 amendment?

22              It's fine if you don't.

23              THE WITNESS:  No.  It was always in terms of the

24    overall SERP.

25              THE COURT:  Thank you.

1          Counsel, please continue.

2     BY MR. MEEHAN:

3     Q.   OK.   One other name that you mentioned in your affidavit

4     that you had conversations with, but I don't believe you

5     mentioned here today, was Matthew Sturiale?

6          THE COURT:   Could I have a spelling, please?

7          MR. MEEHAN:   S-t-u-r-i-a-l-e.

8     Q.   There is a reference in paragraph 60 and then again in 61

9     of your affidavit.

10    A.   Yes.   Matt Sturiale was acting CEO and I was -- I was

11    resigning from the agency, and I had been in communication with

12    Elliot Green, who was the board chair, and obviously Craig and

13    Mike Connors, who were in contact with me regarding the benefit

14    and the calculation.   And then very close to June 30, Mike

15    Connors, Mr. Connors said that he had been asked not to

16    communicate directly with me and that I should communicate

17    through -- with Matt Sturiale.   So Matt Sturiale, I went to

18    Matt and he said, yes, he would speak to Elliot Green.   And

19    this was when, you know, the conversations back and forth about

20    my benefit were taking place.

21    Q.   So this is in the 2004 time period you're talking about?

22    A.   2014.

23    Q.   I'm sorry, 2014.   I apologize.

24    A.   Yes.

25    Q.   So you don't recall speaking to Mr. Sturiale about your

J5TsWEG2                          Wegmann - Cross

1    SERP participation prior to 2014, is that accurate?

2    A.  Yes, that's accurate.

3    Q.  As to Mr. Sturiale, you did not consider him particularly

4    sophisticated in his understanding of the SERP, did you?

5    A.  Well, I didn't -- I didn't think that Matt Sturiale --

6    well, actually, I didn't know for sure, but I didn't understand

7    that he understood the whole supplemental pension plan.

8    Q.  You didn't think that he had a very good understanding of

9    the history of the SERP, for example, right?

10   A.  I was not sure that he did.

11   Q.  And you didn't feel that he had a good grip on the

12   complexities of this SERP, right?

13   A.  I didn't know the level of his awareness of the SERP, so I

14   didn't want to surmise that he knew it in depth.

15   Q.  When you first went to him, you weren't even sure he was

16   aware there was a SERP, right?

17   A.  Right.

18   Q.  The calculation that you set forth in your affidavit, what

19   is the basis for your view that the total, annual earnings

20   should include a longevity bonus?

21   A.  Based on the definition, it's net earnings.  I think the

22   paragraph is in there.

23   Q.  If you could point -- are you referring, perhaps, to --

24   A.  To my affidavit.

25   Q.  -- to 48 in your affidavit, is that the definition you're

J5TsWEG2                          Wegmann – Cross

1   thinking of?

2   A.  Just a second.

3          Yes.  Yes, total annual earnings, all cash

4   compensation, salary plus bonuses paid through any agency

5   affiliated with the YAI Institute for people with disabilities,

6   excluding bonus, which was the tuition bonus, and YAI interest

7   bonus.

8          So I actually never received those bonuses, but those

9   were the excludables, and that is how I -- what I referred to.

10  Q.  Is it accurate that there is no other document on which you

11  believe the definition of total annual earnings for purposes of

12  this SERP is set forth?

13  A.  It is set forth in the beginning document.

14  Q.  The 1985?

15  A.  Yes, but not in great detail.

16  Q.  So then do you understand the 2008 amendment to provide

17  more detail as to what was meant by that term, is that your

18  understanding?

19  A.  Well, yes, it certainly assisted me.

20  Q.  OK.  What is your understanding of why the car allowance is

21  permitted as part of your total annual earnings?

22  A.  Well, they are part of my annual earnings.  They are on my

23  W-2.

24  Q.  OK.  And the long-term disability, that is also on your

25  W-2?

1    A.  Yes, it is.

2    Q.  So that is the source to which you look to identify, your

3    W-2?

4    A.  Yes, those and my 1099.  Those are the records that I have.

5    Q.  OK.  Do you know whether, in any of the calculations for

6    Dr. Joel Levy or Dr. Phil Levy or Steve Freeman or Thomas Dern

7    or Joe Rut or Mr. Odswido, Kathleen Rut, whether YAI ever

8    defined total annual earnings the same way you do by including

9    such things as longevity, bonus, car allowance, long-term

10   disability.

11          Do you know one way or the other?

12   A.  I -- I'm not -- I do not know the exact calculations for

13   those individuals.  I know that they all received lump sum

14   pay-outs, and so I was not privy to those calculations of those

15   lump sums.  I would want not to speak to that.

16   Q.  OK.

17          THE COURT:  So the answer is no?

18          THE WITNESS:  No.

19          THE COURT:  Thank you.  That's fine.

20          MR. MEEHAN:  OK.  Your Honor, I take it I don't need

21   to delve into the lump sum issue?

22          THE COURT:  Correct.

23          MR. MEEHAN:  Thank you.

24   Q.  You also say, it is in paragraph 47, the New York League of

25   Early Learning bonus paid by YAI.  Do you see that?  Are you

1    with me?

2    A.  Yes.

3    Q.  All right.  Now, the New York League is an entity that is

4    distinct from YAI, is it not?

5    A.  Yes.  It is part of the YAI network, but just as Young

6    Adult Institute is separate, New York League is separate.

7    Q.  So the New York League bonus was not paid by YAI itself,

8    correct?

9    A.  I mean, it was paid directly by New York League.  The

10   approval of the bonus was by my boss, Joel, so...

11   Q.  Are you saying that Joel Levy determined what New York

12   League should pay you as a bonus?

13   A.  Well, the New York League for Learning was one of the

14   companies that was managed by YAI.

15   Q.  OK.  So it was a management contract?

16   A.  Yes.

17   Q.  And that management contract sets forth the relationship of

18   these two entities, does it not?

19   A.  Yes, that's correct.  So if I may?

20   Q.  Go ahead, please.

21   A.  Since I was the CFO of New York League for Learning, I wore

22   all the hats of each individual organization.

23   Q.  Do you have an understanding of what the term affiliate

24   means when you talk about different organizations or companies?

25   A.  You mean within the structure of YAI and the YAI network?

1          THE COURT:  No, starting smaller than that.

2          Do you know what the term affiliate means?

3          THE WITNESS:  Yes.

4          THE COURT:  Did YAI have affiliates?

5          THE WITNESS:  Yes, we -- yes, we were joined by

6    management agreements.

7          THE COURT:  OK.  And New York League is one of those

8    affiliates?

9          THE WITNESS:  Yes.

10         THE COURT:  If you were CFO at YAI -- to get all

11   alphabet soup like -- if you were CFO at one affiliate, were

12   you CFO at every affiliate?

13         THE WITNESS:  Yes.

14         THE COURT:  And if you were the CEO of one affiliate,

15   were you the CEO of every affiliate?

16         THE WITNESS:  I want to make sure I answer it

17   correctly.

18         THE COURT:  Yes.

19         THE WITNESS:  Because the affiliates also had

20   executive directors, but for -- so to your example, they were

21   in charge of that particular affiliate operations, but the CEO

22   was Joel Levy.

23         THE COURT:  OK.

24   BY MR. MEEHAN:

25   Q.  Do you know anything about the legal structure of the New

 1   York League?

 2              Do you know whether it was a corporation, if so, what

 3   type of corporation, anything about that?

 4   A.  Yes.  It is a 501(c)(3) corporation.

 5   Q.  Who owns a 501(c)(3)?

 6   A.  Well, it is a not-for-profit, so there is no owner.

 7   Q.  So YAI had no ownership interest of New York League, right?

 8   A.  No.  It was affiliated through a management agreement.

 9   Q.  So YAI was not a member in any sense of New York League,

10   right?

11   A.  Correct.

12   Q.  OK.  Paragraph 47, you there refer to the idea that 2009

13   correlated to my highest year of earnings?

14   A.  Yes.

15   Q.  Are you with me?

16              Is, in fact, that correct, 2009 was your highest year

17   of earnings?

18   A.  Yes.

19   Q.  You remained with YAI until sometime in 2014, correct?

20   A.  Yes, June.

21   Q.  OK.  Now, I would like to ask you about the point you're

22   making in paragraph 50 of your affidavit.  There you're talking

23   about your knowledge of YAI's budget and the resources being

24   allocated to fund the plan.

25              Do you see where I am?

1    A.  Yes.

2    Q.  All right.  What was your understanding that led you to

3    conclude sufficient resources were being allocated annually by

4    the board to fully fund the plan for my inclusion?

5    A.  Well, each year when we had the operating budget for the

6    organization, there was a fringe benefit amount in the budget,

7    and it was allocated amongst the different components of fringe

8    benefits, medical, and then the pension had the different

9    pension plans in it.

10           So there was an amount of money for pension, for all

11   pension plans, and then by plan.  So I saw that the amount for

12   the supplemental plan was -- would be two million, it would

13   be -- you know, it was -- in my opinion, it was a significant

14   amount of money.

15   Q.  And you refer here in this paragraph, my knowledge of YAI's

16   budget.

17           What does that reference have to do with the

18   understanding you set forth about sufficient resources were

19   being allocated?

20   A.  Yes.  Well, my role was to, you know, prepare the budget,

21   to manage the budget throughout the year for the organization.

22   You know, I oversaw all of the financial operations day to day.

23   So I was aware of our revenue and our expenses and, you know,

24   our increases in our health insurance and things of that

25   nature, and the accrual or set aside in the budget for the

1   pension, which you're pointing to.

2   Q.  Was it part of your job, as you understood it, to make sure

3   the budget included all of the monies needed to meet all of the

4   obligations of the organization?

5   A.  I just want to -- it was my responsibility to have

6   oversight over it and to, you know, the management individual

7   reporting to the executives.

8   Q.  Part --

9   A.  Regarding our financial, financials.

10  Q.  And did that mean that you did your best to make sure that

11  anytime there was an item for an expense, that there was

12  sufficient money to meet that expense in the budget?

13  A.  Yes.  I mean, specifically in fridge benefits, we worked --

14  I worked with a percentage of budget, and so it was more -- it

15  wasn't exactly a precise dollars and cents each and every year,

16  because we had to manage -- we managed the costs to the

17  break-even.

18  Q.  Could you explain, what do you mean you managed the cost

19  within the break-even?

20  A.  Meaning we had a budget when we started the year.  We would

21  put together a plan to give, you know, increases to the

22  employees and whatever, health insurance, you know, increases

23  and to be able to handle or pay for those increases as they

24  came throughout the year.  That was the budget process.

25  Q.  OK.  Was a similar approach used for the pension

J5TsWEG2                         Wegmann - Cross

1    contributions and obligations of organization?

2    A.  Yes.  A portion of the 28 and a half percent was for the

3    pension.

4    Q.  OK.  Now, you say in your paragraph 50, you're talking

5    about fully funding the plan for your inclusion.

6            What did that mean in terms of your oversight of the

7    budget?

8    A.  Um, that each year we had funds available to fund the

9    pension program, all the plans, and I -- I mean, the execs.

10   And my understanding was that we were -- we were funding, you

11   know, the plans.  They were funded each year.  It wasn't that,

12   you know, we had a budget of, say, six million, but we could

13   only fund 5 million.  It was that we had a budget of six

14   million and we were able to fund it.

15   Q.  The goal here was to make sure that the budget balanced out

16   with whatever was believed owing on the pension, including the

17   SERP, right?

18   A.  I wouldn't put it that way.  The goal was to make sure that

19   the agency was balanced position that it was solvent and we did

20   allocate for benefits.  Basically, we had a pie chart kind of a

21   thing, and based upon availability, you know, the pension --

22   the amount was available for the pension.  And as I mentioned,

23   there was never the issue -- and my example was if there were

24   six million in our budget, it wasn't that we -- we came up less

25   than that through the course of the year with respect to any of

1    the benefits.

2    Q.   All right.

3              THE COURT:  Counsel, if I may inquire?

4              MR. MEEHAN:  Of course.

5              THE COURT:  I just want your honest recollections of

6    things.

7              Ms. Wegmann, are you familiar, have you ever heard

8    about companies failing to appropriately fund pension benefits?

9              Are you familiar with that concept?  Have you ever

10   heard about it?

11             THE WITNESS:  I'm familiar with the concept.

12             THE COURT:  OK.  Who was the person at Wegmann that

13   made sure that that didn't happen, right?

14             Was there a person at Wegmann who made sure that

15   didn't happen?

16             MR. MEEHAN:  I believe your Honor is saying at

17   Wegmann.  Perhaps --

18             THE COURT:  You are Ms. Wegmann.  Excuse me.  At YAI.

19             THE WITNESS:  Thank you.  Now I know what you're

20   referring to.

21             And to my knowledge, it would have been Joel or --

22             THE COURT:  The CEO?  He's responsible for the

23   benefits?  Really?  OK.

24             THE WITNESS:  No, when you mean --

25             THE COURT:  Here's what I mean.

J5TsWEG2                        Wegmann - Cross

1                THE WITNESS:  Go ahead.

2                THE COURT:  There are benefit plans.  They don't fund

3     themselves.  Someone has to allocate some money to fund them,

4     correct?

5                THE WITNESS:  Yes.

6                THE COURT:  In theory, you allocate enough money to

7     fund them.  When people draw down on them, they're not

8     underfunded, is that also correct?

9                THE WITNESS:  Yes.

10               THE COURT:  Somebody in the YAI organization had to

11    look at all of the various pension plans and benefit plans that

12    the organization provided and said, we must make sure there is

13    enough money in each of those plans, also correct?

14               THE WITNESS:  Yes.

15               THE COURT:  Who was that person?

16               THE WITNESS:  Joel.

17               THE COURT:  It was Joel?

18               THE WITNESS:  Yes.

19               THE COURT:  As CEO?

20               THE WITNESS:  Yes.

21               THE COURT:  You were CFO?

22               THE WITNESS:  Yes.

23               THE COURT:  You had no responsibility for that?

24               THE WITNESS:  Well, I mean I reported to him and, um,

25    I gave him the information.  And to the extent that they made

J5TsWEG2                      Wegmann - Cross

1   Craig the actuary National Westminster, did the calculations on

2   the plans and said, OK, this is the amount necessary.  We

3   allocated that amount.

4              THE COURT:  So Craig --

5              THE WITNESS:  The amount was available.

6              THE COURT:  Craig Miller was an outside person,

7   correct?

8              THE WITNESS:  Yes.

9              THE COURT:  Craig Miller came to you and said -- Craig

10  Miller had accurate information about all of the benefit plans

11  and pension plans that YAI provided, correct?

12             THE WITNESS:  Yes.

13             THE COURT:  He looked at them every year?

14             THE WITNESS:  Yes.

15             THE COURT:  He looked at who was in them?

16             THE WITNESS:  Yes.

17             THE COURT:  He figured out how much money had to be

18  set aside, gave you his best, his professional estimate, and

19  whatever expertise he had in the subject and said, you should

20  allocate X dollars for each of these; yes?

21             THE WITNESS:  Yes.

22             THE COURT:  And that information went to you?

23             THE WITNESS:  Yes.

24             THE COURT:  And you set aside that money?

25             THE WITNESS:  Can I just --

J5TsWEG2                        Wegmann — Cross

1          THE COURT:  Yes.

2          THE WITNESS:  It worked as we had an allocation in the

3     budget.

4          THE COURT:  Yes.

5          THE WITNESS:  I guess, I don't know if there is a step

6     before that.  I hope I'm not doing too much detail, but

7     basically there was a fringe benefit allotment.

8          THE COURT:  Yes.

9          THE WITNESS:  And then towards -- at the end of the

10    year, I would give all the census information, employees and

11    salaries and number of years and, you know, Excel files

12    basically.  And I would give those to Craig, and Craig would do

13    computations and come back with what the defined contribution,

14    what each of the benefit plans needed to be funded, and then I

15    would fund those.

16         THE COURT:  Sure.  And that meant that Craig Miller

17    needed to know all of the plans?

18         THE WITNESS:  Yes.

19         THE COURT:  All of them, you couldn't hide a plan from

20    Craig because then you wouldn't know how to fund it, correct?

21         THE WITNESS:  Oh, yes.

22         THE COURT:  OK.  And you also had to know everybody

23    who was in those plans?

24         THE WITNESS:  Yes.

25         THE COURT:  As of the particular date that these set

1    asides were, as of a particular time period for which he was

2    recommending you set aside a certain amount of money, correct?

3              THE WITNESS:  Yes.

4              THE COURT:  I'll try that that again.

5              No, no, you're fine.

6              What I'm saying is, if there was a plan, it mattered

7    to him whether there were two people or 100 people who were in

8    the plan, correct?

9              THE WITNESS:  Yes.

10             THE COURT:  Because he would have to tell you an

11   appropriate number given the number of people in the plan,

12   correct?

13             THE WITNESS:  Yes.

14             THE COURT:  OK.  So you had to tell him who was in

15   each of the plans?

16             THE WITNESS:  Yes.

17             THE COURT:  And by you, I mean you, Ms. Wegmann?

18             THE WITNESS:  Yes, yes.

19             THE COURT:  You told Mr. Miller, here is a plan, here

20   is everybody in the plan, correct?

21             THE WITNESS:  Correct.

22             THE COURT:  Got it.  Thank you.

23             Counsel, please continue.

24   BY MR. MEEHAN:

25   Q.  OK.  You do say in your affidavit, paragraph 50, sufficient

1  resources were being allocated annually by the board to fully

2  fund the plan for my inclusion.

3          But the followup on her honor's point, Mr. Miller

4  never provided a number for you for the SERP, correct?

5  A.  No.  I mean, I actually didn't get specific numbers for the

6  SERP for anyone.  I just gave -- the particular computations

7  were for the defined contribution and the makeup, and then when

8  it was in existence, I think it was the defined benefit, and

9  then an amount for the SERP.

10         So let's say -- go ahead.

11         So if it was, say, six million, for example, and the

12  other plans, you know, we would make the payments to the other

13  plans, and then the SERP would have -- let's say the balance

14  was two million.  There would be a payment to SERP, the

15  supplemental executive plan, not, you know, an amount for Joel

16  and an amount for Phil.  It was just a lump sum that I would --

17  Craig would give me the amount, and I would prepare it, the

18  check.

19  Q.  So just to make sure I've got it.  You're saying all

20  Mr. Miller gave you was a single figure for the SERP?  He did

21  not say X for Joel, Y for Phil, you know, Z for Tom?  It wasn't

22  broken out, it was just one lump sum figure?

23  A.  Correct.

24  Q.  And that was true the entire time from 2001 through 2014,

25  Mr. Miller would just give you an overall SERP figure with no

1   breakdown by any individual's name?

2   A.  Yes, yes.  I mean, the individual breakdowns were for the

3   defined -- defined contribution, the benefit plan, and makeup

4   plan.  Those were by individual.

5        I would give the files to him, and then he would

6   calculate and give me the amounts back.  But for the

7   supplemental, no, it was a lump sum.

8   Q.  OK.  Are you familiar with what a form 990 is?

9   A.  Yes.

10  Q.  What is that, in your understanding?

11  A.  It is the tax return for nonprofit.

12  Q.  And included among the information that form requires the

13  nonprofit to provide to the government a listing of retirement

14  benefits that are being accrued for people, correct?

15  A.  Right.  It requires a disclosure of the highest -- the

16  highly compensated individuals in the organization, which

17  includes benefits.

18  Q.  So that would include the folks that you considered

19  executive management, the Levys, yourself, among others, right?

20  A.  Yes, and I believe it is that and the five highest paid, so

21  I think there is a minimum disclosure.

22  Q.  And you, at least for certain years, fell within the five

23  highest paid?

24  A.  Oh, yes.

25  Q.  OK.  So that 990 form, you had a role in its preparation,

1    did you not, each year?

2    A.   Yes.

3    Q.   Would you please describe what your role is?

4    A.   Sure.  So each year the form 990 has our balance sheet and

5    description of programs, number of employees.  It's got a

6    variety of different pieces of information.  And we -- after we

7    finished the financial statements with the auditor, we would

8    begin to complete the form 990.

9         So the majority -- and so the revenues, the expenses,

10   the balance sheet information, there is some disclosures

11   regarding contributions and supplemental schedules, and then

12   there is also a schedule for listing board members and the

13   executives and highly -- the top five, or I forget the highest

14   compensated individuals, and you would fill out the salaries

15   and benefits for those.

16        So I would get that information from the payroll and,

17   you know, we would provide it to our accounting firm, Loeb &

18   Troper, who would complete the form 990.

19   Q.   And your role, in essence, was to coordinate all of that,

20   is that right?

21   A.   Yes.

22   Q.   You did your best to make sure the 990s were accurate when

23   they were submitted, yes?

24   A.   Yes.

25   Q.   And you understood that Joel Levy and anyone else who

1    signed a 990 was doing so under penalty of perjury; you knew

2    that, right?

3    A.  Yes.

4    Q.  Circling back to your role here with the funding of the

5    benefits, would you agree that your role was that the budget

6    was available to fund the benefits being accrued?

7    A.  Yes.

8    Q.  OK.  Form 5500, you're familiar with that as well, are you

9    not?

10   A.  That -- yes.  That's a benefits tax return.

11   Q.  OK.  And in your own understanding, what does that set

12   forth?

13   A.  Um, form 5500s are filled out for medical benefits and

14   pension -- pension 403(b) plans, you know, benefit -- employee

15   benefit plans.

16   Q.  And that included the SERP, correct, at YAI?

17   A.  Yes.  All the -- all the -- all the plans, I believe.

18   Q.  And you personally signed some of those 5500s on behalf of

19   YAI, did you not?

20   A.  Yes, I did.

21   Q.  When you did so, you did your best to make sure the 5500

22   was complete and accurate; yes?

23   A.  Yes.

24   Q.  You understood at the time that you were signing those

25   5500s under penalty of perjury, correct?

J5TsWEG2                        Wegmann – Cross

 1   A.  Yes.

 2   Q.  All right.  I think one last subject and then I'm going to

 3   start showing you some documents.

 4          So here is the topic.  Have you had an opportunity to

 5   review Mr. Conners' declaration that he submitted?

 6   A.  Yes, I read his affidavit.

 7   Q.  And do you recall the portion of it where he talks about

 8   the tax impacts on you, if you are deemed to be a participant?

 9          MR. ZABELL:  Objection to relevance.

10          THE COURT:  I'm surprised you let your client read

11   someone else's declaration in connection with this trial.

12          I'll allow the question.

13   A.  I'm sorry?

14   Q.  Sure.  I'll do it again.

15          Do you recall the portion of the declaration where

16   Mr. Connors is talking about what he understands the tax impact

17   on you to be if you are deemed a participant in the SERP?

18   A.  I'm -- Mr. Connors was talking about a variety of different

19   tax sections or regulations, which I read, but...

20          THE COURT:  Counsel, if I may.

21   A.  I'm not an expert.

22          THE COURT:  That's my question.

23          Do you understand the tax consequences that he is

24   discussing?

25          THE WITNESS:  Not -- I mean, I only understand the

J5TsWEG2                         Wegmann - Cross

1     gist of it, that he is saying an event could trigger a tax

2     event.

3                 THE COURT:  A tax liability to you?

4                 THE WITNESS:  Yes.

5                 THE COURT:  You saw that?

6                 THE WITNESS:  Yes.

7                 THE COURT:  You understood that?

8                 THE WITNESS:  No.

9                 THE COURT:  OK.

10                THE WITNESS:  I mean, I don't understand that.

11                THE COURT:  Let's try it this way.  He discusses a

12    number of tax laws.  Do you have knowledge of their operation?

13                THE WITNESS:  I just have heard of them, your Honor.

14                THE COURT:  OK.  All right.  Do you have any basis to

15    agree or disagree with any of the statements he makes about tax

16    consequences of certain events happening?

17                MR. ZABELL:  Your Honor.

18                THE COURT:  You're going to object to my question?

19                MR. ZABELL:  As respectfully as I possibly can.

20                THE COURT:  So far it's not going so well.

21                Go ahead.

22                MR. ZABELL:  Your Honor, whether or not there is a tax

23    implication if she receives this benefit is not relevant to the

24    statute of limitations argument that we're here to try.

25                THE COURT:  I understand, sir.  Thank you.  You can be

J5TsWEG2                          Wegmann - Cross

1     seated.

2             I'm going to ask you to answer my question, please.

3     And it is, you've read his declaration, is that correct?

4             THE WITNESS:  Yes.

5             THE COURT:  He discusses certain -- what he believes

6     to be certain tax consequences of certain things, also correct?

7             THE WITNESS:  Yes.

8             THE COURT:  Do you have any reason to agree or

9     disagree with what he is saying?

10            You may not be a tax lawyer.  That is fine.  You may

11    have knowledge independent of this case or as part of this case

12    and able to say, I agree with him on this, I disagree on that,

13    or you can say I don't know either way.

14            THE WITNESS:  I don't know either way.

15            THE COURT:  That's the answer.

16            Move on, counsel.

17    BY MR. MEEHAN:

18    Q.  Now what I'll try to do is tie it back to the conversations

19    you say you had with Mr. Connors.

20            So you began in paragraph 53 of your affidavit, you

21    say on several occasions you spoke to Mr. Connors about your

22    SERP participation.

23            All right.  Are you with me on where we're going now?

24    A.  Yes, yes.

25    Q.  All right.  In any of those conversations with Mr. Connors

J5TsWEG2                     Wegmann - Cross

1    that you're referencing here in your paragraph 53, did he

2    mention a concept called grandfathering as it related to this

3    SERP?

4              THE COURT:  If you recall.

5    A.  No.  I don't know.

6    Q.  Do you recall at any of those conversations that you are

7    referencing in your affidavit Mr. Connors getting to the idea

8    that if you were brought into the SERP in the 2000s at any

9    time, that there would be immediate tax consequence to you?

10   A.  No.

11             THE COURT:  Let me make sure I understand what you're

12   saying, Ms. Wegmann.

13             When we talked about grandfathering and you said no,

14   does no mean we never talked about this, or I don't recall?

15             THE WITNESS:  We never talked about that.

16             THE COURT:  Never talked about grandfathering, never

17   came up?

18             THE WITNESS:  Yes.

19             THE COURT:  Tax consequences never came up, to the

20   best of your recollection?

21             THE WITNESS:  Never came up.  Yes, correct.

22             THE COURT:  OK.

23   BY MR. MEEHAN:

24   Q.  In this context as it relates to this SERP and tax issues,

25   does the concept of grandfathering even have a meaning to you?

1   A.  No.

2   Q.  All right.

3           THE COURT:  Counsel, let me have a sense of how much

4   more cross you have?

5           MR. MEEHAN:  Well, your Honor, with the caveat that

6   lawyer's estimates of their exams are notoriously unreliable.

7           THE COURT:  Yes.

8           MR. MEEHAN:  My best estimate would be to walk through

9   the documents.  I think maybe another 90 minutes.

10          THE COURT:  Really?

11          MR. MEEHAN:  I will do my best to be briefer.

12          THE COURT:  You're going to take up the entire morning

13  with one witness?

14          MR. MEEHAN:  That is my hope, and I believe it will be

15  consistent with finishing today.

16          THE COURT:  If we're leaving at midnight tonight.

17          Move more quickly, counsel.

18          MR. MEEHAN:  OK.  I'm optimistic the afternoon will go

19  quicker.  Your Honor, I get it.

20          Let me double-check to make sure there is nothing else

21  before I show you some things, ma'am.

22  BY MR. MEEHAN:

23  Q.  Yes, I'm sorry, there is.

24          In your affidavit at paragraph 68, you refer to the

25  1985 SERP plan document, what we sometimes call the original

J5TsWEG2                          Wegmann - Cross

1   SERP, and you set forth the formula and then you go on to

2   calculate all that.

3          Are you with me?

4   A.  Yes.

5   Q.  OK.  Was it your understanding before you left YAI that

6   this formula, in fact, might vary as to you?

7          MR. ZABELL:  Objection.

8          THE COURT:  If you understand the question, you can

9   answer it.

10  A.  Um, honestly, I thought it might be a possibility, because

11  I was aware that there had -- the other participants had --

12  there had been discussion over the calculation.  As I said,

13  they -- I don't know what the finalization of it was when they

14  received the lump sum payments, so it's possible.

15  Q.  So you understood that these percentages, for example, that

16  the original SERP 1985 talks about achieving a 100 percent

17  value once someone has more than 19 years of service, you

18  understood and accepted prior to leaving YAI in 2014 that as to

19  you, the percentage might be lower?

20  A.  Could be, yes.

21         MR. MEEHAN:  All right.  I think I can now grab a few

22  documents, if that's all right.

23         MR. ZABELL:  Your Honor, I have a general objection

24  that I would like to make, but I would like to make it outside

25  of the presence of the witness.  I don't want to taint her

J5TsWEG2                         Wegmann - Cross

testimony with what I have to say, and I'm concerned that it

will.

          THE COURT:  All right.  Let's meet at sidebar, please.

          Stay there.

          (At sidebar)

          MR. ZABELL:  Your Honor, many of the objections that

I've been making have to do with relevance.  Anything that

happened after 2010 simply isn't relevant to their statute of

limitations that they're making.  It is just not relevant.

          So to the extent we're going to go through documents

that have been exchanged after 2010, I'm going to object to

them.

          THE COURT:  Understood.  All right.

          MR. MEEHAN:  Should I explain why?

          THE COURT:  No, that's fine.  I understand the

arguments you're making.

          I'm neither agreeing or disagreeing with you, sir.

I'm just telling you you have to move more quickly than you're

currently moving.

          Thank you.

          (In open court)

          THE COURT:  What is the exhibit, sir?

          MR. MEEHAN:  Let's begin with D, Defendant's Exhibit

D.  At this point, I can have somebody hand up that binder for

Ms. Wegmann.  I'll take it up.

1          THE COURT:  OK.  Is there a copy for me?

2          MR. MEEHAN:  I believe, your Honor, the exhibits I'm

3   going to call out will be in the bigger binders.  We've only

4   selected some, and I may select even fewer to try to move us

5   along.

6          THE COURT:  Thank you.

7   BY MR. MEEHAN:

8   Q.  Ms. Wegmann, if you could turn to Exhibit D, D as in David.

9          That's a copy of the 2003 990, is it not?

10  A.  Yes.

11  Q.  That covers the period July 1, 2003, through June 30, 2004,

12  am I correct?

13  A.  Yes.

14  Q.  All right.  If you turn back towards the signature pages,

15  Bates stamped lower left 7173 and 7174, are you with me on what

16  I mean by the Bate stamp?

17         On 7174, you see that is Mr. Levy's signature?

18  A.  Yes.

19  Q.  All right.  Then on 7173 there is a reference at the form

20  line 91 to the books for the organization being in your care.

21         Do you see that?

22  A.  Yes.

23  Q.  And that was accurate, was it not?

24  A.  Yes.

25  Q.  All right.  And if you look on the page towards the very

1    end, Bates stamp 7194 are the last four numbers.

2    A.  Yes.

3    Q.  All right.  Actually, beginning 7193 and 7194, there are

4    set forth various amounts for the individuals who are receiving

5    retirement benefits, among other benefits, correct?

6    A.  Yes.

7    Q.  All right.  You're listed right on page 7194?

8    A.  Yes, yes.

9    Q.  There is no amount included there for the SERP for you,

10   correct, because it had not yet been calculated?

11   A.  This is the total amount employee benefit plan

12   contribution.

13   Q.  Right.

14   A.  So it's --

15   Q.  It does not include a SERP figure within that number for

16   you, correct?

17   A.  I don't believe so.

18   Q.  OK.  Just so there is no misunderstanding, Exhibit K.

19            THE COURT:  Counsel, are we agreeing that all of the

20   exhibits submitted by both sides are admitted into evidence?

21            MR. ZABELL:  Yes.

22            MR. MEEHAN:  Yes, your Honor.

23            THE COURT:  They are taken as admitted.  Thank you.

24            MR. MEEHAN:  That is good.  That may help us move

25   along quite a bit too, very briefly.  So Exhibit K.

1          THE COURT:  Exhibit K, do you see the tabs on the

2     side?

3          THE WITNESS:  Yes.

4          THE COURT:  Thank you.

5          THE WITNESS:  Thank you.

6     BY MR. MEEHAN:

7     Q.  Exhibit K, that is the 990 for the year 2005, correct?

8     A.  Yes.

9     Q.  All right.  Follows the same format.  We can all look at

10    that, but it follows the same format in terms of what you were

11    trying to present, correct?

12    A.  Yes.

13    Q.  All right.  If you could look at Exhibit L.

14          You mentioned Craig Miller earlier.  Linda Miller was

15    his wife, also an actuary, and they worked together at

16    Westminster for YAI, right?

17    A.  Yes.

18    Q.  So Exhibit L, that is an e-mail from Linda Miller to you

19    and she is attaching a worksheet.

20          What is that worksheet?

21    A.  Excuse me.

22    Q.  Exhibit L as in Larry.

23          THE COURT:  Let her review the document, sir.

24    A.  I'm just looking at what is in L.

25    Q.  Of course.  At whatever time, please take whatever time you

J5TsWEG2                          Wegmann - Cross

1    need.

2    A.  So it is -- L is the spreadsheet, right, with the list of

3    the individuals, you know, the management, five highest paid,

4    and salary and benefits.  So it would be the worksheet that it

5    would be compiled in order to get to the information for the

6    form 990.

7    Q.  OK.  Do you recall earlier you had said that the

8    information you got from the Millers for the supplemental plan

9    was just a single figure, it did not have a breakdown by the

10   individuals?

11          Do you remember saying that a little earlier this

12   morning?

13   A.  Yes.  For the budget allocation, yes.

14   Q.  OK.  But now here, you see in this Ms. Miller is providing

15   to you for what is the term the supplemental plan, breakdowns

16   by individuals, correct?

17   A.  Yes.

18   Q.  And you see there is no amount for you, right?

19   A.  Yes.

20   Q.  OK.  And you took no action at the time to point out to

21   Ms. Miller that you were a participant in the SERP, right?

22   A.  Right.

23   Q.  OK.  In your affidavit -- and we can look back at it if we

24   need to -- you say that one of the reasons you weren't

25   concerned about monies being set aside for you was because you

1   were far from retirement, you expected your income to go up,

2   and that type of reference, whereas the others had, in your

3   word, plateaued.

4           Do you remember that point you were making?

5   A.  Yes, yes, yes, yes.

6   Q.  Now, if you look at the double asterisk footnote.  I

7   apologize for the size of the print here.  In the double

8   asterisk, it indicates that the individuals for whom amounts

9   are being set forth in the SERP are assumed to have annual

10  salary increases of four percent.

11          You were aware of that at the time, right, that's in

12  the footnote double asterisk?

13  A.  Yes, I see it.

14  Q.  So that assumption -- no, sorry.  I don't need to say that.

15          OK.  Let me ask you to look at Exhibit N as in Nancy.

16          All right.  Now, this is an e-mail from you to Monica

17  Fraczek in May of 2006.

18          Ms. Fraczek worked with the auditor?

19  A.  Yes.  She worked with the audit firm.

20  Q.  What was her function?

21  A.  She was the audit manager on the -- on our account.

22  Q.  And what did that mean her responsibilities were as far as

23  you understood it?

24          THE COURT:  Let him finish his question.

25          THE WITNESS:  I apologize.

1  A.  Monica was the manager -- she might have been an audit

2  partner at this time.  I'm not sure.  She would be the key

3  person on the account for the audit work, and they prepared the

4  form 990 for the agency.

5          THE COURT:  To be clear, her name is spelled

6  F-r-a-c-z-c-k?

7          THE WITNESS:  I think it's -- I believe it is z-e-k.

8  It's a little more legible in the middle of the page, just

9  below the first e-mail.

10         THE COURT:  I see.  That's not a C, that is an E.

11         F-r-a-c-z-e-k.

12         THE WITNESS:  Yes.

13         THE COURT:  Thank you.

14 BY MR. MEEHAN:

15 Q.  OK.  Now, Ms. Wegmann, now, this one comes from you and you

16 were sending on to Ms. Fraczek, a 990 said for YAI as of May

17 2006.  If you look at the schedule, that came from the actual

18 areas, right?

19 A.  Yes, that comes from the actuary.

20 Q.  And, again, in this schedule, we see there is no amount for

21 you under the supplemental plan, right?

22 A.  Yes.  It's blank.

23 Q.  OK.  And we have that same footnote about assuming annual

24 increases for the individuals who do have amounts, right?

25 A.  The same footnote is there, yes.

J5TsWEG2                          Wegmann - Cross

1   Q.  OK.  And you did not say anything to Ms. Fraczek in any

2   regard at this time that, hey, I'm in the SERP too, even though

3   there is no amount for me here, I'm in the SERP, don't

4   misunderstand that; you never said anything like that to her?

5   A.  No, I did not.

6   Q.  All right.  Let's look at Exhibit Q.

7           All right.  Q is a document that you understand was

8   prepared by Mr. Miller, right?

9   A.  Yes.

10  Q.  And you see it does set forth some information about a

11  possible SERP amount for you, right?

12          You see that he set that in there?

13  A.  Yes.

14  Q.  And this document was prepared in or about June of 2006,

15  correct?

16  A.  Yeah.  It says as of June 30, 2006.

17  Q.  All right.  You, from your own observations, concluded that

18  Mr. Miller had a pretty good understanding of how this SERP was

19  supposed to work, right?

20  A.  Yes, I do.

21  Q.  OK.  And you see that he is saying in 2006, at a time that

22  you were CFO, that your entry into the SERP is hypothetical.

23  If you look at his footnote number four, he talks about a

24  hypothetical calculation for you.

25          Do you see that?

J5TsWEG2                         Wegmann - Cross

1   A.  Yes.

2   Q.  I think I already did establish you never told Mr. Miller

3   you were in the SERP at any point, so I don't need to go

4   through that.

5           THE COURT:  I'm asking a question.  Did you tell

6   Mr. Miller you were in the SERP?

7           THE WITNESS:  No.  That wasn't the way we

8   communicated.

9           THE COURT:  Understood.  Thank you.

10          MR. MEEHAN:  Thank you, your Honor, for making sure.

11  BY MR. MEEHAN:

12  Q.  Let's look at Exhibit S as in Sam.

13  A.  S as in Sam.

14  Q.  Now, here is another communication from Ms. Miller to you

15  directly, and she is providing the YAI supplemental plan

16  projection.  She says, YAI supplemental plan projection for

17  K. Wegmann PDF, right.  Do you see that?  That's on page one in

18  her attachment, Exhibit S as in Sam.

19          Are you with me?

20  A.  Yes, I am.

21  Q.  I'm just asking you at this point, if you look at page one,

22  up towards the top it says subject projection, and then below

23  that it says attach and it says YAI supplemental plan

24  projection for K. Wegmann PDF.

25          Are you with me?

J5TsWEG2                    Wegmann – Cross

```
 1    A.  Yes.
 2    Q.  This was a document to be given to you for your work, not
 3    to set forth an actual number for you, correct?
 4    A.  Yeah.  I mean, I read her statement, supplemental plan
 5    projection for KWegmann.PDF meaning the name of the file.
 6    Q.  Right.  And there is no actual projection of your personal
 7    SERP benefit as part of this document, right?
 8    A.  Right.  I'm not listed.
 9    Q.  All right.  And so here in January of 2007, when you
10    received this document, you didn't say to Linda Miller, Hey,
11    Linda, I'm in the plan, where is my number, anything like that,
12    right?
13    A.  No.
14    Q.  OK.  Let's go to AD in your binder.
15              THE COURT:  I'm sorry.  What is it again, please, sir?
16              MR. MEEHAN:  AD, Apple David.
17              THE COURT:  OK.
18    BY MR. MEEHAN:
19    Q.  Now, ma'am, this is an e-mail that you sent in December of
20    2007, and you sent it to Ms. Fava and then you copied Paul
21    Koren and David Samuels.  We already know on this record who
22    Ms. Fava is.
23              Can you please tell us who Mr. Koren is?
24    A.  Paul Koren was on the business committee.  He was a member
25    of the board.
```

J5TsWEG2                          Wegmann – Cross

1    Q.   And David Samuels?

2    A.   David Samuels was an attorney who worked with the board on

3    executive compensation.

4    Q.   OK.

5    A.   That's my recollection.

6    Q.   All right.   And you were forwarding to those individuals

7    information you had received from the actuaries about the SERP

8    contributions, right?

9    A.   Yes.   I would be asked to provide information on the

10   exec. -- on the listed executives from time to time, so that

11   is...

12   Q.   So as of this December of 2007 time period, you were

13   providing information to the chair of the board, the head of

14   the business committee for the board, and the organization's

15   outside benefits counsel a chart that had zero for you as

16   accruing any benefit under the SERP, correct?

17           THE COURT:   Let her take a moment to review the chart.

18           Ms. Wegmann, did you hear the question?

19           THE WITNESS:   Yes, I did.   Yeah.   I'm just trying to

20   reconcile the request, because I would be -- for the executive

21   comp committee, I would be asked to give compensation for Joel

22   and Phil primarily, and then the decisions for the other execs

23   were made by Joel and Phil and these -- these worksheets looked

24   more like the worksheets we put together to compile the form

25   990 information.   I am just taking a moment.

J5TsWEG2                          Wegmann – Cross

1    BY MR. MEEHAN:

2    Q.  It does appear to be for the 990?

3    A.  Yeah.

4    Q.  In fact, if you look in your e-mail, towards the end of

5    that second paragraph, you're talking about worksheets for the

6    last three years of the 990 filings.  It includes both cash,

7    compensation, and benefits.  So they do seem to be for the

8    990s?

9    A.  Yes.  I'm just trying to recollect.  Linda Miller would --

10   sometimes they would just ask me for the three-year information

11   and then I would just simply -- it was much shorter

12   spreadsheet, and then other times Linda would forward me

13   spreadsheets and ask me to add in information about the

14   vehicle, about some of the other benefits, so, and base salary.

15   So I'm actually just trying to place this particular one.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1              THE COURT:  This isn't coming from Ms. Miller.

2              THE WITNESS:  This spreadsheet is from Ms. Miller.

3              THE COURT:  I see.  The e-mail is not -- the e-mail

4       was not to her.  It was to the YAI board folks.

5              THE WITNESS:  Right.

6              That's why I'm trying to reconcile in my mind, because

7       generally my information -- the information I gave them, as I

8       said, was it was much less detailed.  I am just trying to

9       recall all of this.

10      BY MR. MEEHAN:

11      Q.  If I could focus us, you were passing along information to

12      those individuals at this time setting forth there was no

13      allocation to you or benefits being accrued by you as of

14      December 2007, right?

15      A.  Correct.

16      Q.  Let's look at AF, apple frank.

17             THE COURT:  One moment, please, counsel.

18             Thank you.

19             MR. MEEHAN:  I'm sorry.  I am maybe a little too

20      mindful of your Honor's wanting to move along quickly.  I will

21      try to move at an appropriate pace.

22             THE COURT:  It is not that, sir.  It is just that she

23      wasn't on the exhibit.

24             THE WITNESS:  I have it.

25      Q.  You are with me now on AF?

1    A.   Yes.

2    Q.   That is an e-mail with what's termed a draft report coming

3    to you from Craig Miller, right?

4    A.   Yes.

5    Q.   You see it's copied to various other people.  In fact, they

6    have helpfully included the BCCs on this one, so we can see the

7    folks that received it.  That includes the Levy brothers who,

8    were the two top individuals in the organization on the

9    management side at this time, right?

10   A.   Yes.

11   Q.   All right.  Mr. Miller was providing you with a preliminary

12   draft of a summary report from the actuaries about the 2005 and

13   '6 fringe allocation, and if you look at the page that's Bates

14   stamped lower left 1922, the last four, a number of paragraphs

15   about the supplemental plan.

16        If in particular, if you look at the fifth paragraph

17   from the top, at that section it begins with the total

18   contributed from the supplemental plan from the 2005 and 2006

19   plan year and then it gives a figure.

20        Are you with me on the paragraph?

21   A.   Yes.

22   Q.   All right.  So Mr. Miller indicates that there is 100

23   percent funding for two participants closest to retirement.

24   That was the Levy brothers, right?

25   A.   Yes.

J5tnweg3                          Wegmann - Cross

1   Q.  OK.  And then 55 percent of the annual for the remaining

2   two participants.  Do you see that?

3   A.  Yes.

4   Q.  OK.  So, as of this document, February of 2008, the

5   remaining two participants were Mr. Freeman and Mr. Dern,

6   right?

7   A.  This is the '05, '06 contribution, so it would have

8   included Joe Rut.  He was still alive -- and/or -- I mean, he

9   was still alive.  And/or his -- Kathleen, you know, his wife as

10  the widow benefit -- beneficiary.

11  Q.  There was an arrangement that was reached to deal

12  separately with Mrs. Rut, was there not, in terms of her

13  survivor claim?

14  A.  I don't -- I am not aware of --

15  Q.  You don't know?

16  A.  No, not what was done.

17  Q.  In any event, can we agree that in this February 2008

18  document, which you received, you understood that the reference

19  to the two participants closest to retirement did not mean you,

20  right?

21  A.  Yes.

22  Q.  And what's called the remaining two participants, that also

23  did not mean you, and you understood that in February of 2008,

24  right?

25  A.  Yes.

J5tnweg3                      Wegmann - Cross

1    Q.  And you told no one in or around that time, Hey, I'm in

2    this SERP, too, right?

3    A.  Right.

4    Q.  Let's look at Exhibit AU.  All right.

5            Are you with me on that document, ma'am.  It's an

6    e-mail, February 23, 2009, from Craig Miller to Mr. Samuels,

7    the two Messrs. Levy and yourself.

8            Do you have the document?

9    A.  Yes, I'm looking at it.  Yes.

10   Q.  Now, if you look at the last sentence of text right before

11   that little chart for Mr. Dern and Mr. Freeman, Mr. Miller

12   says, Karen Wegmann is not included in the YAI supplemental

13   plan.

14           You didn't take any action to correct Mr. Miller that

15   in your view you were in fact included in the plan, right?

16   A.  Correct.

17   Q.  And in your affidavit in a couple of places you talk about

18   how you weren't concerned that monies weren't being set aside

19   for you in the SERP because you were so far away from

20   retirement.  Do you remember that concept?  I can show you

21   specific references if you need, but do you remember that

22   concept in your affidavit?

23   A.  Yes.

24   Q.  OK.  Now, if you look here on this chart you will see

25   Mr. Dern, projected retirement date June 30, 2018.  Your

J5tnweg3                        Wegmann - Cross

1    projected retirement date is on your 65th birthday, right?

2    A.  Yes.

3    Q.  I'm sorry.  I shouldn't have done it that way.  Your

4    projected beginning of any payments under the SERP would be on

5    your 65th birthday, right?

6    A.  Yes.

7    Q.  And could you tell us when that is, please.

8    A.  January 25, 2022.

9    Q.  All right.  So four years -- three and a half years

10   basically after Mr. Dern is being projected in 2009 to begin

11   his benefits, right?

12   A.  Yes.

13   Q.  So, I know we can do the math, but I just want to do the

14   math and then ask you a question.  So February 2009 to June of

15   2018 is nine and a quarter, nine and a third years.  Seeing

16   that Mr. Dern was having monies set aside for him some

17   nine-plus years in advance, did that affect your view that no

18   money needed to be set aside for you because you were four

19   years junior to him?

20   A.  I didn't have the view that no money should be set aside

21   for me.

22   Q.  Well --

23   A.  I just wasn't pressing on the calculation.  I actually

24   didn't even think about retiring at 65.  I mean, I was just --

25   I was working.

J5tnweg3                        Wegmann - Cross

1              THE COURT:  May I ask, I just want to understand what

2     you have just said.  You knew that no money was being set aside

3     for you, correct?

4              THE WITNESS:  Correct.

5              THE COURT:  OK.  Did you think it should have been?

6              THE WITNESS:  I knew there was an amount of money in

7     the fund, and that when it came time for my calculation or I

8     was closer to retirement that it would be calculated.  I didn't

9     surmise, you know, such an elaborate process of it.

10             THE COURT:  Sure.

11             But at some point they had to prepare, right?

12             THE WITNESS:  Yes.  When I -- I mean, I had

13    anticipated being at YAI my -- you know, forever.

14             THE COURT:  Yes.

15             When were you going to be worried that they hadn't

16    started setting money aside?

17             You weren't in 2009, correct?

18             THE WITNESS:  Correct.

19             THE COURT:  Were you in 2014?

20             THE WITNESS:  Yes, yeah.  I was -- yes, starting --

21    obviously coming, you know, in front of me, to be addressing it

22    and be concerned.

23             THE COURT:  OK.

24    BY MR. MEEHAN:

25    Q.  Ma'am, the whole time you were at YAI was 27-plus years,

J5tnweg3                        Wegmann - Cross

1    right?

2    A.  Yes.

3    Q.  And each of those years you had some responsibility of more

4    or less authority over financial and budgeting type matters,

5    right?

6    A.  Yes.

7    Q.  Was it the normal practice at YAI to accrue a multimillion

8    liability and have no money set aside for it in the budget?

9    Was that normal?

10   A.  I don't understand your question.  The pie chart that was

11   in what you showed me, those were the -- that is an example of

12   an annual accrual -- an annual amount available.

13   Q.  OK.  Let's go with the pie concept.

14   A.  OK.

15   Q.  Imagine a pie, and based on those documents we see that

16   Joel Levy, Phil Levy think they are going to eat a hundred

17   percent of what they want and Tom Dern and Steve Freeman think

18   they are going to eat 55 percent of what they want.  If you

19   come in to take a bite, don't you take a bite out of everybody

20   else?  Don't you eat some of the pie that they think is being

21   set aside for them?

22              THE COURT:  Sustained.

23              I think you took that metaphor a little too far.

24              MR. MEEHAN:  Very well.  I will save that for later.

25              THE COURT:  Actually, I have a question.

1           Ms. Wegmann, I appreciate what you are saying, which

2      is one of the reasons you weren't concerned is that you didn't

3      imagine that you would be retiring for a period of years.  But

4      you could have retired earlier than 2022, correct?

5           You could have retired at some earlier point, correct?

6           THE WITNESS:  Yes.

7           THE COURT:  I am going to be completely transparent

8      about the point I am trying to make, and it is this:  We all

9      have intentions of working to a particular point in time, but

10     sometimes circumstances develop that might cause you to retire

11     early, agreed?

12          THE WITNESS:  Yes.

13          THE COURT:  And sometimes circumstances might come up

14     that cause you to retire later than you expected.  Also

15     correct?

16          THE WITNESS:  Yes.

17          THE COURT:  Are you saying that YAI could bank or have

18     complete confidence that you were going to retire at some much

19     later date?  I would have thought they would have had to start

20     accruing just in case you decided to retire at the first

21     available opportunity.  That's my question.

22          THE WITNESS:  Retirement is not even something I think

23     about, so --

24          THE COURT:  Well, I appreciate that you don't.  But

25     wasn't it incumbent on YAI to be thinking about all of its

1    employees and basically being prepared so that they could

2    retire if they wanted to at the earliest eligible date?

3              THE WITNESS:  Yes.

4              THE COURT:  OK.

5    BY MR. MEEHAN:

6    Q.  In fact, Ms. Wegmann, you did not remain at YAI up to the

7    point of your 65th birthday.  We know that because you're not

8    65 today, right?

9    A.  Yes.

10   Q.  You left YAI before the normal retirement age we'll call it

11   of 65, right?

12   A.  Yes.

13   Q.  You never at any time signed an agreement guaranteeing YAI

14   that, come hell or high water, you would stay there until were

15   you 65, right?

16   A.  Right.

17   Q.  And they never gave you a document guaranteeing that, come

18   hell or high water, they would employ you until you were 65,

19   right?

20   A.  Yes.

21   Q.  I'm going to ask what seems like a personal question, but

22   it ties directly to the SERP I assure you, and I'm happy to

23   explain it.  You're not married, right?

24   A.  Right.

25   Q.  At any time while you were at YAI were you married?

J5tnweg3                         Wegmann - Cross

A.  No.

Q.  At any time while you were at YAI were you engaged to be

married?

A.  No.

Q.  OK.  You do understand there are provisions in the SERP

that speak about spousal benefits in the event of the untimely

passing of the SERP participant, right?

A.  Yes, and I think children is mentioned.

Q.  I was going to say children.  And you don't have any

children, right?

A.  Right.

          THE COURT:  Move on, counsel.

          MR. MEEHAN:  I think your Honor knows what I was going

to say.  I don't need to do it.  I just wanted to figure out if

there was a delicate way to do it.  All right.

Q.  Let's -- I believe the next one is AV, apple victor.

          Here's another document, this one is from Mr. Miller,

February 25, 2009, sending it to you, copying the Levys and

he's setting forth, Mr. Miller is setting forth what he says he

has discussed with you in the first paragraph of text, his

expense allocation for the employee benefit plans and deferred

compensation, and that would include the SERP.

          If you look at it, you'll see again zero for you in

the SERP.  So, once you look at it, my question, again, is

going to be, again, you took no action to correct, clarify,

J5tnweg3                        Wegmann - Cross

1    contest this at any time, right?

2    A.  No.  Not with the form 990.  The amounts, again, as I think

3    I mentioned when we had the deposition, the amounts on the

4    schedule were actuarial, and I didn't interpret them as being

5    the benefit that would be paid.  So I wasn't considering it

6    that way.

7    Q.  Let's look at --

8            THE COURT:  Even if the figure wasn't precise, you're

9    saying they were actuarial, they were estimates, right?  Best

10   estimates?

11           THE WITNESS:  Yes, I mean --

12           THE COURT:  OK.

13           THE WITNESS:  We got them from Craig, from the

14   actuaries.

15           THE COURT:  OK.  But they're estimating zero for you.

16           THE WITNESS:  Yeah.  Yes.

17           THE COURT:  OK.

18   BY MR. MEEHAN:

19   Q.  So you had to believe the estimate for you should be

20   something above zero, right?

21           If you are entitled to be in the plan the best

22   estimate was not zero, it had to be some number, right?

23   A.  Yes.  They hadn't included an estimate.

24   Q.  OK.  But you didn't point any of that out?

25   A.  Excuse me?

 1   Q.   You didn't point any of that out, correct?

 2   A.   No.

 3   Q.   Let's look at BA, boy apple.

 4              This one is from you.  It's May 2, 2009.  Apparently

 5   you're working over the weekend to pull together the 990, and

 6   you are looking for information on the SERP, and you're

 7   questioning the absence of amounts for the Levys and Mr. Dern

 8   and Mr. Freeman, but you raised no question about the absence

 9   of an amount for yourself, correct?

10   A.   Correct.

11   Q.   OK.  Let's look at BC.  These are some further e-mails over

12   that week, yourself and Mr. Miller, again copying the Levys

13   throughout.  Mr. Miller has responded in the e-mail below at

14   5:57 p.m. on that Saturday to the point that you, Ms. Wegmann

15   were correct in saying that they should not have zeros for the

16   Levys, Mr. Dern, Mr. Freeman, it's just that the amount has not

17   yet been inserted, and you don't say anything to him about,

18   well, why don't you put in an amount for me, anything other

19   than zero, correct?

20   A.   Correct.

21              MR. MEEHAN:  Your Honor, I am just taking a moment to

22   look at other exhibits that I think I can dispense with.  It

23   will take 30 seconds, if I may.

24              THE COURT:  Yes, sir.

25              (Pause)

J5tnweg3                    Wegmann - Cross

1    BY MR. MEEHAN:

2    Q.  OK.  Let's go to BJ, boy joy.  This is a set of minutes for

3    two meetings of the business committee, one on May 27, 2009,

4    one on June 1, 2009.  You attended both of these meetings,

5    correct?

6              MR. ZABELL:  I object to this document, Judge,

7    questioning on this document.

8              THE COURT:  On what basis, sir?

9              MR. ZABELL:  On the basis that this is well within the

10   statute of limitations period of time.  This is a May 27

11   document.  The statute of limitations cutoff is, I believe, May

12   15 -- I'm sorry, 18th.

13             THE COURT:  I will allow it because I want to

14   understand what the questioning is.

15             I will take note of your objection.  Thank you.  It's

16   overruled.

17             MR. ZABELL:  Thank you.

18             THE COURT:  You may answer questions about this.

19             MR. MEEHAN:  Thank you, your Honor.

20   BY MR. MEEHAN:

21   Q.  Ma'am, you attended these meetings, did you not?

22   A.  Yes, yes.

23   Q.  So you were present for the discussion in the May 27

24   meeting which was about voting on retirement funding for 2007

25   and 2008, all of the information that's set forth here in the

J5tnweg3                         Wegmann - Cross

1    minutes, including as it related to the supplemental plan, the

2    SERP, right?  You were present?

3    A.  I believe so.  It is just unusual for -- I would definitely

4    be in the June 1 meeting, that was the business committee, and

5    it looks like there was a half-hour premeeting, and I -- from

6    time to time I would be there, but then I would leave.  They

7    would ask me to leave for periods of it.  So I was just reading

8    the minutes again to get the best of my recollection.

9    Q.  Sure.  If it helps, look at the first paragraph under May

10   27.  It indicates that you were present.

11   A.  I know.  That's what was standard, to do that, because I

12   was there for the meeting.

13              THE COURT:  Even if you weren't there for the entirety

14   of the meeting, did you receive the report?

15              THE WITNESS:  Yes.

16              THE COURT:  OK.

17              THE WITNESS:  Yes.

18   BY MR. MEEHAN:

19   Q.  OK.  And then the individuals identified as board members

20   in that first paragraph from the May 27 meeting, you knew each

21   of them, correct?

22   A.  Yes.

23   Q.  And you were comfortable in having your -- a working

24   relationship with each of them, right?

25   A.  Yes.

1  Q.  You weren't so intimidated by any of them that you would be

2  afraid to mention that you were owed, in your view, millions of

3  dollars on the SERP, were you?  I mean you weren't so

4  intimidated by them you were afraid to bring that up?

5          THE COURT:  Sustained.  Don't answer the question.

6          Thank you.

7          MR. MEEHAN:  OK.

8  BY MR. MEEHAN:

9  Q.  But, in any event, you did not bring up your view that you

10  were in the SERP as of this time, right?

11  A.  At this meeting, no.

12  Q.  And you didn't have a sidebar with any of these board

13  members at or around this time on that subject, correct?

14  A.  Correct.

15  Q.  Just briefly, the minutes of the June 1 -- my observation,

16  every paragraph other than the one at the end about what the

17  committee recommends -- so, I don't know, let's say a dozen, we

18  can all count -- it begins with Ms. Wegmann, Ms. Wegmann

19  presents, Ms. Wegmann reviews, Ms. Wegmann provides, right?

20          Was this typical at these business committee meetings

21  that you would be the dominant presenter?

22  A.  Well, I gave -- I presented, you know, the nuts and bolts

23  of all the reports.  So I was the presenter, yes.

24  Q.  OK.  And that included, if you look at page 4901, such

25  things as the paragraph at the top, the first full paragraph:

J5tnweg3                        Wegmann – Cross

1   Ms. Wegmann presented the initial YAI operating budget for

2   fiscal year 2009-2010.  It then goes on to explain the initial

3   operating budget includes income, and expense balanced.  You

4   made presentations of that sort at these business committee

5   meetings?

6   A.  Yes, yes.  We presented a balanced budget.

7   Q.  So you didn't present a budget that knowingly had a gap:

8   There is a liability accruing out there, but I don't have any

9   money for it.  You didn't do that knowingly at any time, did

10  you?

11  A.  No.

12  Q.  OK.  Let's skip to BM.  Now, these are exhibits being

13  provided by Mr. Miller to you, copied to Mr. Phil Levy and --

14          MR. ZABELL:  Same objection, Judge.

15          THE COURT:  Understood.

16  Q.  And also they're communicated within the actuary firm among

17  the three members.  There was actually also an Andrew Miller

18  who I believe was the son of the two, wasn't he, Mr. and

19  Ms. Miller?

20  A.  Yes.

21  Q.  He also became an actuary and worked with his parents?

22  A.  I know he worked.

23  Q.  At the actuary firm?

24  A.  Yes.

25  Q.  So these exhibits are for the pension committee.  What was

1  the pension committee?

2  A.  I mean, I wasn't familiar with the pension committee like

3  the business committee.

4  Q.  All right.  Did you have any understanding as to what its

5  function was?

6  A.  Well, similar to the business committee.  They would review

7  pension information.

8  Q.  OK.  So they were focused on pension issues as you

9  understood it, is that right?

10  A.  Yes.

11  Q.  If you look at what is being provided to you here, it is

12  one of the documents on the left -- actually, I keep saying on

13  the left.  Mine is double sided.  I hope I am not confusing

14  anybody.  But it is Bates stamped 2431.  There is a section

15  there about the supplemental plan.

16        Do you see here the first sentence in that section.

17  It says, The supplemental plan provides benefits for Philip

18  Levy, Joel Levy, Steven Freeman, and Thomas Dern.

19        Then, if you look below, it sets out those names and

20  provides various information about them.

21        You did not raise your hand with anybody to say Karen

22  Wegmann is also in this plan, right?

23  A.  No.  I just passed the information along from Craig.

24  Q.  OK.  Let's skip all the way to BY.

25        Now, BY, this is an e-mail from Mr. Miller to you.

J5tnweg3                    Wegmann - Cross

1  He's copying Mr. Philip Levy.

2            MR. ZABELL:  Same objection, Judge.

3            THE COURT:  Understood, sir.

4  Q.  Phil Levy at this point -- this is May of 2010 -- Phil Levy

5  was the CEO at this point, correct?

6  A.  Yes.

7  Q.  All right.  Joel Levy had left in June of 2009, is that

8  right?

9  A.  Yes.  That would be June 30.

10  Q.  And for roughly a year before Joel Levy stepped down --

11  wait.  I want to be careful how I phrase it.

12            Roughly for a year before Joel Levy was no longer the

13  CEO, he and his brother Philip were co-CEOs?

14  A.  Yes.

15  Q.  Right.  So roughly from a point in 2008 to June 30 of 2009,

16  give or take, the two brothers were co-CEOs, right?

17  A.  Yes.

18  Q.  The understanding that was generally made public was Philip

19  was going to succeed Joel when Joel departed the employ, right?

20  A.  Yes.

21  Q.  And you were aware of that?

22  A.  Yes.

23  Q.  OK.  All right.  So, now, here on our Exhibit BY,

24  Mr. Miller is providing you information about annuities being

25  sought for the SERP.  Do you recall what that was about?

1    A.  I don't have a lot of detail on it.  I know at a point in

2    time there was discussion about purchasing annuities as a type

3    of investment.

4    Q.  And these annuities, if purchased, were to be on the lives

5    of -- sorry, let me rephrase that.  These annuities, if

6    purchased, were to be associated with individual participants

7    in the SERP to backstop the SERP's obligations to them, is that

8    right?

9              THE COURT:  If you know.

10             THE WITNESS:  I don't.  I don't know.

11             THE COURT:  Fine.  This don't answer it then.

12   Q.  You played a role, did you not --

13   A.  Yes.

14   Q.  Why don't you explain what your role was.

15   A.  I'm trying to think.  You know, I don't have much

16   recollection of this.  I would be asked to get information or

17   pass along information.

18   Q.  Maybe I can help.  I'm sorry.

19   A.  Yeah.  I don't remember really --

20   Q.  I apologize.  I did not mean to cut you off.  Were you

21   finished?

22   A.  Yes.

23   Q.  OK.  Did you have a role in supporting the idea that YAI

24   was contacting differing entities that offered annuities to see

25   whether YAI could get an acceptable price to purchase annuities

J5tnweg3                          Wegmann - Cross

1  for each of these individuals?  Does that strike a bell?

2  A.  My recollection is that Marci and Craig would have asked me

3  to follow up to get annuity information and then collect -- you

4  know, gather it and give it to them.

5  Q.  Do you recall that there were different companies that

6  offered annuities at different prices?  Does that strike a bell

7  at all?

8  A.  I know there were different companies because Craig and

9  Marci were aware of them.  And so, you know, they guided it.

10  Q.  OK.  Just a quick question about Ms. Fava.  Did you while

11  you were at YAI look to her as in a sense a mentor to you?

12  A.  No.

13  Q.  Did you -- how was -- what was your relationship with her?

14  A.  It was fine.

15  Q.  Did you view her as a confidant in any way?

16  A.  No.  I mean, I spoke to her on several occasions, but I

17  mean I -- I looked up to her.  She was the chairperson of our

18  board.

19  Q.  Did you sometimes go to her when you thought you were

20  having issues within the organization, just, you know, how do I

21  handle this, or how do I address this person's problem, you

22  know, that sort of day-to-day thing that sometimes comes up?

23  A.  No.

24  Q.  All right.  OK.  Just a quick question.  You see this

25  document refers to the April CPIU results.  That's the second

1   paragraph in Mr. Miller's e-mail to you.  Inasmuch as the April

2   CPIU results have not yet been published.  Do you see that?

3   A.  Yes.

4   Q.  What is the CPIU?

5   A.  Consumer price index.

6   Q.  What does the U mean?

7   A.  I'm not sure.

8   Q.  Do you know how the U distinguishes from the W?

9   A.  No.

10  Q.  All right.  If you look at this document, you'll see that

11  potential annuity information is set forth for five individuals

12  who are denoted on the document as the annuity owner if

13  annuities are purchased.

14          There's PL.  That's Phil Levy, right?

15          THE COURT:  Is PL Philip Levy if you know?

16          THE WITNESS:  Oh, yes.

17  Q.  And JL, that's Joel Levy?

18  A.  Yes.  That would be Joel.

19  Q.  KR, that's Kathleen Rut --

20  A.  Yes.

21  Q.  -- Joe Rut's widow?  Yes.

22          SF, that's Steve Freeman, right?

23  A.  Yes.

24  Q.  And TD, that's Tom Dern, right?

25  A.  Yes.

```
 1    Q.  There's no KW, right?

 2    A.  Correct.

 3    Q.  And you didn't at any point in this time period say:

 4    Folks, there should be a KW.  I deserve an annuity, too.  I'm

 5    in this plan.  I'm a participant.  You need to provide for me,

 6    too.

 7              Nothing like that, right?

 8    A.  No, not at this time.

 9    Q.  OK.  Let's skip down to CF.  All right.  This one is

10    another e-mail from Mr. Miller to yourself, again copying Phil

11    Levy and the several Miller actuaries.

12              THE COURT:  I appreciate that Mr. Zabell objects to

13    it.

14              MR. ZABELL:  At this point, your Honor, I'm also going

15    to add that I think we're becoming a little duplicative in the

16    evidence.

17              THE COURT:  That I am not yet agreeing with, but I

18    understand the objection.

19    BY MR. MEEHAN:

20    Q.  OK.  If you look at this one, there is an attachment, it's

21    Bates stamped 1695, the third page of text within the exhibit.

22    It has a caption, YAI Executive Retirement and Welfare Plan

23    Summary as of July 26, 2010, if you look at the first paragraph

24    of text.

25              THE COURT:  She sees it.
```

J5tnweg3                        Wegmann - Cross

1              THE WITNESS:  I see it.

2    Q.  OK.  So it identifies the SERP as being the principal

3    retirement program for the highest ranked executives.  Current

4    participants include the CEO and president and two chief

5    operating officers.  You were not as of July 26, 2010, among

6    any of those titles at YAI, right?

7    A.  Correct.

8    Q.  Just to round that out, again, you didn't raise your hand

9    in protest, correct?

10   A.  I don't recollect this document, but --

11   Q.  OK.

12             MR. MEEHAN:  Your Honor, I am looking at the end to

13   see if there's anything further in the exhibits in this area.

14             THE COURT:  Of course.

15   BY MR. MEEHAN:

16   Q.  Actually, why don't we take a very brief look -- since you

17   said you don't recall it, let's look at CG.  That's an e-mail

18   from yourself which is sent to Andrew Weir, W-e-i-r.  He's at

19   PRM consulting.  PRM was an organization retained by YAI to

20   provide advice on benefits matters, right?

21   A.  I believe so.

22   Q.  OK.  So Mr. Weir worked for them and you were providing

23   information to Mr. Weir.  You sent him a copy of that

24   attachment that we just went over from the prior exhibit, CF,

25   correct?

1          If you look at page Bates stamped 0119, you will see

2     that you forwarded it to Mr. Weir that attachment which

3     describes the current participants as people not including

4     yourself --

5     A.   Yes.

6     Q.   -- right?

7     A.   My recollection is I was given the chore or the role of

8     gathering a listing of documents that are listed there in the

9     e-mail and gathered those all together.  I mean, my focus would

10    have been mostly on the network annual report.  Again, this is,

11    you know, July of 2010.  As I said, it was, you know, a period

12    that was completely, I was completely absorbed with the qui

13    tam.

14    Q.   So you had time to send the e-mail, but you didn't have

15    time to add a sentence that said that first paragraph is

16    incomplete?  Is that what you are saying?

17    A.   I'm sorry.

18    Q.   You had --

19              THE COURT:  Sustained.

20    Q.   If you would look at -- yes, if you would look at CM.

21              All right.  CM, that is an e-mail from you, September

22    23, 2010.  It is being sent to Mr. Phil Levy and Ms. Fava.  You

23    are sending it to the CEO and the chair of the board, and you

24    are providing a draft that you had prepared of the pension

25    committee meeting that took place on September 15, 2010, right?

 1   A.  I am not sure if Marci is still the chair.

 2   Q.  OK.  She was still on the board?

 3   A.  Yes.  But she was -- I know she was involved in the pension

 4   committee.

 5   Q.  OK.  We'll try to clarify later today --

 6   A.  OK.

 7   Q.  -- separately if she was still the chair.

 8          In any event, you -- sorry, pardon me -- you were

 9   sending along to them your draft of the minutes of the pension

10   committee meeting that took place on September 15, 2010, right?

11   A.  Yes.

12   Q.  All right.  If you look at the minutes themselves, page

13   0245 in the Bates stamping, the first paragraph you indicate

14   that you were present, right?

15   A.  Yes.

16   Q.  And then in the second paragraph you explain that at the

17   meeting, you attended this pension committee, reviewed

18   materials about this potential purchase of annuities for what

19   you call the four executives in the plan and Kathleen Rut.  So

20   you did not include anywhere in these minutes a protest by

21   Karen Wegmann that Karen Wegmann is also in the plan, right?

22   A.  No.  I'm also not entirely sure if Marci didn't send me the

23   minutes.

24   Q.  So you think she may have sent you the minutes, but then

25   you were sending them back to her and to Mr. Levy?

1   A.  Yes.

2   Q.  OK.  But, in any event, you didn't raise any corrections or

3   clarifications or objections to this point about who was in the

4   plan, right?

5   A.  Right.

6   Q.  OK.  Let's skip all the way to CZ.  Are you with me on CZ?

7   A.  CZ.

8   Q.  CZ, that's one of these 5500s that you signed for the

9   organization, is that right?

10  A.  Yes.

11  Q.  OK.  And if you look towards the end of the exhibit, there

12  is a cover letter.  Apparently it was sent by certified mail

13  return receipt requested, I mean the 5500 was, and you sent the

14  cover letter, you signed it on behalf of YAI, the cover letter,

15  right?  Do you see that on page 0499?

16  A.  I mean, the copy I have is not signed and I --

17  Q.  If you would look towards the end of the exhibit.

18  A.  I'm sorry.  I just don't have a recollection.

19  Q.  Page 0499.  I am trying to focus you on the cover letter.

20  A.  I was on the wrong letter.

21  Q.  Sorry.  Sorry.

22  A.  OK.

23  Q.  My fault.  Are you with me now that you are on the August

24  1, 2013 cover letter that you sent to the U.S. Department of

25  Labor enclosing the 5500 for YAI that you had also signed on

1   behalf of YAI?

2   A.  Yes.

3   Q.  The cover letter, that's -- you signed it, right?  That is

4   your signature?

5   A.  Yes.

6   Q.  The same thing for the document itself, the 5500.  You

7   signed that, too, right?

8           THE COURT:  Where is the signature?

9           MR. MEEHAN:  You know what, I apologize.  We'll look

10  into this.  I do not see in this document a signed 5500.  We

11  can focus only on the letter, and I think I've already got

12  that.

13  A.  The letter and the document would have been completed by

14  Craig.

15  Q.  OK.  So Mr. Miller filled out the documents?

16  A.  Yes.

17  Q.  We already agreed earlier that you did sign 5500s for the

18  YAI?

19  A.  Yes.  Typically they filled out the information, and I

20  signed on behalf of the agency.

21  Q.  Did you have a practice of trying to verify to your own

22  satisfaction that the information in these 5500s was correct?

23  A.  I would review it, general, you know, the general

24  information plan participant, number of participants, etc.

25  Q.  OK.  Who wrote the cover letter that you signed?

J5tnweg3                          Wegmann - Cross

1    A.  That would have been Craig.

2    Q.  OK.  You reviewed it before you signed it and sent it,

3    right?

4    A.  Yes.

5    Q.  Do you see in that second paragraph of text in the cover

6    letter it says, YAI maintains two plans primarily for the

7    purpose of providing deferred compensation?

8              THE COURT:  Counsel, for court reporter and judge,

9    just please be a little bit --

10             MR. MEEHAN:  Go slower?

11             THE COURT:  Thank you.

12   BY MR. MEEHAN:

13   Q.  You say, YAI maintains two plans primarily for the purpose

14   of providing deferred compensation for a select group of

15   management or highly compensated employees, right?

16             Are you with me on that?

17   A.  Yes.

18   Q.  And that was accurate, right?  I mean that was true when

19   you signed off on this, was it not?

20   A.  Yes.

21   Q.  And then the next sentence, these plans cover only one, and

22   then it's open paren, the numeral one, close paren, individual,

23   dash, a former executive of YAI.  That was also true, right?

24   A.  Yeah.  I'm not exactly sure -- my recollection, I'm not

25   sure what this is referring to.

1   Q.   What's the "this" that you are not sure about?

2   A.   I'm thinking about the two plans and the one individual

3   former executive.  I am not -- my memory -- I'm not able to

4   recollect --

5   Q.   That one individual was Joel Levy, right?

6   A.   You know, actually I wasn't sure.

7   Q.   August of 2013 he was gone, and he was in a dispute with

8   YAI.  You don't remember that?

9   A.   Right, but Joe Rut --

10            MR. ZABELL:  Objection.

11            THE COURT:  Yes.

12            THE WITNESS:  Go ahead.

13            THE COURT:  Sustained.

14            THE WITNESS:  Do I answer?

15   BY MR. MEEHAN:

16   Q.   Are you saying that as you sit here today you do not have

17   any idea who the one individual is to whom this letter referred

18   that you signed?

19            MR. ZABELL:  Objection.

20            THE COURT:  I will allow it.

21   A.   I don't recollect.

22   Q.   Are you able to today identify any plans that provided

23   deferred compensation at YAI in 2013 to anyone?

24   A.   Repeat the question.

25   Q.   Yes.  As you sit here today, are you able to identify any

1   plans at YAI providing deferred compensation for anyone who was

2   within a select group of management or highly compensated

3   employees?

4   A.  To my knowledge today, individuals received lump sums.

5   Q.  Let me try it again, because I think I'm not with you on

6   the question.  I'm asking you to take yourself back, if you

7   can, to August 1, 2013.  Are you able to identify today what

8   the plans were that existed at that time at YAI primarily for

9   the purpose of providing deferred compensation for a select

10  group of management or highly compensated employees?

11  A.  August of 2013?

12  Q.  Yes.

13  A.  I think in August of 2013 the lump sums had been paid.  So

14  I don't think that I -- I'm sure Steve and -- Steve Freeman,

15  Tom Dern, Phil Levy, and Kathleen Rut were -- they had been

16  paid.  They had received their lump sums under the SERP.  I'm

17  trying to remember if Joel was receiving any payments.

18  Q.  All right.  Just to --

19  A.  But I am not sure.

20  Q.  Just to clean it up, when you talk about these lump sums,

21  you mean there was an arrangement that YAI reached with each of

22  those persons to give them a sum of money to resolve whatever

23  their claims were under the SERP?

24  A.  Yes, they received a lump sum.

25  Q.  You do understand that no such agreement was ever entered

1    into with Joel Levy and YAI to resolve consensually his claims

2    under the SERP?

3    A.  Yes.

4    Q.  OK.  The SERP existed on August 1, 2013, did it not?

5    A.  Yes.

6             MR. MEEHAN:  Your Honor, if I may ask for just a

7    couple of minutes to consult with my client and colleagues.  I

8    think I am very, very, very close, as in maybe a few minutes

9    away from being done, but I want to make sure I haven't

10   overlooked something.

11            THE COURT:  That's fine.  We will take a break.  Also,

12   in case anyone wants to stretch their legs or use the restroom.

13            I will remind you that you're still under oath, and

14   you can't discuss the substance of your testimony with your

15   attorney.

16            THE WITNESS:  Yes.

17            THE COURT:  Do you understand that?

18            THE WITNESS:  Yes.

19            THE COURT:  That's fine.  I will see you in a few

20   minutes.

21            MR. ZABELL:  How long should we plan, your Honor?

22            THE COURT:  Five minutes, but four would be nice as

23   well.

24            MR. MEEHAN:  OK.

25            THE COURT:  Mr. Zabell, something you want to add?

J5tnweg3                          Wegmann - Cross

1              MR. ZABELL:  I just want to use the facilities, and I

2    know it is on another floor.

3              THE COURT:  That's fine.  Five minutes.

4              MR. ZABELL:  Thank you.

5              (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. MEEHAN:  Your Honor, I have no further questions

2     of Ms. Wegmann.

3          Thank you, Ms. Wegmann.

4          THE COURT:  Mr. Zabell, redirect?

5          MR. ZABELL:  Thank you.

6     REDIRECT EXAMINATION

7     BY MR. ZABELL:

8     Q.  Ms. Wegmann, Mr. Meehan asked you many questions and showed

9     you many documents that indicated that YAI was not putting

10    aside funds to fund a SERP for you, is that correct?

11    A.  Yes, he did.

12    Q.  Throughout your employment, did you complain about the

13    documents that you received not indicating that YAI was putting

14    away funds for your SERP?

15    A.  I did not complain because my -- my view of seeing the

16    amount of money that was being put aside was sufficient for the

17    individuals that would be in the plan.

18    Q.  Did anybody at YAI assure you that, notwithstanding what

19    those documents said, that you were a SERP member?

20    A.  Yes.  My conversations with Joel, my boss, over years, um,

21    confirmed that in my mind, yes.

22    Q.  And that was Joel who?

23    A.  Joel Levy.

24    Q.  And do you recall the last time you had a conversation with

25    Joel Levy where he indicated to you that you were in the SERP?

 1   A.  Yes.

 2   Q.  Please tell me when that was.

 3   A.  We had several of them, so I'm trying to recall.  He

 4   assured me that I would be included in the SERP.

 5   Q.  OK.

 6           THE COURT:  Sorry, just a couple points.

 7           THE WITNESS:  Sorry.

 8           THE COURT:  Don't worry about it.

 9           Do you recall the year in which this conversation took

10   place?

11           THE WITNESS:  The last conversation?

12           THE COURT:  The last conversation.

13           Was it before you left YAI in 2014?

14           THE WITNESS:  Yes.

15           THE COURT:  Was it in 2013, when these documents we

16   were just looking at were sent around?

17           You don't know?

18           THE WITNESS:  I'm sorry.

19           THE COURT:  Let's try it this way.  You were working

20   on the *qui tam* in 2010?

21           THE WITNESS:  Yes.

22           THE COURT:  Was it during that time period?

23           THE WITNESS:  No.

24           THE COURT:  Was it after that time period?

25           If you don't know, you don't know.

 1                THE WITNESS:  I'm sorry.

 2                THE COURT:  My point is, I'm using you dates that you

 3     might be able to use.  It was clearly before 2014.

 4                THE WITNESS:  Yes.

 5                THE COURT:  That is when you left?

 6                THE WITNESS:  Yes.

 7                THE COURT:  You don't recall if it was at or after the

 8     time you were working on the *qui tam* in 2010 that you testified

 9     about.

10                You just don't recall, correct?

11                THE WITNESS:  Correct.

12                THE COURT:  OK.  And I want to make sure I understand

13     what he said to you, because your testimony was he said you

14     would be included in the SERP, that is what you recall him

15     saying consistently?

16                THE WITNESS:  Yes.

17                THE COURT:  Thank you for letting me know.

18                THE WITNESS:  Yes.

19     BY MR. ZABELL:

20     Q.  Can you recall when Joel Levy said this to you by reference

21     to when he left YAI, as in he said -- did he say it before or

22     after he left YAI?

23     A.  Before.

24     Q.  Do you know when he left YAI?

25     A.  He left in June of 2009.

J5TsWEG4                    Wegmann - Redirect

1    Q.   OK.   At some point around, can you recall in reference to

2    when he left in June of 2009, the last time he said to you that

3    you were in the SERP?

4                MR. MEEHAN:   Your Honor, if I may?

5                THE COURT:   Sir.

6                MR. MEEHAN:   It is a form question.   The witness used

7    a different phrase than the question.

8                THE COURT:   Hold on.   Would you please read it back.

9                (Record read)

10               THE COURT:   No.   Her testimony was you would be

11   included in the SERP, but let's do it this way.

12               Any conversation you had with Mr. Levy took place

13   before he left --

14               Let me say that again.   Any conversation you had with

15   Dr. Levy about the SERP took place before June of 2009,

16   correct, when he left?

17               THE WITNESS:   Yes.

18               THE COURT:   OK.   Do you recall how long before he

19   left -- a month, six months, a year -- that conversation may

20   have been?   And if not, then that's fine.   Just tell me you

21   don't remember.   That's fine.

22               THE WITNESS:   I don't remember.

23               THE COURT:   That's all the precision we can have.

24               Thank you, counsel.

25   BY MR. ZABELL:

1   Q.  Did you have any conversations with Phil Levy about you

2   being in the SERP?

3   A.  Yes.  Close to the time I was leaving, I asked Phil about,

4   you know, getting my calculations for the SERP.

5   Q.  And what did Phil Levy say to you?

6   A.  He -- he --

7               MR. MEEHAN:  Your Honor, if I may?

8               THE COURT:  I know your form objection, sir.

9               MR. MEEHAN:  I think it is a hearsay problem.

10              Phil Levy.

11              THE COURT:  Phil Levy.

12              MR. MEEHAN:  He is not here and nobody is calling him.

13              THE COURT:  All right.  I understand that.

14              Let me say, I'm not taking this for the truth of the

15  matters asserted in it, but merely that it was said.

16              MR. MEEHAN:  Understood, your Honor.

17              THE COURT:  Thank you.  Don't worry about that issue.

18              THE WITNESS:  OK.

19              THE COURT:  Do you have a recollection?

20              THE WITNESS:  Yes.

21              Around the time when I was tendering my resignation

22  and I was leaving, I spoke to Phil and also Craig Miller and

23  Mike Connors who were working on my calculation, the

24  information for me.

25  BY MR. ZABELL:

1   Q.  What did Phil Levy say to you, if you recall?

2   A.  Um, we'll have Mike Connors work on that.  He's dealt with

3   this before, so he'll know what to do.

4           MR. ZABELL:  Thank you.  I have nothing further,

5   Judge.

6           THE COURT:  All right.  You may step down.  Thank you

7   very much.

8           (Witness excused)

9           MR. MEEHAN:  Your Honor, can I have like 30 seconds?

10          THE COURT:  No.  Thank you.  No recross.

11          Thank you so much.  Next witness, please.

12          Is there another witness for plaintiff's side, or are

13  you resting on that, sir?

14          MR. ZABELL:  We're resting on that.

15          THE COURT:  If the parties would agree, may I

16  understand that any mid-trial motion you would otherwise have

17  made has been made, and that I'm reserving decision on that

18  mid-trial motion?

19          If you would like to actually make one, I'll hear you.

20          MR. MEEHAN:  Your Honor, we're content to put the

21  record all in and then proceed with the post-trial submissions.

22          THE COURT:  Thank you very much.

23          Ms. Wegmann, why don't you go back to the front table.

24          Who is the first defense witness, please?

25          MR. MEEHAN:  We will call Marci Fava, your Honor.  She

J5TsWEG4                          Fava - Direct

1    is outside, I believe, ready.

2              THE COURT:  She may be invited in.  Thank you very

3    much.

4              MR. MEEHAN:  May I ask that she be brought in at this

5    time?

6              THE COURT:  Yes, please.

7     MARCELLA FAVA,

8         called as a witness by the defendants,

9         having been duly sworn, testified as follows:

10             MR. MEEHAN:  Your Honor, pursuant to your previous

11   permission, I'm going to hand the witness her affidavit and the

12   exhibits.

13             THE COURT:  Yes.

14   DIRECT EXAMINATION

15   BY MR. MEEHAN:

16   Q.  Ms. Fava, I have put up on the side there next to you a

17   copy of your affidavit and the exhibits to which it refers.

18             Did you give a declaration that is set forth in front

19   of you?

20   A.  I did.

21   Q.  Do you adopt it here today as part of your testimony in

22   this court?

23   A.  I do.

24             MR. MEEHAN:  All right.  Your Honor, I note I have the

25   original signed declaration here, which I can provide to your

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

J5TsWEG4                          Fava - Cross

1   clerk, and with that, I would pass the witness.

2              THE COURT:  Thank you very much.  We'll take the

3   original.  Thank you.

4              Mr. Zabell, is there cross-examination?

5              MR. ZABELL:  Yes, there is.  Thank you, your Honor.

6              THE COURT:  Thank you very much.  You may inquire.

7   CROSS-EXAMINATION

8              MR. ZABELL:

9   BY MR. ZABELL:

10  Q.  Good morning, Ms. Fava.

11  A.  Good morning.

12  Q.  My name is Saul Zabell.  I represent Karen Wegmann.

13              Do you know who Karen Wegmann is?

14  A.  I do, yes.

15  Q.  Ms. Wegmann worked for YAI, is that correct?

16  A.  Correct.

17  Q.  During the period of time that she worked at YAI, what was

18  your role at YAI?

19  A.  My role?

20  Q.  Yes.

21  A.  I was the chairman of the board of trustees.

22  Q.  And throughout your time at YAI, you were responsible for

23  having the SERP created, is that correct?

24              THE COURT:  She personally, or something else?

25              MR. ZABELL:  I believe it was created under her

J5TsWEG4                          Fava - Cross

direction.

                THE COURT:  I see.

                Do you understand the question?

                THE WITNESS:  Yes.

A.  It is not accurate in terms of how I recall the situation.

The SERP was created and presented to the board by the

executives as a plan that should be adopted for management.

Q.  What was your role in that process?

A.  Um, I was part of the oversight committee of the board,

that being the pension committee, later called the executive

compensation committee of the board, to review it and make a

recommendation to the full board.

Q.  OK.  Did you recommend that the SERP be adopted by the

board?

A.  I did, yes.

Q.  And when you made that recommendation, were you familiar

with the content of the SERP document?

A.  I believe so, yes.

Q.  Did you read it?

                THE COURT:  Counsel, I'm sorry.  May I please inquire?

                You said that the SERP was created and presented to

the board by the executives.  To whom are you referring when

you use the term "executives?"

                THE WITNESS:  Specifically Joel Levy.  He wanted to

create a plan that would be beneficial to his management crew.

```
 1              THE COURT:  All right.  Anyone else that you can
 2     recall?
 3              You used the term in the plural.  I wanted to make
 4     sure I understood it.
 5              THE WITNESS:  Yes.  I believe that Phillip Levy may
 6     have been involved in those discussions, but I don't know for
 7     sure.
 8              THE COURT:  OK.  Thank you.
 9              Counsel, you may continue.
10              MR. ZABELL:  Thank you.
11     BY MR. ZABELL:
12     Q.  Ms. Fava, when the SERP plan was adopted by the board, were
13     you familiar with its content?
14     A.  Yes.
15     Q.  Have you had any experience reading SERPs before that time?
16     A.  No.
17     Q.  Have you had any experience reading SERPs other than the
18     SERP at issue since that time?
19     A.  No.
20     Q.  Did you possess the requisite knowledge to understand the
21     legal implications of the SERP when it was adopted?
22     A.  I believe that I did.
23     Q.  Now, you have your affidavit there in front of you,
24     correct?
25     A.  Yes.
```

J5TsWEG4                          Fava - Cross

1   Q.  Attached to that affidavit is the SERP.  It is Exhibit A.

2   I'm sorry.

3           THE COURT:  Are you asking her to turn to that

4   exhibit?

5           MR. ZABELL:  I am, if you could, please.

6           THE COURT:  Ms. Fava, do you see, if you look on the

7   tabs on the side, there will be one marked A.  Just look.

8           THE WITNESS:  I see --

9           THE COURT:  It is probably the very first one.

10          THE WITNESS:  Yes, I see it.

11          THE COURT:  Thank you.

12          Turn to that, please.

13          THE WITNESS:  OK.

14  BY MR. ZABELL:

15  Q.  Now, is that the SERP document that you referenced in your

16  affidavit?

17  A.  Um, it appears to be, yes.

18  Q.  And that was the SERP document that you understood at the

19  time you presented it for board approval, correct?

20  A.  Correct.

21  Q.  And do you understand the content of that SERP now?

22  A.  I believe that I do, yes.

23  Q.  OK.  Now, are you familiar with the eligibility

24  requirements under the SERP?

25  A.  Yes.

J5TsWEG4                          Fava - Cross

Q.  Are the eligibility requirements for the SERP included

within the SERP?

A.  Yes.

Q.  Are they contained exclusively within the SERP?

A.  I believe so, yes.

Q.  Based upon the eligibility requirements of the SERP

document itself, is that how you administered the SERP during

your time with the, I believe, the executive compensation

committee?

A.  Yes.

Q.  So during your time on the executive compensation

committee, there was never a time that you utilized any

eligibility requirements other than those that were written in

the SERP itself, is that correct?

A.  Yes.

Q.  OK.  Now, were you ever involved in the process of

calculating benefits under the SERP?

A.  No.

Q.  Did you take steps to ensure that all the requirements of

the SERP were being carried out?

        THE COURT:  May I understand what you mean by all of

the requirements?

Q.  All of the contractual requirements provided for in the

SERP were being carried out by YAI?

A.  I attempted to, yes.

J5TsWEG4                          Fava - Cross

1    Q.  There have been a number of litigations over the SERP, is

2    that correct?

3    A.  A couple, yes.

4    Q.  There is this one, correct?

5    A.  Correct.

6    Q.  There is Joel Levy's, correct?

7    A.  Correct.

8    Q.  And I believe Ms. Rut sued under the SERP, is that correct?

9    A.  Correct.

10   Q.  Were there any others, other than those three?

11   A.  Not that I'm aware of.

12   Q.  I'm going to ask that you turn to paragraph 3.2 of the

13   SERP.  It is on a page that is Bate stamped numbered 359 in the

14   bottom right-hand corner.

15   A.  Yes, I have it.  Thank you.

16   Q.  Now, are you familiar with that paragraph, the 3.2, the

17   interest nontransferable portion?

18   A.  I would like to just read it for a moment, please.

19   Q.  Sure.

20   A.  OK.

21   Q.  Are you familiar with that portion?

22   A.  Yes.

23   Q.  OK.  Do you see where it says the trust fund shall be

24   subject in any manner to sale, transfer, assignment, pledge,

25   attachment, garnishment, or other alienation or encumbrances of

J5TsWEG4                              Fava - Cross

1   any kind?

2            Do you see that?

3   A.  Yes.

4   Q.  Do you know what that means?

5   A.  I believe I do, yes.

6   Q.  What do you believe it means?

7   A.  I believe it means that the benefit was specific to the

8   management person to whom it was -- to whom it accrued, and

9   that that person could not transfer to another individual or

10  another entity that pension benefit.

11  Q.  Does that mean that a person who has earned rights under

12  the SERP can't alien alienate those rights in any way, correct?

13            THE COURT:  If you understand the question.

14  Q.  Is that what you're saying?

15  A.  I don't totally understand the question.

16  Q.  Is it your understanding that a person who has earned

17  rights under the SERP can't pledge those rights to any other

18  entity; is that your understanding?

19  A.  On the basis of what this paragraph says, yes.

20  Q.  OK.  And do you see where it says one, two, three, four

21  lines down on the right-hand side "or other alienation?"

22  A.  Yes.

23  Q.  Do you know what that means in the context of this SERP?

24  A.  Not really.

25  Q.  Do you know what it means to alienate certain rights?

1    A.  Yes.

2    Q.  Do you believe that that term means that you can't alienate

3    your rights under the SERP?

4    A.  Yes.

5    Q.  If you look at the last page of the SERP, page Bates stamp

6    number 386.

7    A.  OK.

8    Q.  That bears your signature, correct?

9    A.  Correct.

10   Q.  And in what capacity did it bear your signature?

11   A.  I presume as chairman of the board.  It's not listed under

12   my signature.

13   Q.  OK.

14   A.  It lists trustees of the supplemental pension plan, so I'm

15   listed as one of trustees and signed as such.

16   Q.  Thank you.

17          I'm going to ask that you turn to the page that is

18   marked 372.

19   A.  OK.

20   Q.  Now, are you familiar with the paragraph 7.1, the right of

21   amendment?

22   A.  Yes.

23   Q.  Are you familiar with it other than just looking at it

24   right here, right now, or did you have occasion throughout your

25   tenure at YAI to become familiar with it?

1   A.  I had occasion to become familiar with it.

2   Q.  Could you explain to me how you came to be familiar with

3   it?

4   A.  We did amend the plan.  I can't recall exactly when we did

5   it, and I may even have trouble recalling exactly what the

6   amendment was, but we did amend the plan.

7   Q.  Now, when you amended the plan, were you careful to respect

8   the provision in 7.1 that provided for not divesting anyone of

9   benefits to which they have already earned?

10  A.  Yes.

11  Q.  OK.  How did you take that caution, take those steps, to

12  protect benefits that had already been earned?

13  A.  We always worked with legal counsel.  The board relied upon

14  counsel to assure us that nobody would be divested of their

15  accrued benefits.

16  Q.  And who was the legal counsel that you worked with?

17  A.  Mike Connors.

18  Q.  OK.  Now, did you have a conversation with Mike Connors

19  asking him to make sure that YAI did not run afoul of provision

20  7.1?

21              THE COURT:  At any time?

22              I'm sorry, sir, a particular time period?

23              MR. ZABELL:  At any time.

24              THE COURT:  Did you understand the question?

25              THE WITNESS:  I do, but I don't recall.  We covered a

J5TsWEG4                           Fava - Cross

1    lot of ground.  I don't recall specifically at that point.

2    BY MR. ZABELL:

3    Q.  OK.  I'm going to ask that you turn to the page that is

4    Bates stamped numbered 380.

5    A.  OK.

6    Q.  Do you see that page?

7    A.  Definitions, yes.

8    Q.  And under 10.11, it has an effective date, is that correct?

9    A.  Correct.

10   Q.  And that is 1985?

11   A.  Correct.

12   Q.  And does that correspond with your memory of when this SERP

13   plan became effective?

14   A.  Yes.

15   Q.  OK.  And then below that, there is 10.1.2 eligibility?

16   A.  Yes.

17   Q.  Is there not?

18   A.  Yes.

19   Q.  And that is the eligibility requirements that we talked

20   about before, correct?

21   A.  Yes.

22   Q.  And those were the eligibility requirements that governed

23   anybody accruing any rights under the SERP plan, correct?

24   A.  Yes.

25   Q.  And in your administration of this SERP plan, as a member

1   of the ECC, the executive compensation committee, or, I'm

2   sorry, as the chair of the board of the executive compensation

3   committee, you made sure that only the eligibility requirements

4   that were contained in 10.1.2 were considered when an employee

5   would have vested under the SERP, is that correct?

6   A.  To be admitted to the SERP, you had to qualify.  When you

7   speak of vesting, um, I'm not sure what you mean.

8   Q.  OK.  So in order to be admitted to the SERP, is it your

9   position that you needed to meet the terms of 10.1.2?

10  A.  Yes.

11  Q.  And because I asked you before if there were any other

12  terms other than those in 10.1.2 that an employee needed to

13  meet in order to be admitted to the SERP and you said no.  Then

14  10.1.2 are the only conditions necessary of being admitted to

15  the SERP, correct?

16  A.  That's not correct.  It required board approval to be

17  admitted to the SERP.

18  Q.  I see.  Could you show me where in 10.1.2 it says that you

19  needed board approval to be admitted into the SERP?

20  A.  It was a matter of practice from the very first people who

21  were admitted to the SERP that the board opined that they could

22  be a part of the SERP.

23  Q.  OK.  Did you consult Mike Connors to determine if board

24  approval was necessary to be admitted to the SERP,

25  notwithstanding the language of the SERP document?

1   A.  Mike Connors did not become counsel to the board until a

2   number of years later than the late 80s, early 90s.  So no, we

3   did not consult with him.

4   Q.  OK.  So this practice that the board had of admitting

5   people into the SERP, did that only factor in the eligibility

6   requirements of 10.1.2 of the SERP?

7   A.  Yes.

8   Q.  So there were no requirements other than 10.1.2 that the

9   board considered in admitting employees into the SERP, correct?

10  A.  Correct.

11  Q.  Now, did there come a time where the board or the ECC sent

12  out a notice to all potential SERP members that in order to be

13  a participant in the SERP, the board needed to admit you?

14  A.  No.

15  Q.  Was that ever written down anywhere?

16  A.  I'll withdraw that.

17  Q.  Was that practice ever written down anywhere?

18  A.  I don't know.

19  Q.  Was that practice ever codified in any amendments to the

20  SERP?

21  A.  I don't believe so.

22  Q.  OK.  Now, looking at eligibilities requirements contained

23  this 10.1.2, do you have an opinion as to whether or not

24  Ms. Wegmann was eligible to be in the SERP?

25  A.  Well, she certainly had 15 years of service.

1    Q.   OK.   Was she a management-level employee?

2    A.   She became a management-level employee when she assumed the

3    role of CFO.

4    Q.   OK.

5    A.   I believe that was in 2006 or 2007.

6    Q.   OK.   What about her compensation?

7    A.   She was well compensated.

8    Q.   OK.   Do you know if she met the compensation eligibility

9    requirement?   I'm sorry.

10   A.   What is that, compensation eligibility requirement?

11   Q.   OK.   I'm sorry.   I assumed a familiarity with this.

12           So it says here that service with the institute and

13   whose compensation is not fully considered in the computation

14   of federal Social Security benefits.

15           Do you see that?

16   A.   Yes.

17   Q.   OK.   Now, do you know if Ms. Wegmann's compensation met

18   those requirements?

19   A.   I'm not sure.

20   Q.   OK.   Did you ever ask?

21   A.   I had no reason to ask.

22   Q.   Pardon?

23   A.   I don't think I ever had any reason to ask.

24   Q.   When did you leave YAI?

25   A.   Um, 2011.

1    Q.  OK.  Now, if you keep reading under the eligibility, it

2    talks about entry into the plan as a plan participant shall be

3    on the July 1st coincident with or next following the

4    employee's compliance with the eligibility requirements, is

5    that correct?

6    A.  Correct.

7    Q.  Was that provision in the eligibility requirement respected

8    by the ECC?

9    A.  I believe so, yes.

10   Q.  OK.  Well, that would mean that once an employee met all of

11   the eligibility requirements, then they would automatically be

12   in the plan, not have to be adopted into the plan, correct?

13   A.  You know, I practiced from day one.  There was no automatic

14   eligibility.  We did not consider it an automatically derived

15   benefit.

16   Q.  Even though the actual contractual document says that that

17   is how one gets into the plan, correct?

18   A.  Our practice was different.

19   Q.  I see.  Now, let's talk about Mr. Rut.

20           Do you remember Mr. Rut?

21   A.  I do, yes.

22   Q.  Who was Mr. Rut?

23   A.  He was the chief financial officer of the agency prior to

24   Ms. Wegmann assuming that role.

25   Q.  And do you remember when he became the chief financial

J5TsWEG4                          Fava - Cross

1   officer?

2   A.  Um, no, I don't.

3   Q.  And wasn't the decision by the ECC to include Mr. Rut in

4   the SERP made before he held the title of CFO?

5   A.  I don't know.

6   Q.  The title Mr. Rut held before he was the CFO was what,

7   ma'am?

8   A.  I believe controller.

9   Q.  So did you play any role in the admission of Mr. Rut into

10  the SERP plan?

11  A.  As a member of the pension committee, yes.

12  Q.  OK.  Do you recall what discussions were made at that time

13  regarding Mr. Rut?

14  A.  I believe he was admitted along with several other

15  management employees.

16  Q.  So only management employees were in the SERP, correct?

17  A.  Correct.

18  Q.  Do you know who Enid Barbell is?

19  A.  Yes.

20  Q.  Who is Ined Barbell?

21  A.  She was executive assistant to Joel Levy.

22  Q.  She was his secretary?

23  A.  She was an executive assistant.  She was well more than a

24  secretary.

25  Q.  Was she a C-suite level employee?

J5TsWEG4                          Fava - Cross

1   A.  One could argue, yes.

2   Q.  Who is that one and what would they argue?

3   A.  She had a tremendous amount of responsibility.  Joel had a

4   lot on his shoulders, and she worked alongside him to

5   facilitate his ability to do his job.  He worked very, very

6   long hours, during which she was in the C-suite along with him.

7   Q.  As his assistant, correct?

8   A.  Correct, as his valued assistant.

9   Q.  I'm sure.

10          All of the employees at YAI were valued, correct?

11  A.  Correct.

12  Q.  Ms. Wegmann was valued, correct?

13  A.  Absolutely.

14  Q.  Was she valued as an assistant controller?

15  A.  I'm not sure that she had that title.

16  Q.  Was she --

17  A.  Is that where she started?

18  Q.  Yes.

19  A.  OK, yes.

20  Q.  Was she valued as a controller?

21  A.  Yes.

22  Q.  And was she valued as a CFO?

23  A.  Yes.

24  Q.  OK.  She just wasn't admitted into the SERP, correct?

25  A.  Correct.

J5TsWEG4                              Fava - Cross

1   Q.  Why wasn't she admitted into the SERP?

2   A.  Well, beyond a certain point in time, no one was admitted

3   into the SERP.

4   Q.  So --

5   A.  That point in time being around 2004, when we had some

6   compensation surveys done.

7   Q.  Well, was there an actual SERP amendment in 2004 that said,

8   from now on, the SERP is closed to new members?

9   A.  No.

10  Q.  Was there any sort of publication that the contractual

11  benefits that were being provided by the SERP were no longer

12  eligible to management employees who met the eligibility

13  requirements?

14  A.  Technically, no.

15  Q.  OK.  Did you communicate to Ms. Wegmann that she wasn't in

16  the SERP?

17  A.  I had no reason to communicate that.

18  Q.  When did you ever tell Ms. Wegmann that she wasn't in the

19  SERP?

20  A.  I never had any discussions with her about her being in the

21  SERP or not being in the SERP.

22  Q.  OK.  Did you, as chair of the ECC, oversee the drafting of

23  the original SERP?

24  A.  No.

25  Q.  Who did?

1   A.  Outside counsel did the document, drafted the document.

2   Q.  And did you supervise outside counsel in that process?

3   A.  I did not.

4   Q.  Who did?

5   A.  Joel Levy.

6   Q.  Joel.

7          Now, are you familiar with some of the decisions that

8   have emanated out of this case?

9          THE COURT:  I'm sorry.  Are you asking her if she is

10  familiar with my opinions in this case?

11         MR. ZABELL:  Yes.

12         THE COURT:  I'm not sure about the relevance, but have

13  you been following along my opinions?

14         You can say no.  I won't take offense.

15         THE WITNESS:  No.

16         THE COURT:  That's fine.  She did leave the

17  organization in 2011.  Again, I take no offense.

18  BY MR. ZABELL:

19  Q.  Now, do you recall making a decision as to whether or not

20  Mr. Rut was a management-level employee at the time that the

21  board voted to permit him to go into the SERP?

22  A.  I believe so.

23  Q.  Do you know, do you recall what factors were considered?

24  A.  I imagine responsibilities and title.

25  Q.  So you said you imagine.

```
 1              Are you surmising from all the facts that are around
 2   you, or do you actually remember?
 3   A.  It was many, many years ago, so I don't actually remember
 4   the criteria before us, but certainly that would be fundamental
 5   to somebody being admitted to the SERP.
 6   Q.  OK.  Now, do you recall who the board approved of entering
 7   the SERP in the 1990s, let's say?
 8   A.  I recall the participants, yes.
 9   Q.  Who were they?
10   A.  Joel Levy, Phillip Levy, Steve Freeman, Tom Dern, and Joe
11   Rut, and Ined Barbell.
12   Q.  Now, in 1993 -- I'm sorry.
13              Do you know if the board approved putting Joseph Rut,
14   Ined Barbell, Stephen Freeman, and Thomas Dern into the SERP in
15   1993?
16   A.  I believe so, yes.
17   Q.  And, in fact, if you look at paragraph 27 of your
18   affidavit, you indicate that?
19   A.  Correct.
20   Q.  And you were part of that board that approved that,
21   correct?
22   A.  Correct.
23   Q.  Now, when you approved that, do you know if all of those
24   participants met all of the eligibility requirements of the
25   SERP?
```

J5TsWEG4                          Fava - Cross

1    A.  Yes.

2    Q.  So at that time, they had all completed 15 years of

3    service?

4    A.  I believe so, yes.

5    Q.  And they were all management-level employees, correct?

6    A.  Correct.

7    Q.  And there are salary requirements were met as defined under

8    the eligibility requirements, correct?

9    A.  I believe so, yes.

10   Q.  And were there any factors other than those three factors

11   that are identified in 10.1.2 that were considered by the board

12   in admitting them into the SERP?

13   A.  No, I don't recall any.

14   Q.  OK.  Now, I'm going to ask that you turn to paragraph 30 of

15   your affidavit.

16           If you look at particular at paragraph 30, it

17   indicates that Mr. Dern and Rut were put into the SERP before

18   they had 15 years of employment, is that correct?

19   A.  From this, yes, I would agree.

20   Q.  I see.

21           THE COURT:  This was your declaration; yes?

22           THE WITNESS:  It is my declaration.

23           THE COURT:  It is your declaration.

24           THE WITNESS:  I didn't recall that.

25   BY MR. ZABELL:

J5TsWEG4                          Fava - Cross

1    Q.  Pardon?

2    A.  I'm sorry.  This is my declaration, and I didn't recall

3    this provision.

4    Q.  I see.  Did somebody help you prepare this affidavit?

5    A.  I went over it with my counsel.  I prepared it.

6    Q.  And who was it that you went over it with?

7    A.  Jay Gould, my counsel.

8    Q.  OK.  And it was prepared specifically for this litigation,

9    correct?

10   A.  Correct.

11   Q.  Now, this 1993 decision by the board to include Mr. Dern

12   and Mr. Rut in the SERP didn't result in a SERP amendment until

13   2005, correct?

14   A.  Yes.

15   Q.  And that 2005 amendment really wasn't implemented until

16   2008, correct?

17   A.  Yes.

18   Q.  OK.  Now, based upon your familiarity with the SERP, is

19   there a provision within it that requires someone who meets the

20   eligibility requirements to say that they meet the eligibility

21   requirements?

22   A.  No.

23   Q.  Notwithstanding that there is no provision in the SERP

24   that requires that, was there a board practice of requiring

25   employees of YAI to say that they qualify for the SERP?

J5TsWEG4                          Fava - Cross

1    A.  No.

2    Q.  OK.  Now, did you have any knowledge throughout your time

3    at YAI of any employees' belief that they were or should have

4    been covered under the SERP?

5    A.  No.

6    Q.  OK.  Would you have been in a position to obtain knowledge

7    of who thought they were entitled to be in the SERP?

8    A.  Practically, yes if I wanted to know that.

9    Q.  OK.  And if you wanted to know, how would you go about

10   trying to find that out?

11   A.  I would inquire.

12   Q.  From whom would you inquire?

13   A.  Joel, Phillip.

14   Q.  When you were at YAI, did you inquire of anyone at all at

15   YAI who believed they were in the SERP?

16   A.  No.

17   Q.  Did you, during your tenure at YAI, engage counsel to

18   inquire who falls under the eligibility requirements of the

19   SERP?

20   A.  No.

21   Q.  Now, is it impossible to become eligible for SERP benefits

22   without board approval?

23   A.  Yes.

24   Q.  OK.  Could you tell me where in the SERP it says that?

25   A.  It doesn't.

```
1    Q.  And so the impossibility stems from whether or not the

2    board members would allow someone who meets the eligibility

3    requirements to transfer over that transom and be in the SERP,

4    correct?

5    A.  Our practice, again, from day one was that board approval

6    was a necessary step in becoming a participant.

7    Q.  All right.  And that was not codified in any amendment to

8    the SERP, correct?

9    A.  It was only in terms of established practice, which was

10   consistent throughout.

11   Q.  OK.  Now, the funds that the trustees of the SERP used to

12   pay SERP benefits, do you know where they were maintained?

13   A.  They were managed by an asset manager.

14   Q.  OK.  Were they maintained in individual accounts for the

15   specific individual members of the SERP?

16   A.  No, it was one fund.

17   Q.  So it was one pool of funds?

18   A.  Correct.

19   Q.  To satisfy the obligations of the SERP?

20   A.  Correct.

21   Q.  OK.  Do you know if that pool of funds that was set aside

22   to satisfy the obligations of the SERP were ever used to

23   satisfy any other obligations of YAI?

24   A.  I do not believe that they were.

25   Q.  Are you aware that a portion of those SERP funds were
```

J5TsWEG4                          Fava - Cross

1    utilized to satisfy certain financial obligations that arose as

2    a result of the *qui tam* action?

3    A.  Yes.  In point of fact, they were pledged as collateral on

4    that action.

5    Q.  How much of those funds was pledged?

6    A.  Um, I believe it was $18 million.

7    Q.  I see.  Do you know if any of those $18 million was

8    actually spent on something other than paying obligations of

9    the SERP?

10   A.  I believe not.

11   Q.  You believe not?

12   A.  Correct.

13           THE COURT:  Just for my own clarification, they were

14   pledged as collateral in the *qui tam* action, but never actually

15   used to satisfy anything?

16           THE WITNESS:  No, because I believe other assets of

17   the agency were available to satisfy that.

18           THE COURT:  OK.  Thank you.

19           THE WITNESS:  Liability.  Um-hmm.  They were pledged,

20   again, as collateral.

21           THE COURT:  Yes.

22   BY MR. ZABELL:

23   Q.  Do you recall when they were pledged as collateral?

24   A.  Sometime during the settlement of the *qui tam* lawsuit,

25   which was -- I'm not good with years.

1    Q.  OK.  Does it refresh your recollection if I said sometime

2    around 2010?

3    A.  That's about right.

4    Q.  All right.  Now, I had asked you before if you ever had

5    inquired of Joel Levy whether or not there were any people

6    claiming to be participants of the SERP.

7          Do you recall that?

8    A.  Yes.

9    Q.  You indicated that you didn't ever inquire, is that

10   correct?

11   A.  Correct.

12   Q.  Did Joel Levy ever bring up to you his understanding that

13   there were YAI employees that felt that they were entitled to

14   benefits under the SERP?

15   A.  Um, yes.

16   Q.  OK.  Do you recall when that was?

17   A.  I would say somewhere 2008, 2009.

18   Q.  Is there anything I could do to refresh your recollection

19   regarding the timing, whether it was in 2008 or 2009?

20   A.  Yes.

21   Q.  What could I do?

22          Is there a document I could show you, perhaps?

23   A.  I know there was a personal practices committee or it was

24   an executive comp committee meeting.  There was some notes

25   taken.  I was aware of that Karen Wegmann wanted a pension

1  benefit and we discussed it in committee.

2  Q.  OK.  How about I direct your attention to paragraph 57 of

3  your affidavit?

4  A.  2008.

5  Q.  November of 2008, correct?

6  A.  Correct.

7  Q.  And that is when Joel Levy discussed with you Karen Wegmann

8  receiving SERP benefits, correct?

9  A.  Receiving retirement benefits, yes.

10  Q.  OK.

11  A.  It was never expressed in terms of receiving SERP benefits.

12  Q.  So Joel Levy never said anything to the ECC or you about

13  Ms. Wegmann receiving SERP benefits?

14  A.  Again, it was about her receiving a retirement benefit.

15  Q.  OK.

16          THE COURT:  Just for my own clarification, please,

17  could you help me understand the different types of retirement

18  benefits that might be available.

19          Was there a deferred benefits plan or deferred

20  compensation plan?

21          THE WITNESS:  There was a longevity plan, which Karen

22  was a participant in.

23          THE COURT:  OK.

24          THE WITNESS:  And I know that the compensation

25  committee considered formulating a new plan, retirement plan,

1   for Karen and possibly other people, but we didn't get very far

2   in terms of developing a plan like that, recognizing that we

3   might want to afford that benefit to other people.  Because

4   there was a point in time at which we knew that we could not

5   admit anyone to the SERP because of changes in the tax law.  So

6   the SERP was, for all practical purposes, closed to other

7   individuals.

8            THE COURT:  Given that fact, when approximately do you

9   remember that closing, the changes in the tax law?

10           THE WITNESS:  I think it was 2004, 2005.

11           THE COURT:  OK.  So after 2004, you did not expect

12   anyone to ask that either they or someone they advocated on

13   behalf of be included in the SERP, correct?

14           You believed it to be closed, so you didn't expect

15   anybody to ask to be included in the SERP, the one that is the

16   subject of this litigation, correct?

17           THE WITNESS:  Correct.

18           THE COURT:  OK.  And you also expected no one to ask

19   anybody else to be included in the SERP, you know, if they

20   weren't advocating for themselves, for someone else, you

21   wouldn't have expected that, correct?

22           THE WITNESS:  We did not, correct.

23           THE COURT:  When you say you, you're speaking of the

24   pension committee or the executive compensation committee?

25           THE WITNESS:  Exactly, the executive compensation

1    committee.  The pension morphed into executive comp.

2                THE COURT:  Thank you.  I would just ask you to let me

3    finish the question so we can be sure to be talking about the

4    same thing.

5                THE WITNESS:  Sure.

6                THE COURT:  After 2004, you expected no one to ask.

7         Do you believe Dr. Joel Levy had the same

8    understanding that you did in 2004, which is that no one would

9    ever be put in the SERP ever again?

10               THE WITNESS:  We both understood that negative

11   implications of letting somebody into the SERP.  There were tax

12   consequences.  There were potentially personal liability

13   consequences to trustees of making those changes.

14               THE COURT:  OK.  So you had conversations with

15   Dr. Levy that made clear to you that he understood, just as you

16   understood, the ramifications or the consequences of adding

17   someone to the SERP, correct?

18               THE WITNESS:  Correct.

19               THE COURT:  As a result, when you had this meeting in

20   2008, are you saying that Dr. Levy specifically or did not

21   mention inclusion of Karen Wegmann in the SERP because of the

22   knowledge of the consequences?

23               THE WITNESS:  Correct.

24               THE COURT:  But he asked that her retirement benefits

25   be discussed at this meeting, also correct?

1              THE WITNESS:  Correct.

2              THE COURT:  And you understood that he wanted at least

3       to consider setting up a second SERP for --

4              THE WITNESS:  An alternative, plan, correct.

5              THE COURT:  An alternative plan that wouldn't have the

6       same tax consequences for Ms. Wegmann and, perhaps, others?

7              THE WITNESS:  Correct.

8              THE COURT:  But never, not ever, did he discuss with

9       you in 2008 placing Ms. Wegmann into the SERP that is the

10      subject of this litigation?

11             THE WITNESS:  Never.

12             THE COURT:  I appreciate the clarification.  Thank

13      you.

14             Thank you, counsel.

15             THE WITNESS:  Surely.

16      BY MR. ZABELL:

17      Q.  Now, we're talking about the SERP.  What does the SERP

18      stand for?

19             What does SERP stand for?

20      A.  Supplemental employee retirement.

21      Q.  Plan?

22      A.  Plan.

23      Q.  OK.  So I'm going to ask that you take a look at Exhibit AM

24      to your affidavit, please.

25             Can you make that out?  I know it is a little

1   difficult.

2   A.   Yes, I can.

3   Q.   Now, you appended this to your affidavit, correct?

4   A.   Yes.

5   Q.   OK.   This is a document that you're familiar with, correct?

6   A.   Yes.

7   Q.   So as of June 30, 2007, there was some sort of calculation,

8   SERP calculation, being made for Karen Wegmann, is that

9   correct?

10  A.   There was a retirement plan calculation.

11  Q.   OK.   And that retirement plan, that is called proposed

12  supplemental defined contribution target plan, is that correct?

13  A.   Correct.   That's the name it was given.

14  Q.   And that is on this very same page as the SERP benefits for

15  Thomas Dern, Stephen Freeman, Joel Levy, and Phil Levy,

16  correct?

17  A.   Yes.

18  Q.   And that puts a present value of over $2 million on those

19  benefits, correct?

20  A.   Correct.

21  Q.   And it sets up what YAI should contribute on her behalf,

22  correct?

23  A.   Correct.

24  Q.   But then if you look at the very bottom, it says strictly

25  confidential, for board committee reference only, correct?

1   A.  Yes.

2   Q.  And then it says it is not to be distributed to nor relied

3   upon by plan participants or beneficiaries, correct?

4   A.  Correct.

5   Q.  Do you know if this document was ever distributed to plan

6   participants or beneficiaries?

7   A.  I don't know.

8   Q.  Do you know what the practice was with regard to documents

9   that said for board committee reference only?

10  A.  Practice was to keep them within the board and

11  confidential.

12  Q.  OK.  And was the practice also not to distribute nor to

13  rely upon by plan participants or beneficial areas?

14  A.  Yes.

15  Q.  So you don't know if Ms. Wegmann actually received this

16  document, do you?

17  A.  I don't believe that she did.

18  Q.  And in any event, it doesn't really matter because she

19  never got any of those benefits, correct?

20  A.  It says in the footnote that these were all hypothetical.

21  Q.  Hypothetical based upon what?

22  A.  Hypothetical based upon contribution -- I mean, there would

23  be a number of factors that would be considered in terms of

24  determining the actual dollar amounts of any contribution,

25  which for purposes of this illustration were hypothetical,

1    because there was no such plan in place.

2    Q.  Well, actually, if you read the hypothetical, it says that

3    it is a hypothetical based upon whether or not Karen Wegmann

4    was in the SERP plan, correct?

5    A.  I'm having trouble reading it.  My apologies.

6          Could I ask you to rephrase your question, please?

7    Q.  The hypothetical, the calculation is calculated as if

8    Ms. Wegmann was in the SERP plan as of June 30, 2007, correct?

9    A.  Yes.

10   Q.  OK.  I'm going to ask that you turn to the very next

11   exhibit, Exhibit AP.

12   A.  OK.

13   Q.  Now, that's your document, AP, correct?

14   A.  It is, yes.

15   Q.  And that is your handwriting, correct?

16   A.  It is.

17   Q.  OK.  And this is the executive compensation committee

18   November 24, 2008 agenda, correct?

19   A.  Correct.

20   Q.  OK.  Now, it says it is actually typewritten on there,

21   Karen retirement.

22          Do you see that?

23   A.  I do.

24   Q.  Was Karen planning on retiring in 2008?

25   A.  I don't believe so, no.

1    Q.  OK.  So how did Karen retirement get on your November 24,

2    2008, executive compensation committee agenda?

3    A.  Because we knew she wanted something.  She wanted a plan.

4    Q.  I see.  And it actually says wants plan, equal supplemental

5    plan, correct?

6    A.  No.  She wanted a plan equal to the supplemental plan.

7    Q.  I'm sorry.  Did I just say wants plan, equal supplemental

8    plan?

9    A.  OK.

10   Q.  Did I say that wrong?

11   A.  Well, the first time it didn't sound quite right.

12   Q.  OK.  I apologize.

13   A.  She wanted a plan similar to --

14            THE COURT:  Excuse me, please.  You wrote those words

15   down?

16            THE WITNESS:  I did.

17            THE COURT:  What did you mean when you wrote them

18   down?

19            THE WITNESS:  I meant she wanted a benefit that would

20   be equivalent to what she would be getting were they a part of

21   the supplemental plan, which she was not.

22            THE COURT:  I understand.

23            THE WITNESS:  And would never be.

24   BY MR. ZABELL:

25   Q.  And she was not and would never be because the board

```
 1   wouldn't do it, correct?
 2   A.  Because the plan was closed to anybody.
 3   Q.  OK.  Could you show me where in the exhibits to your
 4   affidavit there is a document closing the SERP plan?
 5   A.  I've already said that there were changes in the tax law
 6   that made it prohibited for us to add anyone to the plan.
 7   Q.  So those changes in the tax law just meant that there were
 8   tax ramifications for adding someone to the plan, correct?
 9   A.  There were personal liabilities to the trustees.
10   Q.  Only if it the trustees made mistakes, correct?
11   A.  Correct.
12             THE COURT:  Calm down, counsel.  Calm down, witness.
13             I think the point of this line of questioning is that
14   you would agree that it wasn't a legal impossibility, it just
15   had consequences that made the compensation committee think
16   twice; yes?
17             THE WITNESS:  Yes.
18             THE COURT:  Now I understand.
19             MR. ZABELL:  I apologize.  I'm sorry.
20   BY MR. ZABELL:
21   Q.  Now, those taxation consequences arose in what year?
22   A.  Um, I don't recall.
23   Q.  OK.  But you can say that the SERP plan was amended at some
24   point after those tax implications were enacted, correct?
25   A.  Correct.
```

J5TsWEG4                        Fava - Cross

1   Q.  All right.  Now, at some point there was the 2008 SERP

2   amendment, correct?

3   A.  Yes.

4   Q.  And were you involved in that?

5   A.  Yes.

6   Q.  And how were you involved in that?

7   A.  Making recommendations to the board to approve the amended

8   plan.

9   Q.  I see.

10           THE COURT:  Did you yourself draft or participate in

11  the drafting of the amendment?

12           THE WITNESS:  Um, to some extent, yes.

13           THE COURT:  What was the impetus for the amendment?

14           Was there somebody at YAI who wanted the plan amended

15  or suggested its amendment?

16           THE WITNESS:  Let me just be reminded of what the

17  amendment was in 2008.  I'm sorry.

18           THE COURT:  That's fine.  Do you want to show her the

19  amendment?

20           MR. ZABELL:  Sure.

21           THE WITNESS:  Then I'll connect dots.

22  BY MR. ZABELL:

23  Q.  If you look at Exhibit AT as in Tom.

24  A.  I was not involved in drafting this, if that was the

25  question.

```
 1   Q.  Do you know what the purpose of the amendment was?
 2   A.  I believe it was to comply with changes in the tax law.
 3   Q.  OK.  I'm going to ask that you take a look at AQ, the
 4   document just before that.
 5   A.  Yes.
 6   Q.  Those are minutes from the executive compensation
 7   committee, correct?
 8   A.  Yes.
 9   Q.  And you were listed as an attending, were you not?
10   A.  Correct.
11   Q.  Have you seen these notes before?
12   A.  At some point, yes.
13   Q.  At some point because they were appended to your affidavit,
14   correct?
15   A.  Correct.
16   Q.  I'm going to ask that you turn to the second page, the page
17   that is Bates stamp numbered 198.
18   A.  Yes.
19   Q.  Now, in that first paragraph, it talks about why the plan
20   was amended, correct?
21   A.  Yes.
22   Q.  And it doesn't say anything about tax implications, does
23   it?
24   A.  No.  I'm being reminded that there were employment
25   agreements that had been entered into.
```

J5TsWEG4                          Fava - Cross

1    Q.  Right.  So the plan amendment, which is AT, was just

2    amending the SERP plan to address specific changes to benefits

3    for certain plan members, correct?

4    A.  Correct.

5    Q.  And those plan members voluntarily gave up some of the

6    benefits that they were supposed to be entitled to, correct?

7    A.  Correct.

8    Q.  OK.  And that is what the purpose of the amendment, which

9    is AT was, correct?

10   A.  Yes.

11   Q.  It wasn't amended for any other purpose, was it?

12   A.  No.

13   Q.  OK.  Now, did you sign the amendment?

14   A.  Yes.

15   Q.  When did you sign it?

16   A.  Shortly after -- I mean, after it was approved by the

17   board.

18   Q.  I'm going to help you out here.  Turn to the last page.

19   A.  OK.

20   Q.  I'm sorry.  I thought you were going to do that.  I

21   apologize.

22   A.  The last page?

23   Q.  Yes.  Page Bates stamp number 430.

24            THE COURT:  This is Exhibit AT, if that is helpful.

25            THE WITNESS:  I'm at AT.  Oh, right.  I was in AQ.

J5TsWEG4                        Fava - Cross

AT.

                    THE COURT:  Go to the last page of AT.

                    THE WITNESS:  Um-hmm.

                    Yes, I signed it.

BY MR. ZABELL:

Q.  And you signed it in December of 2008, correct?

A.  Correct.

Q.  And do you know if this amendment was distributed to all

plan members?

A.  I don't know.

Q.  Do you know if this amendment was distributed to all those

who met the eligibility of the original 1985 SERP document?

A.  I expect not.

Q.  Do you know if this document was distributed to Karen

Wegmann?

A.  I don't know.  I expect not.

Q.  But you do know that the plan, the SERP plan, wasn't closed

in the early 2000s because in 2008, you were still amending it,

correct?

A.  I believe that amendments could be made while at the same

time it was understood that no one new would be entering the

plan.

Q.  I see.  Now, in 2008, the plan was amended to reduce

certain benefits that these four individuals were to receive,

correct?

1  A.  Correct.

2  Q.  Now, the reduction for these four individuals -- I'm sorry.

3  I'll withdraw that.

4         When did YAI start reducing the benefits being paid

5  into the fund for these four individuals?

6  A.  I'm not sure.

7  Q.  Do you know if those reductions were made only once the

8  plan was amended?

9  A.  I'm not sure.

10  Q.  Do you know if amending the plan to reduce the benefits for

11  these individuals resulted in a surplus in the YAI SERP plan

12  trust funds?

13  A.  I don't believe we ever had a surplus in that trust fund.

14  Q.  Do you know if you ever had a deficit?

15  A.  We always had a deficit.  I mean, in more recent years, we

16  had a deficit as compensation was growing and our ability to

17  contribute to the fund was limited.

18  Q.  But you always had the ability to make annual contribution

19  to the SERP fund to cover the annual obligations of the SERP

20  fund, correct?

21  A.  Yes.

22  Q.  Except that with the exception of Dr. Joel Levy, all the

23  other SERP benefits were paid out in a lump sum annuity,

24  correct?

25  A.  Correct.

J5TsWEG4                          Fava - Redirect

1   Q.  Now, would Ms. Wegmann be present at a board committee

2   meeting that was discussing her compensation?

3   A.  No.

4   Q.  Would Ms. Wegmann be at a board committee meeting that was

5   discussing whether or not to include her in a SERP?

6   A.  No.

7   Q.  Now, did there come a time where Ms. Wegmann was asked to

8   collect bids for annuity to cover obligations of the SERP?

9   A.  Yes.

10  Q.  Who asked her to do that?

11  A.  I might have asked her.

12  Q.  Did you ask her to get an annuity to cover her benefits

13  under the SERP?

14  A.  No.

15          MR. ZABELL:  I have nothing further, Judge.

16          THE COURT:  Redirect?

17          MR. MEEHAN:  Very briefly, your Honor.

18          THE COURT:  Very briefly.

19          You're good?

20          THE WITNESS:  I'm good.  Thank you.

21  REDIRECT EXAMINATION

22  BY MR. MEEHAN:

23  Q.  Good afternoon, Ms. Fava.  Thanks for your patience.  I

24  know you had to wait a while.

25  A.  Sure.

1   Q.  The SERP document that was Exhibit A and it is attached to

2   your affidavit, can you turn back to that, please?

3   A.  Yes.

4   Q.  OK.  If you look at those eligibility sections, it is

5   section ten?

6   A.  Um-hmm.

7   Q.  You've given us your view about the board's role.  I don't

8   need to go into that.

9        I do need to ask you, in that section, there is a

10  reference to the term management employee.  You'll find that

11  10.1.2?

12  A.  Yes.

13  Q.  Can you point to the portion of the SERP that defines

14  management employee?

15  A.  I don't believe it is defined in terms of role or title.

16  Q.  Well, then how was it determined who was or was not a

17  management employee?

18  A.  Day-to-day practice, responsibilities.

19  Q.  And who made that determination at YAI?

20  A.  Um, the board members.

21  Q.  All right.  If you take a look at -- it's on the same

22  section.  It is talking about actuarial equivalents.  Now we're

23  getting into the benefits.  This is 10.1.4.  You see there it

24  says that the benefit, whenever it was to kick in for whatever,

25  would be actuarially determined.

 1              Do you see that phrase?

 2  A.   Yes.

 3  Q.   Where is it defined in the SERP what actuarially determined

 4  means?

 5  A.   I don't know that it is defined in the SERP.

 6  Q.   Can you point me to the part where it says who is going to

 7  put the actuary?

 8  A.   I don't believe it is here.

 9  Q.   How was that kind of a situation handled at YAI?

10  A.   We, on a fairly regular basis, engaged specific experts, be

11  they actuaries or fund managers, to assist the board.

12  Q.   All right.  So are these examples of situations where the

13  board had to step in to administer a document?

14  A.   Yes.

15  Q.   To spell out all the details?

16  A.   Sure.

17  Q.   You talked briefly about personal liability after these tax

18  changes?

19  A.   Yes.

20  Q.   What were you getting at?

21  A.   There were compensation requirements that a board act

22  reasonably and fairly in setting executive compensation, and

23  the penalties to a board who did not comply with the

24  requirements were personal and could be onerous.

25              (Continued on next page)

J56nwet5                         Fava - Redirect

1    Q.   OK.  Did that mean you might have to go out of pocket?

2    A.   Yes.  It was known as intermediate sanctions.

3    Q.   OK.  Are those the tax consequences that you are

4    referencing in paragraph 30 of your affidavit?  That's the one

5    where you say you developed an understanding it was impossible

6    because of these tax changes --

7    A.   Correct, yes.

8    Q.   You were asked about Exhibit AM.

9    A.   Uh-huh.

10   Q.   That's the one that had what you pointed out was a

11   hypothetical computation for Ms. Wegmann.

12   A.   Yes.

13   Q.   If you could turn to that briefly.

14   A.   Uh-huh.

15   Q.   OK.  Was that calculation for what was being considered a

16   different plan from the SERP?

17   A.   Definitely.

18   Q.   Was any such new plan adopted at any time while you were at

19   YAI?

20   A.   No.

21   Q.   If you look at AT, that's the 2008 amendment, you were

22   asked some questions to the effect of why was this adopted, and

23   I think you were led to a point of saying, well, it didn't have

24   anything to do with taxes.  Do you remember being asked about

25   that?

J56nwet5                          Fava - Redirect

1    A.  I do, yes.

2    Q.  Can you look the the first paragraph on the very first page

3    of the amendment.  Do you see all of those references to taxes

4    and regulations and grandfathering?

5    A.  Correct.

6    Q.  OK.  Ma'am, two quick questions to close up.  Are you over

7    the age of 35?

8    A.  Yes.

9    Q.  Are you an American citizen?

10   A.  I am.

11   Q.  Are you President of the United States?

12   A.  I am not.

13   Q.  OK.  But you are eligible to be, are you not?

14   A.  Yes.

15            MR. ZABELL:  I am just going to object, Judge.  Those

16   were four questions, not two.

17            THE COURT:  I know.  His estimation abilities are a

18   bit suspect.

19            MR. MEEHAN:  I admit that, your Honor.

20            THE COURT:  Ms. Fava, I thank you very much for your

21   time.  You are welcome to step down.

22            THE WITNESS:  Thank you very much.

23            THE COURT:  Counsel, thinking about food?  Thinking

24   about a lunch break?

25            MR. MEEHAN:  Whatever the Court wishes.

J56nwet5                          Fava - Redirect

1              THE COURT:  45 minutes, can it be done?

2              MR. MEEHAN:  Yes.  Just for housekeeping, I think we

3    have Mr. Conners and then Mr. Hart.

4              MR. ZABELL:  I don't anticipate it being much longer

5    than this.  I expect both of them, Conners and Hart, to be

6    roughly the same amount of time.

7              THE COURT:  So we will finish today?

8              MR. ZABELL:  Come hell or high water.

9              MR. MEEHAN:  Yes.  It sounds like we will have no

10   problem.  45 minutes sounds great if that's OK.

11             THE COURT:  I will see new 45 minutes.  I thank all of

12   you involved today, I especially thank all of you who are still

13   waiting to testify, and my thanks always to the court

14   reporters.

15             45 minutes.  Thank you.

16             (Luncheon recess)

17

18

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION

 2             (1:50 p.m.)

 3             THE COURT:  Thank you very much.

 4             Please be seated.

 5             THE COURT:  Mr. Meehan, your next witness, please.

 6             MR. MEEHAN:  Yes, your Honor, the defendants call

 7   Michael Connors.

 8    MICHAEL P. CONNORS,

 9         called as a witness by the Defendants,

10         having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. MEEHAN:

13             THE COURT:  Mr. Meehan, you may inquire.

14   BY MR. MEEHAN:

15   Q.  Good afternoon, Mr. Connors.  Thank you for your patience.

16   A.  Good afternoon.

17   Q.  Sir, do you have in front of you a copy of your declaration

18   together with its referenced exhibits?

19   A.  Yes.

20   Q.  Do you adopt that declaration as part of your testimony

21   here today?

22   A.  Yes.

23             MR. MEEHAN:  All right.  Your Honor, I tender the

24   witness for cross-examination.  I just want to note on the

25   record that I provided the original of the declaration to your
```

1   courtroom clerk.

2            THE COURT:  Yes.  Thank you very much.

3            All right.  Mr. Zabell.

4            MR. ZABELL:  Thank you, Judge.

5   CROSS-EXAMINATION

6   BY MR. ZABELL:

7   Q.  Good afternoon, Mr. Connors.

8   A.  Good afternoon.

9   Q.  How are you today?

10  A.  I'm doing well.

11  Q.  Mr. Connors, you did some work for YAI?

12  A.  Yes.

13  Q.  From when to when did you do work for YAI?

14  A.  Approximately 2007 until present.

15  Q.  So you're still in a business relationship with YAI, is

16  that correct?

17  A.  Yes.

18  Q.  Approximately how much annually does YAI pay you?

19  A.  I have no idea.

20  Q.  Do you know how much you or your firm bills YAI annually?

21  A.  I don't.

22            THE COURT:  Do you have a sense, sir, as to whether

23  you provide a week's work of legal services, a month's worth,

24  or something that could be defined, or does it vary year on

25  year?

J5tnweg5                          Connors – Cross

1             THE WITNESS:  I would say 20 hours a month.

2             THE COURT:  Thank you.

3             THE WITNESS:  Not me, my firm.

4   BY MR. ZABELL:

5   Q.  Are you a partner in that firm?

6   A.  Yes.

7   Q.  What are the billing rates, roughly, for those 20 hours?

8   A.  For YAI, I believe the highest rate is 475 down to in the

9   threes somewhere.  They are on a reduced-fee schedule.

10  Q.  I see.  Now, you provided an affidavit with your direct

11  testimony.  Do you recall that?

12  A.  Yes.

13  Q.  OK.  Did you prepare that affidavit yourself?

14  A.  Yes.

15  Q.  Did anybody assist you in preparing that affidavit?

16  A.  Yes.

17  Q.  Who assisted you?

18  A.  Mr. Meehan.

19  Q.  Mr. Meehan, this fellow right here?

20  A.  Yes.  Ed and Paul, yes, from Groom.

21  Q.  And Paul?

22  A.  Yes.

23  Q.  His associate?

24  A.  Yes.

25  Q.  Now, you have been advising YAI on, amongst other things,

1   their 1985 SERP, is that correct?

2   A.  Yes.

3   Q.  And you have been advising them on that SERP since you

4   started working with them in 2007, correct?

5   A.  Yes.

6   Q.  I believe your affidavit holds you out to be someone who

7   deals with all aspects of employee benefits and executive

8   compensation law, is that correct?

9   A.  Yes.

10  Q.  OK.  That includes SERPs, correct?

11  A.  Definitely.

12  Q.  For how long have you been dealing with SERPs?

13  A.  Since '89.

14  Q.  A SERP is a contract, is it not?

15  A.  It is.

16  Q.  And it's a contract between -- the SERP in this particular

17  case, I believe it's Exhibit A to your affidavit, is a contract

18  between YAI and some of its employees, correct?

19  A.  Yes.

20  Q.  The employees that are covered by the SERP are identified

21  by the language of the SERP, correct?

22  A.  This language.

23  Q.  The language of the SERP?

24  A.  Yes.

25  Q.  So, for example, if you take a look at Exhibit A of your

J5tnweg5                         Connors - Cross

1    affidavit -- please take a look -- that is the 1985 SERP,

2    correct?

3    A.  Correct.

4    Q.  You did not draft that SERP, correct?

5    A.  Correct.

6    Q.  But you advised YAI on how to comply with that SERP,

7    correct?

8    A.  Correct.

9    Q.  And how to meet its contractual obligations under that

10   SERP, correct?

11   A.  Correct.

12   Q.  And if you turn to ten point, I believe it's one two, that

13   talks about the qualifications in order to be in that SERP,

14   correct?

15   A.  Correct.

16              THE COURT:  Let him get there, please, sir.

17              Thank you.

18   BY MR. ZABELL:

19   Q.  It is on page Bates stamped No. 380.

20   A.  That's correct.

21   Q.  Now, you're familiar with that provision, correct?  10.1.2?

22   A.  I have read it before.

23   Q.  And is it safe to say that you've read it many times since

24   you have been employed by YAI?

25   A.  No.

1    Q.  Is it your understanding that 10.1.2 governs the

2    eligibility to be in the 1985 SERP?

3    A.  As of 1985, yes.

4    Q.  OK.  When do you believe 10.1.2 stopped governing the

5    eligibility into the SERP?

6    A.  My understanding is that the first time 10.1.2 was amended

7    was 2007 or '8.

8              THE COURT:  Sir, is it your position that the

9    agreement governs up to and only to the extent of the

10   amendments?

11             I didn't say that properly, but you're saying it's

12   still in operation today, this SERP, except it has changed

13   insofar as it has been amended, or are you saying it doesn't

14   apply at all anymore?

15             THE WITNESS:  Well, there is still one participant

16   left in the SERP.

17             THE COURT:  Yes, sir.

18             THE WITNESS:  So in that regard it's still a contract.

19             THE COURT:  Yes.

20             THE WITNESS:  And the law has changed since 1985 --

21             THE COURT:  Yes.

22             THE WITNESS:  -- which supersedes the contract, or it

23   can supersede the contract.  So that a SERP is a contract.  It

24   is also a tax instrument.  It is also a compliance instrument.

25   But one thing it is, is a contract, as you said.  So the answer

J5tnweg5                          Connors - Cross

1   is, the terms of the SERP, the contractual aspect to my

2   knowledge was as it was here until the -- I think the time I

3   was involved to amend the SERP.

4   BY MR. ZABELL:

5   Q.  OK.  Well, 10.1.2 of the SERP deals with eligibility,

6   correct?

7   A.  Yes.

8   Q.  And that is the only provision in the SERP up to December

9   18, 2008, that governed eligibility, correct?

10  A.  I don't know.

11  Q.  Did you ever have occasion to advise YAI on whether or not

12  they were complying with their SERP?

13  A.  Yes.

14  Q.  And did you advise them that they were in fact complying

15  with the SERP?

16  A.  Yes.

17  Q.  And in order to advise them that they were complying with

18  their SERP, you had to review the entirety of the SERP,

19  correct?

20  A.  Yes.

21  Q.  And did you in fact review the entirety of the SERP?

22  A.  Yes.

23  Q.  And in reviewing the entirety of the SERP, you only found

24  two documents, the 1985 SERP and the December 18, 2008,

25  amendment to the SERP, correct?

1    A.  Could you repeat that, please.

2              MR. ZABELL:  May I ask, Judge, that it be read back.

3              THE COURT:  If the court reporter could please read it

4    back.  Thank you.

5              (Record read)

6    A.  I only found it?

7    Q.  You only found those two documents governing the SERP,

8    correct?

9    A.  I don't find things.  I mean, you know, people -- documents

10   are provided to me by my client.

11             THE COURT:  Counsel --

12             THE WITNESS:  I don't understand.

13             THE COURT:  All right.  I understood, so let me ask

14   you the question.

15             THE WITNESS:  OK.

16             THE COURT:  What you're saying is in advising your

17   client on its compliance or not with the SERP you expected your

18   client to produce relevant documents to you, is that correct?

19             THE WITNESS:  Yes.

20             THE COURT:  One of the documents they produced to you

21   to aid you in making those determinations was the SERP document

22   itself, correct?

23             THE WITNESS:  Definitely, yes.

24             THE COURT:  Do you recall at the inception of your

25   provision of legal services to YAI regarding the SERP that they

J5tnweg5                        Connors - Cross

1    provided you any other documents that suggested prior or

2    different amendments to the SERP?

3              THE WITNESS:  Yes.

4              THE COURT:  Was that the document to which Mr. Zabell

5    was just referring?

6              THE WITNESS:  No.

7              THE COURT:  There was another amendment to the SERP of

8    which you are aware?

9              THE WITNESS:  There was another document that

10   purported to amend the SERP.

11             THE COURT:  All right.

12             THE WITNESS:  Whether it was an effective amendment, I

13   don't know.

14             THE COURT:  Understood.  Thank you.

15   BY MR. ZABELL:

16   Q.  Do you know of any courts of a competent jurisdiction that

17   have ruled that it was not an effective amendment?

18   A.  "It" is this other document we were talking about?

19   Q.  That is exactly what "it" is, yes?

20   A.  No, I don't.

21   Q.  Now --

22   A.  So you don't want me to address this other document?

23             THE COURT:  You can.  It's fine by me.

24             MR. ZABELL:  I didn't have a question in front of him.

25             THE WITNESS:  OK.

J5tnweg5                        Connors - Cross

BY MR. ZABELL:

Q.   Did you write the December 18, 2008, amendment?  I believe

it's attached to your affidavit as AT.

A.   My firm did.

Q.   Your firm did.  Did you review it?

A.   Yes.

Q.   Did you supervise its implementation at YAI?

A.   No.

Q.   Pardon?

A.   I don't implement.

Q.   You don't?

A.   I don't supervise.

Q.   You pass documents over and hope that they're implemented

correctly?

A.   I instruct.

Q.   What did you instruct YAI to do with this document that you

provided for them that's attached to your affidavit as AT?

A.   I don't remember.

Q.   OK.  Now, in having someone at your office draft AT, did

you have cause to ask any questions about potential eligibility

for other employees of YAI?

A.   No.

Q.   Did you rely on what YAI told you about the list of

eligible employees for the 1985 SERP?

A.   Yes.

1    Q.  Who told you who was eligible for the 1985 SERP?

2    A.  I have a belief.  I'm not certain.

3    Q.  Please share that belief with me.

4    A.  Joel or Philip Levy.

5    Q.  Now, is it --

6              THE COURT:  Counsel, if I may inquire.

7              Sir, might it have been anyone else, or those are the

8    only two possible sources of that information that you can

9    currently recall?

10             THE WITNESS:  The latter.

11             THE COURT:  Thank you, sir.

12             Counsel, you may continue.

13             MR. ZABELL:  OK.

14   BY MR. ZABELL:

15   Q.  Did you ever provide instructions to anyone at YAI to

16   inquire if there were any employees who completed 15 years of

17   service and whose compensation was not fully considered in the

18   computation of federal Social Security benefits who was also in

19   management?

20   A.  I don't think so.

21   Q.  OK.  Do you know why I asked you that question?

22   A.  I can guess.

23   Q.  Go ahead.  Guess.

24   A.  Because you think that there were other people who were

25   eligible.

J5tnweg5                         Connors - Cross

```
 1              THE COURT:  I might guess otherwise.  I think he was
 2    just reading to you from the 10.1.2 language and seeing if you
 3    had taken an independent investigation as to whether there were
 4    other people who might have qualified under that language, but
 5    we'll see.
 6              THE WITNESS:  Was I done?
 7              MR. ZABELL:  She's right.
 8              THE WITNESS:  OK.
 9              MR. ZABELL:  I concur.
10              THE COURT:  I have been with the case a little bit
11    longer than you, sir.  It's fine.
12              THE WITNESS:  OK.
13    BY MR. ZABELL:
14    Q.  Would it have been wise for YAI to examine their employees
15    to determine if there was a management-level employee whose
16    compensation met the compensation provided for under the
17    eligibility and who had the 15 years of service?
18    A.  At this point, I look back and say it would have been wise,
19    but at that point I don't think it was considered necessary.
20    Q.  At that point you didn't think it was considered necessary?
21    A.  No.
22    Q.  But now that you know about this claim it probably would
23    have been wise for them to have done that, correct?
24              THE COURT:  I believe he means now that you have this
25    lawsuit.
```

1          THE WITNESS:  Yes.

2     Q.  Correct?

3          THE WITNESS:  As your Honor said, now that you have

4     this lawsuit, yes.

5     Q.  If they had done that inquiry, they may have found that

6     Ms. Wegmann and perhaps other employees may have met the

7     eligibility requirements of the 1985 SERP, correct?

8     A.  Yes.

9     Q.  OK.  And would that have changed how you drafted or how

10    your office drafted the December 18, 2008, amendment?

11    A.  No.

12    Q.  OK.  Are you aware of any provisions in Exhibit A that

13    allow the board or YAI to strip away vested benefits?

14    A.  I am not aware of any.

15    Q.  OK.  Isn't there a provision in this agreement that

16    specifically -- in the contract that is Exhibit A that

17    specifically says once somebody has vested benefits you can't

18    take them away?

19         THE COURT:  Do you want to direct him to a section,

20    counsel?

21    Q.  If you look at page Bates stamps numbered 372, 7.1, right

22    of amendment.

23    A.  OK.

24    Q.  Doesn't that say that you can't divest a beneficiary of

25    this contract without their consent?

J5tnweg5                         Connors - Cross

1    A.  Yes.

2    Q.  And if you turn to page Bates stamp numbered 359, under

3    Section 3.2, doesn't that provision also say that no interest

4    can be alienated under this contract?

5    A.  Well, yes.

6    Q.  OK.  Now, if someone had an interest that derived from this

7    1985 contract between YAI and them as an employee of YAI, could

8    that interest be divested in the December 18, 2008 SERP

9    amendment?

10   A.  Not without consent.

11   Q.  I'm sorry?

12   A.  Not without consent.

13   Q.  OK.  So, let's say someone opines that Ms. Wegmann had

14   contractually met her obligations to benefits under the 1985

15   SERP in say 2006 or 2007.  She couldn't lose those benefits by

16   virtue of this December 18, 2008, amendment to the SERP, could

17   she?

18   A.  She could, but she would have a cause of action if she did

19   not consent.

20   Q.  Right.

21   A.  The plan was amended.

22   Q.  OK.

23   A.  And the amendment is effective.

24   Q.  But you can't amend the plan to divest somebody of benefits

25   once they've already earned them without their consent,

1    correct?

2    A.  Correct.

3    Q.  OK.  And nobody took the step in December 18 of 2008 to

4    advise you that Ms. Wegmann may have met the qualifications

5    under the SERP, correct, under the 1985 version of the SERP?

6    A.  Right.

7    Q.  Now, did the board at YAI ever talk to you about certain

8    policies they had regarding eligibility under the 1985 SERP?

9    A.  No.

10   Q.  Did you ever advise anybody at YAI that, notwithstanding

11   the contractual language of the 1985 SERP, they were not

12   permitted to add any additional eligibility requirements?

13            THE COURT:  Absent amendment of the SERP.

14            MR. ZABELL:  Absent amendment of the SERP.

15   A.  Add eligibility requirements?

16   Q.  Yes.

17   A.  We never focused -- I never focused on eligibility and the

18   terms of the plan -- the eligibility terms of the plan with the

19   board.  We were not ever focused on incoming participants.

20   Q.  Did anybody at YAI ask you for an opinion on Karen

21   Wegmann's eligibility to the 1985 SERP?

22   A.  An opinion?

23   Q.  Yes.

24   A.  Like can Karen participate in the SERP?

25   Q.  No, like should she be in the SERP based upon the

```
1    eligibility language of the SERP.
2              THE COURT:  Is there a time frame for this question,
3    counsel?
4              MR. ZABELL:  It's from 1997 until present.
5              THE COURT:  2007?
6              MR. ZABELL:  I'm sorry.  2007 to present.  Sorry.
7              THE COURT:  Thank you for the clarification.
8              Do you understand the question, sir?
9              THE WITNESS:  I do.  I'm not sure if I was ever asked,
10   but I'm certain I advised that no one should be admitted into
11   the SERP.
12   Q.  OK.  And what must one do in order to be admitted to the
13   SERP, prior to December 18, 2008?
14   A.  You just had me read be a management employee for 15 years,
15   and --
16   Q.  That is all that is required, right?
17   A.  I am not sure if there's also something in here that is
18   additional, but that is what I just read.
19   Q.  But there is, if you look at the last sentence of 10.1.2 on
20   page 380.
21   A.  OK.
22   Q.  So there is one additional thing that has to happen in
23   order to be in the plan, correct?
24   A.  Have compensation over the Social Security wage base and be
25   employed on the July 1 following completion of 15 years.
```

1    Q.  Right.  Actually it says July 1 coincident with or next

2    following, correct?

3    A.  Yes.

4    Q.  OK.  So there's no requirement that the board has to

5    approve anybody to go into the -- to obtain their contractual

6    benefits under the SERP plan, correct?

7    A.  I don't remember a requirement.

8    Q.  Pardon?

9    A.  I do not remember such a requirement.

10   Q.  OK.  And --

11   A.  I haven't read this plan document in a while.

12   Q.  You didn't read it when you prepared your affidavit, sir?

13   A.  That's, believe it or not, a while for me.

14   Q.  OK.

15   A.  I don't remember.  I don't remember if there was an

16   additional requirement besides the ones specified in 10 --

17              THE COURT:  1.2?

18              THE WITNESS:  1.2, yes.

19              MR. ZABELL:  OK.

20              THE WITNESS:  Yes.

21   BY MR. ZABELL:

22   Q.  A fair amount of your affidavit talks about tax

23   ramifications of including Ms. Wegmann in the SERP, correct?

24   A.  Yes.

25   Q.  Now, will you agree, sir, that if she was contractually

1  entitled to be in the SERP regardless of what those tax

2  ramifications are, she's supposed to be in the SERP, correct?

3  A.  Yes.

4  Q.  And this argument about tax ramifications preventing

5  someone from being in the SERP is an argument you have made in

6  the past, correct?

7  A.  Yes.

8  Q.  You made it with regard to Joel Levy, correct?

9  A.  Joel Levy?

10 Q.  Yes.  Joel M. Levy and Judith W. Lynn, plaintiffs, against

11 Young Adult Institute Inc.?

12 A.  Repeat your question.

13 Q.  You made the argument that the tax ramifications should

14 prevent him from receiving benefits under the SERP, correct?

15 A.  There's several tax provisions that -- do you mean 4958?

16 Q.  Well, do you remember sending an e-mail that said:

17 Litigation will not simply be a fight between Joel and us.

18 We'll bring in the IRS as part of this process.  I've done this

19 before, and it's incredibly painful for the executive and no

20 sweat at all for the employer.  Suing us with that risk

21 presented would be insanity.

22        Do you remember saying that?

23 A.  It sounds familiar.

24 Q.  That was actually a quote that Judge Sarah Netburn included

25 in one of her decisions, correct?

1                THE WITNESS:  I don't know.

2                THE COURT:  You've not seen the decisions in Dr.

3      Levy's case against YAI?

4                THE WITNESS:  No.

5                MR. ZABELL:  Your Honor, just the cite for that.

6                THE COURT:  Understood.  Thank you.

7      BY MR. ZABELL:

8      Q.  In fact, when it came to Dr. Levy, Phil -- Dr. Levy, you

9      went so far as to threaten to file documents with the IRS

10     indicating that he owed money on SERP benefits that he had yet

11     to receive, correct?

12     A.  No.  I did not threaten anybody.

13     Q.  OK.  Judge Netburn actually quoted -- do you remember

14     saying something like this:  We do not want to give any

15     appearance that we won't assert unreasonableness on an item as

16     long as the executive agrees to something.  Smells of

17     extortion.  For example, say we want to get Joel to agree to a

18     settlement of the SERP that he does not desire and our leverage

19     is that if he doesn't agree to a SERP settlement, we'll report

20     on the 990s for FYE 2011 and 2010 that his consulting pay was

21     an excessive benefit transaction because he never worked.

22                Did you say that?

23     A.  Sounds familiar.

24     Q.  Right.  In fact, you had communications with the IRS on

25     exactly that issue, correct?

J5tnweg5                         Connors - Cross

1   A.  I do not believe I ever did.

2   Q.  And the IRS did not conclude, as you asserted, that the tax

3   ramifications would have prevented the payment to Dr. Levy,

4   correct?

5            THE COURT:  If you know, sir.

6            THE WITNESS:  I don't know.

7            MR. ZABELL:  OK.

8   BY MR. ZABELL:

9   Q.  Have you ever read Judge Netburn's decision?

10  A.  No.

11  Q.  I see.  Did you know that in 2006 or 2007, Ms. Wegmann was

12  a management-level employee at YAI?

13  A.  I knew that she was when I was engaged.  I don't know when

14  she became one.

15  Q.  And you were engaged in 2007, correct?

16  A.  Approximately, yeah.

17  Q.  OK.  And did you know that her compensation met the

18  compensation requirements under the 1985 SERP?

19  A.  Not specifically, but I would have been fairly certain.

20  Q.  OK.  So, knowing those things now, would that have changed

21  your analysis as to drafting the December 18, 2008, SERP --

22  amendment to the SERP.  Excuse me.

23  A.  No.

24  Q.  Are you of the belief, sir, that the December 18, 2008,

25  SERP served any purpose other than codifying the reduction in

1    benefits for the named people on that amendment?

2    A.  Did it have another purpose besides codifying the amount?

3    Q.  Yes.

4    A.  Yes.

5    Q.  And what was that purpose?

6    A.  There were several purposes.

7    Q.  What were they?

8    A.  There were several legal changes in the law.  There were

9    several changes in the law that had occurred since 1985 that

10   required updates.  There was several -- the '84 SERP was vague.

11   It was, you know, not very good.  You know, viewed in 2007, it

12   wasn't very good documentation.  You know, it was probably good

13   in '85, but it wasn't good in 2007.  So we clarified a lot of

14   provisions.  We included some that were missing.  We

15   established eligibility by name.  Probably some other things.

16   Q.  Right.  And who provided you with those names that you

17   established eligibility for?

18   A.  Probably Joel and Philip Levy.

19   Q.  By probably, you're going based upon an assumption, or

20   you're going based upon your actual memory?

21   A.  Assumption.

22   Q.  OK.  Now, if Ms. Wegmann had met the qualifications of the

23   SERP prior to 2008 when this was signed, she should have been

24   included in this, correct?

25   A.  Yes.

J5tnweg5                          Connors – Cross

Q.  But she wasn't, correct?

A.  She was not included.

Q.  Is there anything in this document, this amendment that
allows the board of YAI to undo the contractual obligations
that they created in the 1985 SERP for Ms. Wegmann?

A.  That is the same question you asked ten minutes ago, but,
right.

Q.  I don't remember --

A.  There are new --

Q.  What was your answer then?

A.  Yes, I could not find any provision, and I don't remember a
provision which allows the board to revoke eligibility once the
participant has become eligible.  Is that your question?

Q.  Yes.

A.  I know of no provision in the SERP that provides for that.

Q.  Did you have any discussions with Ms. Wegmann about her
eligibility to the SERP?

A.  As my declaration said, the SERP, I don't think so.  A
SERP, yes.

Q.  OK.  Did you ever tell Ms. Wegmann that she was not
eligible to participate in the 1985 version of the SERP?

A.  I don't remember ever doing that.

Q.  Did you ever tell Ms. Wegmann that she was not eligible to
participate in the December 18, 2008, amendment to the SERP?

A.  I don't think that ever came up.

1    Q.  OK.  If you look at paragraph 9 of your affidavit, please.

2    A.  Yes.

3    Q.  Now, it says that the original SERP provides that the

4    benefits shall be paid as an annual annuity, is that correct?

5    A.  Yes.

6    Q.  Is that one lump sum per year?

7    A.  I don't recall if it was 12 monthly payments or one annual

8    payment.

9    Q.  Well, an annual annuity would suggest one payment per year,

10   a monthly annuity would suggest one payment per month, is that

11   correct?

12   A.  That's correct.

13   Q.  So you believe according to the SERP that she's to receive

14   one payment per year for SERP benefits, correct, should she be

15   found eligible?

16   A.  Yes.

17   Q.  OK.  It then says in paragraph 10 that you were engaged to

18   review the original SERP and YAI's other retirement plans to

19   confirm whether they were in compliance with the Internal

20   Revenue Code, correct?

21   A.  Correct.

22   Q.  Now, it doesn't say that you were engaged by YAI to review

23   the original SERP and other SERP-related documents, does it?

24   A.  No.  It does not say that.

25   Q.  Does that refresh your recollection as to the accuracy of

1   your prior answer?  Was there another document that you had

2   reviewed with regard to the SERP?

3   A.  Are we going back to the -- a resolution that was --

4   Q.  We're just talking about the documents you reviewed --

5   A.  OK.

6   Q.  -- in order to determine --

7   A.  Could you ask the question --

8   Q.  -- whether the SERP was compliant.

9   A.  -- again.  I'm confused.

10  Q.  I'm sorry.  You testified before that you reviewed

11  documents that were provided to you by YAI to determine whether

12  or not its SERP was compliant with the laws, correct?

13  A.  Yes.

14  Q.  And you said that you reviewed the 1985 version of the SERP

15  and that there was some other version, some other document that

16  purported to amend it, correct?

17  A.  Yes.

18  Q.  OK.  How come you did not include that document in

19  paragraph 10?

20  A.  I didn't say that -- paragraph 10 does not say that I

21  didn't review other documents.  The original SERP includes the

22  plan and any amendments thereto.  I mean --

23          THE COURT:  Mr. Zabell, I think the difference is that

24  this paragraph speaks to the scope of his engagement and not

25  the scope of how he discharged that engagement.

1           MR. ZABELL:  Thank you, Judge.

2           THE COURT:  Let's move on.

3           MR. ZABELL:  Thank you, yes.  Thank you.  Got that.

4   BY MR. ZABELL:

5   Q.  After your review of the 1985 SERP, you determined that YAI

6   was in compliance with its obligations under the SERP, correct?

7   A.  No.  I determined that the SERP complied with applicable

8   law.  I am not sure I was opining on YAI's conformity with its

9   obligations.  I'm not sure it is an important distinction.

10  Q.  I think it might be.  Did you ever take any steps to

11  determine if YAI was in conformity with its obligations under

12  the 1985 SERP?

13  A.  I don't think so.

14  Q.  Is it your understanding as someone who practices in this

15  field that the terms of the 1985 SERP continue to be in effect

16  until that SERP is amended to disqualify new people from

17  entering that SERP?

18  A.  Yes.

19  Q.  Do you know if there was ever any document drafted by YAI

20  that stopped new admissions into the SERP?

21  A.  Not until 2007 or '8, whatever that amendment is.

22  Q.  OK.

23  A.  I believe.  I stopped -- you are asking me if there were

24  amendments which discontinued eligibility?

25  Q.  Yes.

 1   A.  I don't think so.

 2   Q.  OK.  And, in fact, the December 18, 2008 amendment is meant

 3   to be read along with the 1985 original SERP document to get a

 4   complete SERP document, correct?

 5   A.  Yes.

 6   Q.  So you have eligibility still defined in the SERP and then

 7   a pool of people who were determined to be eligible, correct?

 8   A.  Yes.

 9   Q.  Are you aware that there is a conflict between those two

10   things?

11   A.  Yes.

12   Q.  When did you first become aware of that?

13   A.  I'm not sure.

14   Q.  Was it prior to today?

15   A.  Yes.

16   Q.  Was it prior to this litigation?

17   A.  No.

18   Q.  OK.  So, once Ms. Wegmann filed this lawsuit, you became --

19   at some point thereafter you became aware of the incongruence

20   between the amendment and the qualifications of the 1985 SERP,

21   correct?

22   A.  No.

23   Q.  No?

24   A.  No.  I mean, there was -- the '85 SERP was open-ended.  The

25   2007 amendment was closed.

1   Q.  OK.  The 1985 SERP was open-ended in terms of eligibility?

2   A.  Yes.

3   Q.  Until when?

4   A.  Until 2007.

5   Q.  OK.  I'm going to direct your attention to AT, Exhibit AT.

6   That's the amendment.

7   A.  Uh-huh.

8   Q.  Now, you're saying that that is amended effective July 1,

9   2007, correct?

10  A.  Yes.

11  Q.  But I am going to ask that you take a look at the back page

12  of it.  When was that document actually signed and implemented?

13  A.  December of '08.

14  Q.  December 18 of 2008, correct?

15  A.  Right.

16  Q.  So the 1985 SERP was open-ended until December 18 of 2008,

17  correct?

18  A.  I don't remember if the 2005 resolution also purported to

19  close the class.  I just don't remember.

20  Q.  OK.  Removing that 2005 resolution from this equation, will

21  you agree that the openness of the 1985 plan remained so open

22  until December 18, 2008?

23  A.  I believe that is so.

24  Q.  Thank you.  Now, if a board member wanted to freeze

25  admission into the SERP at a certain time, what steps would the

J5tnweg5                          Connors – Cross

1   board have to take in order to do that?

2   A.   Freeze admission, did you say?

3   Q.   Yes.

4   A.   The board?  You mean the board, not a board member?

5   Q.   The board, yes.

6   A.   It probably -- they would have had to do what I did.

7   Q.   Which is amend the plan?

8   A.   Amend the plan?

9   Q.   Correct.

10  A.   Yes.

11  Q.   They can't just stand there, put their hands on their hips,

12  and declare a freeze?

13  A.   That's correct.

14  Q.   OK.  Did anybody in the board or the board as a whole tell

15  you that they in fact enacted a freeze without amending the

16  SERP?

17  A.   No.

18  Q.   If they did, what would you have advised them?

19          MR. MEEHAN:  Your Honor, if I may, at this point we're

20  really getting pretty hypothetical and far afield from what

21  actually occurred.  So I object to the relevance of it.

22          THE COURT:  I don't think it's going to aid me.

23          MR. ZABELL:  OK.

24          THE COURT:  We don't need that question.  Thank you.

25          MR. ZABELL:  Thank you.

1              Not much longer, Judge.

2              THE COURT:  That's fine.

3    BY MR. ZABELL:

4    Q.  Now, do you know when Mrs. Wegmann received Exhibit AT, the

5    amendment to the SERP plan?

6    A.  No.

7    Q.  When your staff prepared that SERP plan, did they give it

8    to the board of YAI, or did you give it to the board?

9    A.  I gave it to the board.

10   Q.  Did you give them any instructions on how they're supposed

11   to effectuate that amendment?

12   A.  Probably.

13   Q.  Did you give them any instructions on how they're supposed

14   to circulate that amendment to its affected members?

15   A.  I don't remember.

16   Q.  If you look at paragraph 25 of your affidavit, page 6 --

17   A.  Yes.

18   Q.  -- it says there that the amendment revised Section 10.1.2

19   of the YAI original SERP to confirm that the sole participants

20   in the original SERP were.

21   A.  Yes.

22   Q.  OK.  Where were you given the information to confirm that

23   those were the original -- those were the sole participants in

24   the original SERP?

25   A.  Fairly certain it was Joel or Philip.

J5tnweg5                        Connors – Cross

1   Q.  OK.  So you were just writing down in the December 18,

2   2008, SERP names that you were provided in this affidavit

3   saying that you were doing it to confirm who the sole

4   participants were, is that correct?

5   A.  Yes.

6   Q.  Except there were other participants in the original SERP

7   that aren't listed here, correct?

8   A.  There was a deceased participant at the time.

9   Q.  That would be Mr. Rut, correct?

10  A.  Yes.

11  Q.  What about Enid Barbell?

12  A.  I don't know that.

13  Q.  So that information wasn't provided to you?

14  A.  Right.

15  Q.  OK.  The deceased's spouse ended up in litigation in order

16  to get the benefits under the SERP, is that correct?

17          THE COURT:  If you know.

18          THE WITNESS:  I remember it was a dispute, but I don't

19  remember if it matured into litigation.

20          MR. ZABELL:  OK.

21          THE COURT:  Was it a dispute regarding Mr. Rut's

22  inclusion or exclusion from the SERP, as opposed to something

23  else?

24          THE WITNESS:  I don't remember.

25          THE COURT:  That's fine.

J5tnweg5                         Connors - Cross

1              THE WITNESS:  I wasn't involved --

2              THE COURT:  OK.

3              THE WITNESS:  -- with that dispute.

4              THE COURT:  Understood.

5              THE WITNESS:  OK.

6    BY MR. ZABELL:

7    Q.  Who administered the SERP?

8    A.  The administrator of the SERP was YAI.

9    Q.  And do you know who at YAI administered it?

10   A.  Some combination of finance, Karen, and the actuary, Craig.

11   Q.  OK.  Now, contributions that were made into the SERP, were

12   they made on an individual per-SERP-member basis?

13             THE COURT:  If you know, sir.

14             THE WITNESS:  I do know.

15   A.  The terms of the SERP don't provide for that.

16   Q.  The terms of the SERP provide for a lump-sum payment to be

17   made to the SERP to pay off the obligations of the SERP,

18   correct?

19   A.  The terms of the SERP contemplate a contribution to be made

20   to the SERP to fund everyone's benefits, not just particular

21   people.

22   Q.  So there were no contributions that were being made to the

23   SERP that, once the SERP received it, they were earmarked for

24   those participants, is that correct?

25   A.  They were not supposed to be.

J5tnweg5                          Connors - Cross

1   Q.  The actual language of the SERP says that they're not

2   supposed to be earmarked, correct?

3   A.  The language of the SERP does not provide for earmarking,

4   if I recall.

5           THE COURT:  OK.  Sir, I'm --

6           THE WITNESS:  You asked me if they did.

7   Q.  Hold on.  I'm sorry.  The judge --

8   A.  If they prohibit earmarking, I said --

9           THE COURT:  OK.  The way you're answering the question

10  suggests that there is a follow-up.

11          Do you understand that in practice they were earmarked

12  by YAI?

13          THE WITNESS:  I understand that YAI personnel

14  conceptualized that contributions were for particular people.

15          THE COURT:  Thank you.  OK.

16          THE WITNESS:  But that wasn't correct.

17  BY MR. ZABELL:

18  Q.  So, according to the language of the SERP, all

19  contributions to the SERP trust were made in a block sum to

20  satisfy obligations of the SERP, is that correct?

21  A.  That's my recollection, yes.

22  Q.  OK.  And did you take any steps to change that in the

23  December 18, 2008, amendment?

24  A.  No.

25  Q.  In fact, changing that would have a negative tax

J5tnweg5                          Connors – Cross

1    implication, would it not?

2    A.   Theoretically.  It could have adversely affected one tax

3    principle.

4    Q.   OK.  Now, would it have been impossible for YAI to comply

5    with their obligations under the SERP to Ms. Wegmann if she

6    qualified to receive benefits under the SERP effective 2006 or

7    2007?  I use the word "impossible."

8    A.   Impossible?

9              THE COURT:  As distinguished from cost prohibitive,

10   sir?

11             MR. ZABELL:  As distinguished from impractical.

12             THE COURT:  OK.

13             THE WITNESS:  From absurd.  Impossible?  It would not

14   have been impossible.

15   BY MR. ZABELL:

16   Q.   OK.  Because if you look at paragraph 32 of your

17   affidavit --

18   A.   Yes.

19   Q.   -- you actually say it would have been impossible for her

20   to participate in the original SERP.

21   A.   Yes.

22   Q.   Were you just puffing a little bit there?

23   A.   I actually read that earlier, and I decided that was the

24   wrong word.

25   Q.   OK.

J5tnweg5                         Connors - Cross

1    A.  Absurd would have been better.

2            THE COURT:  Absurd, OK.

3            So you are amending your sworn statement to be absurd

4    rather than impossible?

5            THE WITNESS:  Yes.  It's not completely impossible.

6    Q.  But you do agree --

7    A.  Unprecedented, never happened before, but not impossible.

8    Q.  You do agree that if she met the contractual requirements

9    of the SERP she's entitled to the benefits provided for under

10   the SERP, correct?

11   A.  Yes.

12   Q.  That would be regardless of the implications for YAI,

13   correct?

14   A.  Yes.

15   Q.  Because we were just correcting things, I'm going to ask

16   you if you would take a look at paragraph 42.

17   A.  Yes.

18   Q.  I'm sorry.  No.

19   A.  That's the one we did correct.

20   Q.  That's the one we just did.  I'm sorry.

21           If you look at paragraph 44, in the last sentence, you

22   talk about a total retirement package and a value in the

23   annuity paying her 60 percent of her final earnings, is that

24   correct?

25   A.  Yes.

J5tnweg5                          Connors - Cross

1   Q.   Now, you understand that in the December 18, 2008, SERP you

2   talk about people getting 65 percent of their total earnings,

3   correct?

4   A.   Yes.

5   Q.   And in the original SERP, it talks about 100 percent of

6   their actual earnings, correct?

7   A.   It talks about it?

8   Q.   Sure.  Under what she would be entitled to receive after 27

9   years of service.

10  A.   You mean the formula would produce 100 percent?

11  Q.   Yes.

12  A.   That's -- OK.

13  Q.   So, notwithstanding the hundred percent -- it's more than

14  OK, it's pretty good, right?

15  A.   Yes.  It's very good.  It's -- yes.

16  Q.   OK.  So notwithstanding the 100 percent in the original

17  SERP and the 65 percent in the amendment to the SERP, your

18  calculations were done just at 60 percent, correct?

19  A.   Yes.

20  Q.   OK.  Did you ever witness anybody at YAI tell Ms. Wegmann

21  that she's not going to receive any SERP benefits?

22  A.   I don't remember.

23            MR. ZABELL:  I have nothing further.

24            THE COURT:  Redirect?

25            MR. MEEHAN:  Yes, your Honor.

 1   REDIRECT EXAMINATION

 2   BY MR. MEEHAN:

 3   Q.  Good afternoon, Mr. Connors, once again.

 4   A.  Good afternoon.

 5   Q.  I just want to follow up on a few specific points that were

 6   made in the cross that just took place.

 7           OK.  At one point -- pardon me -- you said that on

 8   this impossible versus impracticable and her Honor even

 9   suggested cost prohibitive, you chose the word absurd.  Do you

10   remember that when you were talking about paragraph 42 in your

11   declaration?

12   A.  Yes.

13   Q.  Why that word in 42 in your declaration?

14   A.  Because the plan was subject to Internal Revenue Code

15   Section 457(f).

16   Q.  And --

17   A.  If a participant was added to the plan, you know, after --

18   in -- at the time that Karen was allegedly added.

19   Q.  OK.  Just for time period, I think I can tell you that on

20   or after 2001 is the time period at issue for her being in the

21   plan.

22   A.  OK.

23   Q.  So using 2001 --

24   A.  Yes.

25   Q.  -- and later, can you explain what, if any, consequences

1   there would be to Ms. Wegmann under the tax laws that underlie

2   your point of view about this being absurd as you put it?

3   A.  Yes.

4   Q.  Please do.

5   A.  The plan on its face spoke as of 1985.  1985 the law

6   allowed a participant in a nonqualified plan to pay income tax

7   on distributions from the plan no matter when the participant

8   happened to vest in those eventual distributions.

9   Q.  So, someone would vest first, receive distributions later,

10  and pay taxes when the distributions were made?

11  A.  Yes.

12  Q.  OK.

13  A.  That was how nonqualified plans worked before the Tax

14  Reform Act of 1986.  The Tax Reform Act of 1986 added Section

15  457(f) to the Internal Revenue Code for any plan that was --

16  except for grandfathered participants.  And the new law said

17  that if a participant vests in a benefit prior to receiving the

18  distribution of that benefit, the participant would pay income

19  taxes when the participant vested; not when the participant

20  received the distribution, but when the participant vested.

21  Q.  OK.

22  A.  So, as a consequence of that, everybody knew, the board

23  knew, everybody knew that this -- and it's a very unique plan.

24  I've seen -- I have probably 500 clients in this space,

25  tax-exempt entities that have nonqualified plans.  It's only

1   the second one I ever saw that was circa 1985.  You kept that

2   in a glass case, because -- it's a great plan for the

3   participants in it because they get to pay income tax when they

4   receive the distributions.  Ever since then, plans were

5   designed completely differently.

6        So why was it absurd?  Because if a participant was in

7   that plan, they would pay income taxes sooner -- if they

8   weren't grandfathered from 457(f), they would pay income tax on

9   the moment they vested.  So in this case it would have been

10  after 15 years of service.  The participant would pay income

11  tax on the full present value of the accrued benefit.  So if it

12  was like this benefit -- this plan was 3 percent times years of

13  service at that point, whatever the full present value of the

14  accrued benefit was, which would have been a very large number,

15  the participant would have immediate income tax on that entire

16  future present value, the present value of that future benefit.

17  That's why it was absurd.  It would have been absurd to add

18  someone.  You could have made special provisions for someone

19  who was entering the plan, you know, in the post-2001 period,

20  but it would have been terrible to just let a person enter the

21  plan after that.

22        THE COURT:  457(f) was enacted when, please.

23        THE WITNESS:  August 16, 2016 -- two thousand, I'm

24  sorry.

25        THE COURT:  Try again.

1           THE WITNESS:  1986.

2           THE COURT:  Thank you.

3           THE WITNESS:  August 16, 1986.

4           THE COURT:  OK.  A day that will live in infamy?

5    Understood.

6           THE WITNESS:  I get numbers confused.

7           THE COURT:  That is all right.

8           THE WITNESS:  I'm sorry.

9           THE COURT:  What you're saying, sir, is that if the

10   present value of this particular program to Ms. Wegmann were $5

11   million, even though she would get it over the course of a

12   lifetime, she would owe the tax at the moment of vesting on all

13   $5 million?

14          THE WITNESS:  On the present value of the $5 million.

15          THE COURT:  The present value of the five.  Thank you.

16   OK.  Got it.

17          THE WITNESS:  Yes.

18          THE COURT:  Does that mean she wouldn't have to pay as

19   she received distributions over the life cycle of the benefit?

20          THE WITNESS:  When she started her distributions, she

21   would have a credit for the payment she already made.  But she

22   would have some more tax but she would get credit the previous

23   taxable amount.

24          THE COURT:  OK.  So you think it's absurd -- let's be

25   candid here.  You think it is absurd she's seeking it now,

J5tnweg5                        Connors - Redirect

1      because if she wins, she loses, because she has an enormous tax

2      bill?

3                  THE WITNESS:  It's better than nothing, but --

4                  THE COURT:  True that.

5                  THE WITNESS:  -- it's close to nothing.

6                  THE COURT:  Understood.

7                  OK.  Counsel, you may inquire.

8      BY MR. MEEHAN:

9      Q.  You had mentioned along those lines at one point earlier

10     that the SERP could be changed by amendment, but there were

11     also -- pardon me -- circumstances where this SERP you thought

12     had been superseded by law is what I wrote down.

13     A.  Uh-huh.

14     Q.  What were you talking about when you used that phrase?

15     A.  Well, 457(f) didn't supersede it.  457(f), I was asked if

16     it was still a contract I think, and I said in a contractual

17     sense it's governed by its plan document, but it is not just

18     the contract that governs the plan.  Laws govern the plan.  I

19     think that was my point.  And the laws that govern the plan

20     were -- included the one I just mentioned, which, you know, we

21     always treated the plan as exempt, which, you know, frankly is

22     one of the reasons I didn't do more to close the eligibility

23     class, because I considered it closed by reason, not

24     necessarily by the term of the plan document.

25     Q.  Can you explain.

1   A.   I --

2   Q.   I'm sorry.  You said you considered it closed.  Can you

3   explain why you considered it closed.

4   A.   Well, as I said, I don't remember in '07 looking at the

5   plan and saying, gee, it looks open-ended, probably because I

6   was affected by the fact that everyone knew it was closed.

7   Kind of everyone was educated about the plan being exempt from

8   457(f).  I think they knew that before I got there.  I

9   certainly made sure everyone understood that.

10          In addition, 4958 was also added to the law before --

11   subsequent to August -- subsequent to 1985.

12   Q.   What was the effect of that provision, as you understood

13   it?

14   A.   4958 imposes an excise tax on the organization and the

15   recipient of compensation when the compensation is excessive.

16   And that was implemented by -- that was enacted by Congress I

17   think in 1995 with regulations being issued shortly thereafter.

18   Essentially those are called the intermediate sanctions rules.

19   And what the intermediate sanctions rules do is they provide a

20   penalty on the people rather than on the organization when

21   somebody's excessively compensated.  The way this plan was --

22   the plan was adopted at a time when the Social Security wage

23   base was $40,000, and the typical executive of a tax-exempt

24   organization might have made 80.

25          So when people make that much money, the formula of 3

percent times years of service payable as annuity, it seems

innocuous.  It seems, OK, good, if someone stays 33 years, they

can get $80,000 for the rest of their life.

        The problem was that over time compensation increased

a lot in charitable organizations, and so the application of

the formula to modern levels of compensation tended to create

very high benefit levels.

        So, to tie this together, the implementation of -- the

enactment of the rules that penalize compensation recipients

and compensation decision-makers from excessive compensation

were also rules from which this plan needed to enjoy

grandfathering, because a 100 percent benefit after 33 years of

service when your compensation is high -- you know, I'm not

saying, I actually don't know precisely what everyone's

compensation was, but I know it was highly competitive.  And I

knew that highly competitive compensation payable at 100

percent for the rest of your life is excessive, or would be

deemed excessive upon scrutiny by the IRS.

        So 4958 was the other tax regime from which this plan

needed grandfathering in order to not be absurd.  It was still

possible.  We still could have implemented it, but we would

have had -- if we determined that it was excessive, we would

have had to declare it to be excessive to the IRS and then seek

to get the money back.

Q.  So under those --

1   A.   So it wasn't impossible --

2   Q.   But under those circumstances you would have been in a

3   position of having your client have to reach out to whoever was

4   paid, in this case Ms. Wegmann, and take money back.  Was that

5   part of it?

6              MR. ZABELL:  Objection.

7              THE COURT:  I didn't understand that that was what was

8   required.  They got penalized, but did that allow them to claw

9   the money back?

10              THE WITNESS:  The way the penalty works, if it's 125

11   percent, 100 percent goes back to the organization and 25

12   percent goes to the IRS.  So there is a recovery of the excess

13   pay back to the tax exempt and then the recipient of the excess

14   pay -- compensation pays a 25 percent excise tax on top of

15   income tax.  So it is a complete recapture, a relinquishment of

16   the money plus 25 percent by the recipient.

17              (Continued on next page)

18

19

20

21

22

23

24

25

J5TsWEG6                        Connors - Redirect

1   BY MR. MEEHAN:

2   Q.   In this same context with these intermediate sanctions that

3   you're discussing, what are the implications for individual

4   board members who approve the package to this later determined

5   to be excess?

6            THE COURT:  I'll allow it.

7   A.   They also pay excess taxes.

8            THE COURT:  125 percent?

9            THE WITNESS:  No.

10           THE COURT:  Is there is another amount?

11           THE WITNESS:  They pay 10 percent of the excess up to

12   20,000 in the aggregate, so if there is ten board members and

13   an excess benefit transaction, they would split, which is, of

14   course, absurd also because they are volunteers, because...

15           THE COURT:  That's a different issue.

16           THE WITNESS:  That is a different issue.

17   BY MR. MEEHAN:

18   Q.   In the course of your work at YAI, did you make clear those

19   risks to the board members?

20   A.   Yes.

21   Q.   You were asked a number of questions about the Levy case

22   and Judge Netburn's opinion and I understand you said you

23   didn't read it.

24           I just want to clean up one thing.  The 457F

25   grandfathering issue that you put in your declaration as you

believe applicable to this case, was that at issue in the Levy

matter?

          THE COURT:  If you recall, sir.

A.  It was very complicated, so give me a second to figure out

if grandfathering was an element.

          THE COURT:  Of course.

A.  I don't remember if it was an aspect of the litigation.  It

was omnipresent, however, as a consideration because we never

wanted to amend the plan in such a way as to lose

grandfathering.

          So it was part of -- so the two Levys and the other

two participants would have been subject to 457 if we, in this

tax investment role, if we amend the plan in a way that caused

grandfathering to be lost, because one requirement of

grandfathering was that the plan not be materially modified

after August 16 to 1986.  So we were very careful when we

amended the plan never to modify it in a way that would make it

lose grandfathering status.

Q.  OK.  In your affidavit, I think you spoke of this issue

about how you determined the plan was in compliance, but if

Ms. Wegmann has been deemed to be in, you would have come to a

different conclusion.

          Can you explain what you were getting at?

A.  Yes.  So if I processed that Karen met the eligibility

requirements and there was no provision that excluded her, then

1    I probably would have corrected it, because if Karen was added

2    to the plan, she would have paid income tax on the full present

3    value of her accrued benefit to that day, and we would have

4    had -- we would have had an excess benefit issue, which I have

5    no idea if there would have been an excess benefit.  But we

6    would have had to have analyzed it in order for me to conclude

7    that the plan satisfied the law.

8    Q.  I believe you also testified in response to some questions

9    from Ms. Wegmann's counsel that you were not ever focused on

10   eligibility.  That was the phrase I wrote down.

11   A.  Um-hmm.

12   Q.  You used a term along those lines?

13   A.  Um-hmm.

14   Q.  Can you explain why is it that you were not ever focused on

15   eligibility under this plan during the course of your advice to

16   YAI since 2016?

17   A.  The eligibility provisions, because everybody knew that the

18   plan was closed.

19   Q.  Let's make sure we get whatever testimony you have in terms

20   of what Ms. Wegmann knew.  I know you speak in your affidavit

21   about certain things.  I want to take you to paragraph 31.

22           MR. ZABELL:  Judge, I'm going to object.  Isn't he

23   leading if he is going over the testimony that he has already

24   entered?

25           THE COURT:  I want to hear the question before I

J5TsWEG6                          Connors - Redirect

 1    sustain the objection.  Thank you.

 2               MR. MEEHAN:  I just meant the topic.  Sorry.

 3    BY MR. MEEHAN:

 4    Q.  Paragraph 31, you set forth certain observations.  Can you

 5    provide any more detail about those conversations that you

 6    summarize in 31?

 7               MR. ZABELL:  Objection.

 8               THE COURT:  Outside of the scope of the

 9    cross-examination.

10               Sustained.

11               MR. MEEHAN:  Your Honor, I thought there were

12    questions that counsel asked about his communications with

13    Ms. Wegmann?

14               THE COURT:  I didn't think that they were this broad,

15    sir.  If he had communications with Ms. Wegmann that are not

16    listed in this affidavit, why are they not listed in this

17    affidavit?

18               MR. MEEHAN:  No, that is not what I'm getting at.  I

19    made notes that there was testimony about he spoke -- he called

20    her Karen --

21               THE COURT:  Yes.

22               MR. MEEHAN:  -- read a SERP, not the SERP, and there

23    were questions about that.

24               THE COURT:  I don't understand what you mean by the

25    term observations.

1           MR. MEEHAN:  Well, I'm trying not to characterize what

2      he said.  I can do it without reference to 31.  I thought it

3      would be easier if I targeted him.  I don't need to do it.

4           THE COURT:  I'll let you ask a question and see if I

5      let him answer it.  Go ahead.

6      BY MR. MEEHAN:

7      Q.  If I followed you correctly, you said you spoke with

8      Ms. Wegmann about a SERP, but not the SERP.

9           Did I get that accurately, first of all?

10     A.  I spoke to Karen about her participation -- I talked to

11     Ms. Wegmann about the SERP and a SERP all the time.

12     Q.  OK.

13     A.  But with regard to her participation in a SERP, our

14     conversations were always about a SERP, not about the SERP.

15          THE COURT:  Did she understand that, sir?

16          THE WITNESS:  Yes, I think -- I believe so.

17          THE COURT:  What led you to that belief?

18          THE WITNESS:  I thought I made it obvious to everybody

19     all the time.

20          THE COURT:  That the SERP was closed?

21          THE WITNESS:  Yes.

22          THE COURT:  All right.  Because I've had three years

23     of litigation on someone telling me she didn't think it was.

24     So I want to figure out whether you have recollections that

25     suggest that she knew all along it was closed.

J5TsWEG6                          Connors - Redirect

1          THE WITNESS:  I don't have specific recollection, just
2     general recollection.
3          THE COURT:  OK.
4     BY MR. MEEHAN:
5     Q.  Did you discuss these tax consequences with her?
6          Do you believe you did that?
7     A.  I don't remember.
8     Q.  Did you have any interaction with Ms. Wegmann in a business
9     sense after she left YAI?
10         MR. ZABELL:  Objection.
11         THE COURT:  I'll allow it, if you understand what "in
12    a business sense" is.
13         Let's try it this way.  After she left in 2014 from
14    YAI, did you ever see her again?
15         THE WITNESS:  I think we had one conversation.
16         THE COURT:  Was in person or over the phone?
17         THE WITNESS:  Over the phone.
18         THE COURT:  Do you recall the substance of the
19    conversation?
20         THE WITNESS:  Yes.
21         THE COURT:  Do you recall approximately when it took
22    place after her departure from YAI?
23         THE WITNESS:  Within three months.
24         THE COURT:  Can you tell me, please, the substance of
25    the conversation, to the best of your recollection?

J5TsWEG6                    Connors - Redirect

1          THE WITNESS:  She invited me or asked if I wanted to

2     meet her board to discuss the provision of services at her new

3     agency.

4          THE COURT:  Thank you.

5          Anything more than that, that you can recall, sir?

6          THE WITNESS:  No.

7          MR. MEEHAN:  No other questions, your Honor.

8     Thank you.

9          MR. ZABELL:  Your Honor.

10          THE COURT:  No.

11          MR. ZABELL:  Can I have a sidebar?

12          THE COURT:  A sidebar?  All right.

13          (At sidebar)

14          MR. ZABELL:  Thank you.

15          I asked for a sidebar because I did want to have a

16     brief opportunity to redirect him, and I know your Honor's

17     position on that, but there were some things that had come out

18     that I did not address.

19          One of them came out as a result of a question that

20     you had asked this witness regarding 457F and how that was

21     implemented in 1986.  That didn't come out in either his

22     affidavit or my questioning him.  I appreciate your Honor

23     bringing that up.  I would like to ask two or three questions

24     regarding that.

25          THE COURT:  No.  No redirect.  No recross.  We've

J5TsWEG6                          Connors - Redirect

1    already had redirect.

2              MR. ZABELL:  There is one other issue.

3              THE COURT:  Yes.

4              MR. ZABELL:  He testified at length about a potential

5    tax liability, should she be in the SERP, and the tax liability

6    now for benefits that she won't receive until sometime in the

7    future.

8              THE COURT:  Yes.

9              MR. ZABELL:  There is a provision in the SERP that

10   says she is entitled to ask for those contributions should just

11   a situation occur.  I would like the opportunity to have maybe

12   two questions on that with him.

13             THE COURT:  No.

14             Thank you.  You could have asked those questions

15   during your cross.  Thank you.

16             (In open court)

17             Mr. Connors, thank you very much.  You may step down.

18             (Witness excused)

19             Your next witness, counsel.

20             MR. MEEHAN:  Your Honor, we are going to call

21   Mr. Harte and Mr. Rinefierd will handle his testimony, your

22   Honor.

23             THE COURT:  All right.  Thank you.

24             Mr. Harte, please come forward.

25             MR. MEEHAN:  Your Honor, one thing just occurred to

1   me, just as a little bit of housekeeping.  Just at the end, I

2   didn't want to forget it.

3          THE COURT:  Yes, sir.

4          MR. MEEHAN:  There were some references, Mr. Connors,

5   he is gone now, was being asked some questions about Ms. Rut's

6   lawsuit.  There are publicly filed rulings in that case that if

7   we had the court's permission, they identify what the issue

8   was, what it is.  I could inform the court, if we can just

9   provide that publicly filed opinion that your Honor would be

10  able to see what the issue was.

11         THE COURT:  Sure, or you could give me, if it is

12  reported or accessed through a database, I can do that too.

13  I can take judicial notice of it if it is relevant to these

14  issues.

15         MR. MEEHAN:  Sure.  OK.  We'll do that.

16         THE COURT:  Thank you.  All right.

17         MR. MEEHAN:  Thank you.

18         THE COURT:  Thank you.

19         Ms. Noriega.

20  VICTOR P. HARTE,

21       called as a witness by the Defendants,

22       having been duly sworn, testified as follows:

23         THE COURT:  Mr. Rinefierd.

24         MR. RINEFIERD:  Your Honor, may I approach the witness

25  and the deputy to give an original version of the declaration

1   as well as a copy?

2              THE COURT:  Yes, sir, you may.

3              MR. RINEFIERD:  Thank you.

4   DIRECT EXAMINATION

5   BY MR. RINEFIERD:

6   Q.  Good afternoon, Mr. Harte.

7   A.  Good afternoon.

8   Q.  Do you have in front of you a copy of your declaration in

9   this matter attaching a copy of your expert report?

10  A.  I do.

11  Q.  Do you adopt that declaration as your testimony in this

12  case?

13  A.  I do.

14             MR. RINEFIERD:  Your Honor, I tender Mr. Harte.

15             THE COURT:  All right.  Thank you.

16             I'll let you work from that one and you'll give it

17  back to me in the end.

18             Mr. Zabell, cross-examination.

19             MR. ZABELL:  Thank you, Judge.

20  CROSS-EXAMINATION

21  BY MR. ZABELL:

22  Q.  Good afternoon, Mr. Harte.

23  A.  Good afternoon.

24  Q.  We've had the pleasure of meeting before, correct?

25             It was a pleasure for me anyway.

J5TsWEG6                        Harte - Cross

1    A.  I figured it was.

2            We have.

3    Q.  We met last week at your deposition, correct?

4    A.  Correct.

5    Q.  I had asked you some questions about how you went about

6    calculating your expert report, correct?

7    A.  Correct.

8    Q.  There was one portion in your calculations where you

9    reached out for advice of counsel, correct?

10   A.  Correct.

11   Q.  You didn't reach out to me, though, correct?

12   A.  I didn't know you.

13   Q.  Right.  Who was the counsel that you reached out to?

14   A.  Paul Rinefierd.

15   Q.  That was because you did not know how to calculate the

16   highest actual earnings, correct?

17   A.  Correct.

18   Q.  Because it was undefined in the document, correct?

19   A.  It was not clearly defined in the document.

20   Q.  OK.  Well, do you have your SERP, the SERP and the amended

21   SERP attached?

22   A.  I do not.

23           THE COURT:  One moment.

24           Ms. Noriega, may I have one of those?  I think it is

25   attached as an exhibit.

J5TsWEG6                         Harte - Cross

1              MR. ZABELL:  May I approach with P-8 and P-7, which

2      are the two documents?

3              THE COURT:  I believe they are attached as well to

4      Mr. Connors' declaration, if you're comfortable with him using

5      those.

6              MR. ZABELL:  I am.  I just thought maybe I have them

7      here available.

8              THE COURT:  Sure.  That's fine.  You may approach.

9      BY MR. ZABELL:

10     Q.  Now, you have in front of you P-7?

11     A.  I do.

12     Q.  That's the 1985 SERP that we have been talking about for

13     most of today, correct?

14     A.  You're calling it SERP.  I would call it the supplement

15     pension plan and trust for certain management employees of

16     Young Adult Institute.

17     Q.  Do you mind if I refer to it as a SERP?

18     A.  If it makes you happy.

19     Q.  Thank you.

20              So that was one of the documents that you reviewed in

21     calculating the benefits for Ms. Wegmann, correct?

22     A.  Correct.

23     Q.  Now, you understand from Ms. Wegmann's testimony that the

24     only real issue that she has with your expert report is what

25     you included in her highest actual earnings, correct?

J5TsWEG6                         Harte - Cross

1    A.  I did hear her make that testimony today.

2    Q.  OK.  Which means that everything else you said she is all

3    right with, just how much her actual earnings were that she

4    disagrees with, with what you calculated.

5            Were you aware of that?

6    A.  I don't believe I made that statement.

7    Q.  I didn't ask you if you made the statement.  I said are you

8    aware of that?

9    A.  Please rephrase the question.

10   Q.  OK.  The only issue she has with your report is that you

11   did not include all of her earnings in her highest actual

12   earnings.

13           Are you aware of that?

14   A.  I'm aware that she made that statement.

15           THE COURT:  Do you believe, sir, that you and

16   plaintiff have any other points of disagreement?

17           THE WITNESS:  Thank you, your Honor.  I do.

18           THE COURT:  OK.  Thank you.

19   BY MR. ZABELL:

20   Q.  What other points of disagreement do you think there are?

21   A.  She is ignoring the balance of the plan amendment, your

22   Exhibit P-8, specifically where it made modifications to the

23   benefit.

24   Q.  Oh, you mean where it reduced the benefit?

25   A.  Where it made modifications to the benefit.

J5TsWEG6                          Harte - Cross

Q.  Yes.

          And those modifications resulted in a reduction of

benefits, correct?

A.  Correct.  And she did not say that that is a disagreement

between our calculations.

Q.  Right.  But you did two calculations, one on the original

SERP and one on the amended SERP, correct?

A.  If you were to use the term SERP, there is only one SERP.

OK.  There is one plan.

          THE COURT:  OK.

A.  There is a preamendment version and there is a SERP that

exists in its totality.

          MR. ZABELL:  We went through this all last week,

Judge.

          THE COURT:  That's great.  I don't want to.

          All right.  So, sir, what you're saying is you did do

two sets of calculations?

          THE WITNESS:  I did.

          THE COURT:  One that took into account the 2008

amendment and one that did not?

          THE WITNESS:  Correct.

          THE COURT:  Thank you.

          MR. ZABELL:  Thank you, Judge.

BY MR. ZABELL:

Q.  Now, if you look at Bates stamp numbered 382 of the 1985

 1   version of the SERP.

 2   A.  Please repeat that date stamp.

 3   Q.  Ending in 382.

 4   A.  I apologize.  I don't have that date stamp on this

 5   document.

 6   Q.  I'm sorry.  There were different versions.  I apologize.

 7          59.  If you look at 59.

 8          THE COURT:  Is there a paragraph or section to which

 9   you're directing his attention?

10          MR. ZABELL:  10.2.1.  Benefit levels.

11          THE COURT:  Thank you very much.

12   A.  I have that page.

13   Q.  Specifically paragraph lettered C, is that what you

14   utilized to determine the highest total annual earnings of the

15   participant while in the employ of the institute?

16          Did you use that language in making your calculations?

17   A.  I utilized -- I read this document and utilized these

18   terms, yes.

19   Q.  OK.  And at your deposition you were shown some exhibits,

20   were you not?

21   A.  I was shown some exhibits.

22          MR. ZABELL:  Your honor, may I approach with those two

23   exhibits?

24          I've already given counsel a copy.

25          THE COURT:  Yes.

J5TsWEG6                              Harte - Cross

1              How have they been identified?

2                   MR. ZABELL:  As Exhibit 1 and Exhibit 2 dated 5/23/19.

3                   THE COURT:  So these are his deposition exhibits, sir?

4                   MR. ZABELL:  Yes.

5                   THE COURT:  All right.  You may approach.

6                   MR. ZABELL:  Thank you.  I have copies for your Honor

7       as well.

8                   THE COURT:  Thank you.

9       BY MR. ZABELL:

10      Q.  Now, Exhibit 1 is Ms. Wegmann's 2009 W-2, is it not?

11      A.  It is.

12      Q.  So Exhibit 1 is her 2009 W-2, correct?

13      A.  Correct.

14      Q.  You were never provided a copy of that document by defense

15      counsel when you were engaged to prepare your expert report,

16      were you?

17      A.  No, I was not.

18      Q.  In fact, on the 2009 W-2, it lists gross pay at 402,743.10,

19      correct?

20      A.  Correct.

21      Q.  And this was issued by YAI, was it not?

22      A.  Yes.

23      Q.  OK.  Then you have Exhibit 2 in front of you as well,

24      correct?

25      A.  I do.

1   Q.  And that is a 2009 1099 issued to Ms. Wegmann, correct?

2   A.  Correct.

3   Q.  And that is from the New York League for Early Learning,

4   correct?

5   A.  Correct.

6   Q.  And you heard Ms. Wegmann testify that that was an

7   affiliated entity to YAI, correct?

8   A.  Correct.

9   Q.  And that was not provided to you as well, correct?

10  A.  This was not provided to me, correct.

11  Q.  So neither the W-2 or the 1099, which shows income received

12  by Ms. Wegmann, was actually received by you from defense

13  counsel when you were engaged to prepare your report, correct?

14  A.  These documents were not provided.

15  Q.  Right.  And they were not utilized when you calculated the

16  highest total annual earnings, correct?

17  A.  No, they weren't.

18  Q.  OK.  Now, the term highest total annual earnings has a

19  clear meaning, does it not?

20  A.  I think that is part of this suit, but in my mind, yes.

21  Q.  Yes.  It does have a clear meaning?

22  A.  Yes.

23  Q.  And that means all the earnings that she received, correct?

24  A.  Um, I would believe that it means, for the purposes of a

25  SERP benefit, her earnings and her bonus.  And when we look at

J5TsWEG6                           Harte - Cross

the 2007 or 2008 amendment, however you're calling it, it gave

better clarity to that definition to say that it included base

pay and bonus and had certain exclusions.

Q.  Could you tell me where in that 2008 amendment it says

that?

A.  I'm not sure what page you have it on.  I have got it on

Section 10.2.1, which is benefit levels.  It is in the second

page under Section G, where it reads -- I'll read the

paragraph.  It is about the third full paragraph.

        For the purposes of this Subsection 2, total earnings,

total annual earnings shall include all cash compensation,

parenthetical, salary plus bonuses, paid through any agency

affiliated with YAI National Institute for People with

Disabilities network, excluding the bonuses denominated YAI

bonus two and YAI interest bonus.

Q.  So when you calculated Ms. Wegmann's highest annual

earnings, did you calculate it based on the 2008 amendment or

based upon the 1985 document?

A.  I calculated it based on the data that I was provided for

her earnings.

Q.  So you didn't use the formulas defined in either document?

A.  I disclosed in my report -- if I can turn to my report?

Q.  Sure.

A.  As detailed in schedule four of my report, data utilized in

assumptions, I have detailed the regular pay and the bonus that

1    I utilized.

2    Q.  Right.  I get that.

3          But which method of determining her highest annual

4    earnings did you utilize, those that were contained in the 2008

5    amendment to the SERP or the 1985 original SERP document?

6    A.  I don't think there is a difference.  I think the original

7    SERP document did not give the specificity that the subsequent

8    document did, but I think it was both pointing at regular pay

9    plus bonus, excluding other extraneous items, excluding other

10   LTD coverage, life insurance coverage, all of those other --

11   those other ancillary components that are paid to an employee

12   or a employee may receive and may pay tax on, but those

13   benefits and the compensation that you might deem related to

14   that those fringe benefits are not included traditionally in a

15   SERP benefit calculation.  You are looking at base earnings,

16   you're losing at bonus.  You're not giving a nonqualified SERP

17   benefit on top of another benefit.  You're not giving fringes

18   on top of fringe.

19   Q.  And you testified in your deposition that you learned that

20   from the definitions that are contained in other SERPs that you

21   have reviewed, correct?

22   A.  As well as my history in the industry, and further, after

23   our deposition --

24   Q.  Wait.

25          THE COURT:  No, no.  Just answer his question.

J5TsWEG6                        Harte - Cross

1    Q.  Here is my question.  Here is my question.

2              So if it you relied on the interpretation of other

3    SERPs, not the YAI SERP, how come you didn't identify those

4    other SERPs when you prepared your expert report of documents

5    that you relied on?

6    A.  That's part of my background as an actuary.  I'm not sure

7    what you're asking me to list every plan that I've ever worked

8    on?

9    Q.  No, just the ones that you utilized in interpreting her

10   highest annual earnings.

11   A.  I -- if that is what you heard me say, then I apologize.  I

12   may have misspoke.

13             What I was trying to characterize was that I made that

14   determination by my knowledge having worked on plans for the

15   last 30 years.

16   Q.  And speaking to Mr. Rinefierd, correct?

17   A.  I did have a dialogue with Mr. Rinefierd.

18   Q.  Yes or no, sir?

19   A.  Yes.

20   Q.  OK.  Now, you took no steps to verify the accuracy of the

21   information that you were given, correct, by Mr. Rinefierd?

22   A.  Other than disclosing it in my report for clarification and

23   questioning later, I had no way of requesting for or I didn't

24   ask for any further verification.

25   Q.  You did actually have a way of doing it.  You could have

1    called him up and asked him, like you did when you had a

2    question about the highest total annual earnings, correct?

3    A.  I'm confused by your question.

4    Q.  Did you have the ability to call up Mr. Rinefierd or

5    Mr. Meehan, for that matter, and say, do I really have

6    everything?

7    A.  I had that opportunity.

8    Q.  Did you do that?

9    A.  I asked is there any other documents that I need to look

10   at.  You know, I had enough information.  There was nothing

11   further that I needed to review to calculate her hypothetical

12   benefit.

13   Q.  So you asked them that question, do you have everything,

14   and they said no, or they said yes, you have everything?

15   A.  I don't recall asking that question.  I think I was

16   provided a lot of information and I was provided information to

17   do the calculation.

18   Q.  And were you asked to do a calculation under the 1985 SERP

19   and the SERP amendment circa 2008?

20   A.  I was asked to calculate the benefit as if she had been

21   covered under the plan, ignoring I didn't need to address

22   eligibility, and secondarily, I was asked to review an Exhibit

23   P-18, which plaintiff had calculated benefit, and then I was

24   asked to calculate a benefit in the terms of the plan ignoring

25   the 2008 amendment.

1   Q.  Now, if you look in paragraph 19 of your affidavit.  You

2   state that the gross annual annuity benefit under A, B, and C

3   above will be limited to the greater of the accrued benefit as

4   of June 30, 2008, or 65 percent of the highest total annual

5   earnings, is that correct?

6   A.  You read correct.

7   Q.  Now, did you utilize that 65 percent across both

8   calculations?

9   A.  That was calculated in the benefit of the entire plan,

10  recognizing the plan amendment.  When I calculated the benefit

11  ignoring the plan amendment.  That section was brought into the

12  document with the plan amendment.

13  Q.  OK.  So my question is, when you calculated Ms. Wegmann's

14  benefit under the plan provided for in the 1985 SERP without

15  considering the 2008 amendment, did you stick with the 65

16  percent, or did you stay with the 100 percent that was provided

17  for in that SERP?

18  A.  I ignored that provision when I calculated the benefit

19  ignoring the amendment.

20  Q.  Did you ignore the 65 percent in favor of the 100 percent?

21          MR. RINEFIERD:  Your Honor, the questioning is about

22  areas that the parties have already determined they are not

23  contesting.  We are talking about the highest annual earnings

24  as the one issue that remains.  I don't really see -- I would

25  object to the relevance of these questions.

1          THE COURT:  All right.  Will you make a proffer of

2   relevance, sir.

3          MR. ZABELL:  Absolutely.

4          This witness has talked about how he has jumped from

5   one document to the other document with regard to definitions,

6   and he hasn't stayed consistent with the two calculations.  So

7   I'm just lining him up to hit him with that question, Judge.

8          THE COURT:  I'll allow it.

9          THE WITNESS:  I'm sorry.  I lost track of the

10  question.

11         MR. ZABELL:  Thank you.  Now I'm going to have to

12  change my course of attack here.

13         THE COURT:  That's OK.  Go ahead.

14  BY MR. ZABELL:

15  Q.  So when you calculated Ms. Wegmann's benefits, you

16  calculated it twice, two different ways, correct?

17  A.  Correct.

18  Q.  And when you calculated it the two different ways, did you

19  utilize solely the 1985 SERP document for calculating her

20  benefits under that plan?

21  A.  Yes.

22  Q.  And when you calculated the benefits under the 2008

23  amendment to that SERP plan, did you utilize solely the 2008

24  definitions?

25  A.  When I calculated the benefit under the -- recognizing

J5TsWEG6                        Harte - Cross

1   the plan and its totality, including the 2008 amendment, I

2   reflected the 2008 amendment as well as the original plan

3   document.

4   Q.  OK.  So when you calculated Ms. Wegmann's highest annual

5   earnings, when you did it solely under the 1985 plan, SERP

6   plan, you utilized only the definition of highest total

7   earnings that was contained in 10.2.1 benefit levels, correct?

8   A.  Correct.

9   Q.  Which was just the plain meaning of the words highest total

10  annual earnings, correct?

11  A.  Correct.

12  Q.  OK.  You didn't exclude anything from those earnings,

13  correct?

14  A.  Um, I included full regular pay and bonus.  I excluded no

15  portion of her regular pay.  I excluded no portion of her

16  bonus.

17  Q.  You used full regular pay as opposed to gross pay, correct?

18  A.  Correct.

19  Q.  And what was the amount that you included for full regular

20  pay?

21  A.  For what year?

22  Q.  2009.

23  A.  $270,885.53.

24  Q.  OK.  You would agree that that is about $130,000 less than

25  the 402,743 that is listed on her W-2 as gross pay, correct?

J5TsWEG6                          Harte - Cross

1   A.  I would agree.

2   Q.  OK.  And you didn't factor in the $27,000 that she received

3   from the New York League for Early Learning, correct?

4   A.  Correct.

5   Q.  And you were not even provided that information, correct?

6   A.  Correct.

7   Q.  OK.  If you were provided that information and told that

8   that is an affiliated entity, would you have utilized it?

9   A.  If it was an affiliated entity and it met the definition

10  under 10.2.1, I would have included it.

11  Q.  But because you were never given it, you didn't even know

12  to ask that question, correct?

13  A.  If I could rephrase my answer?

14       Again, I wouldn't necessarily refer to just the W-2 to

15  determine whether or not it is eligible compensation, because a

16  W-2, that $27,000 could include items that are not earnings

17  that are a disability, life insurance coverage, other taxable

18  amounts that you're reporting on a W-2, but they are not what

19  we would call earnings.

20  Q.  So if somebody received a benefit and had to pay taxes on

21  it, you don't consider that an earning?

22  A.  Not for the determination of a pension or a SERP benefit,

23  no, I don't.

24  Q.  That is based upon all of your experience in reviewing

25  various SERPs, correct?

J5TsWEG6                          Harte - Cross

A.  Correct.

Q.  Just not this SERP, because this SERP says highest total

annual earnings, right?

A.  It does.

Q.  OK.

        THE COURT:  In other SERPs that you have seen, sir, do

they also use the term total highest annual earnings?

        THE WITNESS:  If I can kind of refer on one of the

statements that Mr. Connors had earlier.

        Back in '85, plan documents were a lot looser than

they are now.  There has been a tightening up of wording,

whether I would have seen these exact words in another

document, I can't say.  But I can say when you look at it, you

know, documents that existed in 1985 versus what you would

draft in 2019 are drastically different.  They are much

tighter, much better clarity.

        So there might have been an intent, if you said

earnings back in the day to mean regular pay and bonus, and

everybody knew that that is what it was, because you didn't

have all of these other ancillary benefits, fringes, other

things piling on.

        But by the time you got to 2019, all of these other

things existed and required that better clarity.

        THE COURT:  Yes.  But you would also agree, I suspect,

that we're stuck with what we've got; yes?

1          THE WITNESS:  Yes.

2          THE COURT:  OK.  So today you see things with a lot

3    more precision?

4          THE WITNESS:  Today, I would say plan documents that

5    are being drafted today have a lot more precision.  I'm looking

6    at the 1985 document in the lens that how it was drafted and

7    how it was intended in 1985.

8          THE COURT:  I understand.

9          Thank you, counsel.

10   BY MR. ZABELL:

11   Q.  Did you ever inquire what its drafters meant in 1985?

12   A.  I did not.

13   Q.  OK.  The reality is, you just asked Paul Rinefierd what to

14   use for the regular earnings, correct?

15   A.  I had a dialogue with him in regard to regular earnings in

16   regard to the plan's definition of earnings where I said this

17   is very loose.  It is old language.  We had a conversation.

18   Q.  Right.  And you remember testifying at your deposition

19   about this, correct?

20   A.  Correct.

21   Q.  Do you remember being asked these questions and giving

22   these answers, page 45:

23   "Q.  And you used what Paul said, correct?

24   "A.  Paul asked -- Paul -- it was absent any clarity.  I'm

25   going to use regular pay and bonus, that was the conversation.

1   "Q.  And that is what Paul told to you do, correct?

2   "A.  Yes."

3   Q.  Do you recall being asked those questions and giving those

4   answers?

5   A.  That sounds correct.

6   Q.  OK.  So notwithstanding your history in reading SERPs, you

7   just did what Paul asked you to do, right?

8              THE COURT:  Sustained.

9   Q.  Now, do you know what -- prior to compiling your expert

10  report, did you know what this lawsuit was about?

11  A.  No.

12  Q.  Do you recall at your deposition being asked these

13  questions and giving these answers, page 16, line 17:

14  "Q.  Did anybody, prior to you compiling D Expert 1, explain to

15  you what this lawsuit is about?

16  "A.  In a very small degree.

17  "Q.  Who was it that explained it to you?

18  "A.  Paul."

19  Q.  Do you recall being asked that and giving those answers?

20  A.  Yes, I do.

21  Q.  And the Paul that we're referring to is Mr. Rinefierd,

22  correct?

23  A.  Correct.

24  Q.  And the D Expert 1 that we're referring to is your expert

25  report, correct?

J5TsWEG6                          Harte - Cross

1   A.  Correct.

2   Q.  Now, when you prepared your expert report, you knew that

3   the 2007 amendment didn't include Karen Wegmann, correct?

4   A.  Certainly, yes.

5   Q.  Now, isn't it your normal practice to just use base pay in

6   calculating highest annual earnings?

7   A.  In what determination of my regular practice?

8   Q.  In issuing an expert report like you did here.

9   A.  My regular practice is to rely upon the plan document.

10          THE COURT:  Is there a default position that you have,

11  sir?

12          THE WITNESS:  Um, such as the case with the 1985

13  document, where it says earnings and nothing further than that.

14          THE COURT:  Yes.

15          THE WITNESS:  My default would be to use regular pay

16  and regular bonus.

17  BY MR. ZABELL:

18  Q.  As opposed to total annual earnings, correct?

19  A.  I don't know what you mean by total annual earnings.

20  Q.  I mean what's contained --

21  A.  You asked me what I would do in my practice without

22  clarity.  I told you.  So if you want to give me, as opposed to

23  using some other buckets of compensation, I can answer that.

24  I'm not sure what you're saying otherwise.

25  Q.  I just wanted to see if your expert report was compiled

1    using the total annual earnings as they are written in 10.2.1

2    of subsection 2 of the benefits of the 1985 SERP.

3            THE COURT:  Counsel, I think that is the imprecision

4    that has prompted him to explain to me what he is using.  So I

5    understand the question and the answer.

6            It's fine.  You don't have to answer it.

7            Move on, counsel.

8            MR. ZABELL:  Thank you.

9            THE WITNESS:  Thank you, your Honor.

10   BY MR. ZABELL:

11   Q.  Now, isn't it true that when you calculated the highest

12   annual earnings, you just used base earnings and bonus in the

13   calculation?

14   A.  That is correct.

15   Q.  Did you inquire if anybody else, in calculating benefits

16   under the YAI SERP, used base earnings?

17   A.  No, I did not.

18   Q.  Now, when calculating the highest annual earnings, you

19   excluded long-term disability benefits, longevity pay bonus,

20   and a car allowance, is that correct?

21   A.  That's correct.

22   Q.  And you excluded those because normally those are not

23   considered in the calculation of a SERP, correct?

24   A.  Correct.

25   Q.  And in determining that normally, you were referring to

1   your experience with other SERPs, is that correct?

2   A.  Correct.  And based on the plan document 10.2.1, where it

3   says shall include all cash compensation, salary, plus bonus.

4   Q.  Right.  But there you're looking at the 2008 amendment,

5   correct?

6   A.  I am.

7   Q.  OK.  So you didn't use that document and that definition of

8   highest annual earnings when you calculated Ms. Wegmann's

9   earnings under solely the 1985 SERP, correct?

10  A.  I did use that same definition.  I utilized her regular

11  earnings plus her bonus.

12  Q.  OK.  So in calculating that highest annual earnings, you

13  used language from both the amendment and the original SERP

14  document?

15  A.  I don't believe that the two documents are in disagreement

16  in regard to the definition of compensation to utilize.  I

17  believe that the amendment provided clarification that earnings

18  was salary and bonus.

19  Q.  I see.

20  A.  I didn't see it including car allowance, LTD coverage, etc.

21  Q.  Now, do you need any additional information other than what

22  Ms. Wegmann testified to, to acknowledge that Ms. Wegmann

23  received $27,000 from an affiliated entity that should have

24  been included in her highest annual earnings?

25  A.  After today, I don't need anything further on this case, I

J5TsWEG6                        Harte - Cross

1    don't think.

2            But in regard to the calculation, the $27,000 does not

3    disclose why it is paid.  The W-2, just as I can't use the W-2

4    for YAI, I can't use the W-2 for New York League, even if it is

5    an affiliated entity, because I don't know what is in there.  I

6    don't know if it is regular pay or bonus or something else that

7    should not be counted towards earnings or bonus.

8    Q.  OK.

9    A.  I don't know what is in there.

10   Q.  I just want to -- I believe you said W-2, but it is

11   actually a 1099, correct?

12   A.  I apologize.  It is a 1099.

13   Q.  I just wanted to clarify for the record.

14           But where it does say $27,000, it says not employee

15   compensation, correct?

16   A.  That's the box that it is entered under, yes.

17   Q.  And compensation is earnings, correct?

18   A.  I'm not an expert on 1099s.  I don't know what is in that

19   number.  That is what I'm trying to get at.  I don't know what

20   is represented by the 27,000.  I don't know if it is regular

21   earnings or not.

22   Q.  OK.  You'll agree that if the 1099 income and the full

23   income of the W-2 was included in your calculation of highest

24   annual earnings, then your calculations would be off, correct?

25   A.  Correct.

```
 1   Q.  Now, you'll agree that the term total earnings is not up

 2   for debate, is it?

 3           THE COURT:  I refuse to believe there is something in

 4   this case --

 5           THE WITNESS:  Can I refuse --

 6           THE COURT:  Note the judge laughing as you're asking

 7   the question.

 8           Perhaps you do think it is up for debate, sir?

 9           THE WITNESS:  I think it is up for debate.

10   BY MR. ZABELL:

11   Q.  You're familiar with the term total, correct?

12   A.  I am.

13   Q.  And what does the word total mean to you?

14   A.  It is a summation of some components.

15   Q.  A complete sum of components, correct?

16   A.  It is a summation of components.

17   Q.  Right.

18   A.  It could be some of odd numbers.  That doesn't mean add all

19   numbers.  It means some odd numbers.  It is -- a total is a

20   sum.

21   Q.  Right.  And implicit in total is not excluding something,

22   correct?

23   A.  OK.  It is totaling the elements that are being suspect to

24   the total.

25   Q.  And earnings has a meaning, correct?
```

1    A.  Earnings has a meaning, and I'm sure it has more than one

2    meaning.

3    Q.  Well, as an actuary, what is your understanding of the word

4    earnings?

5    A.  As an actuary, calculating a benefit from a nonqualified

6    plan, it means regular pay and bonus.  It means excluding any

7    values received for fringe benefits, it means excluding any

8    values received for other qualified plans, other nonqualified

9    plans, etc.

10   Q.  And that is all a definition that you've received from

11   reading certain SERP documents, correct?

12   A.  As well as 30 years in the industry.

13   Q.  Right.  And those years of the industry gave you the

14   experience reading those other SERP documents, correct?

15   A.  I'm confused by the question.

16   Q.  Not every SERP document defines what compensation should be

17   considered in a SERP calculation the same, correct?

18   A.  Correct.

19   Q.  Some are more inclusive than others, correct?

20   A.  Yes.

21   Q.  All right.  And you used your experience in reading prior

22   SERPs to come to the conclusions that you utilized in making

23   your calculations in Ms. Wegmann's case, correct?

24   A.  As well as reviewing the 1985 document and the related plan

25   amendment.

1   Q.  OK.  Do you know what the term gross pay means?

2   A.  Um, I'm not an accountant.  I know it is an entry that goes

3   on a W-2.  I could not tell you all of the components that are

4   listed in that.

5   Q.  OK.  Did you ever inquire what gross pay meant with regard

6   to Ms. Wegmann?

7   A.  No.

8   Q.  Now, you've testified before as an expert, correct?

9   A.  I have.

10  Q.  How many times?

11  A.  Three other times.

12  Q.  How many of those other times that you testified as an

13  expert did you testify on behalf of the Groom Law Firm?

14  A.  Twice.

15  Q.  And in those other cases that you testified, in the

16  aggregate, how much were you paid for your services?

17  A.  I apologize.  I don't have the amount.  I know it was

18  provided to you over the last few days.

19          MR. ZABELL:  Judge, we agree to stipulate to the

20  amount, should he not remember.

21          THE COURT:  Certainly.

22          Mr. Rinefierd, if you want to make a proffer to the

23  court about that amount, I will listen to you.

24          MR. ZABELL:  Somewhere around 40,000?

25          MR. RINEFIERD:  Yes.

1              MR. ZABELL:  We'll stipulate that it was somewhere

2       around 40,000.

3              THE COURT:  All right.  I'm finding you amusing that

4       you're stipulating or such an imprecise figure, but I get where

5       you're going with it.  All right.

6              Finish up, counsel.

7              MR. ZABELL:  Thank you.

8       BY MR. ZABELL:

9       Q.  And you were paid for your services in this case, correct?

10      A.  Yes.

11      Q.  OK.  And do you know how much that was?

12      A.  I don't have the exact amount.  I don't know, 10, 12,000.

13      Q.  If I told you $13,000, would that refresh your

14      recollection?

15      A.  Could be in that neighborhood.

16              MR. ZABELL:  Can I have that stip?

17              MR. RINEFIERD:  Yes.  Your Honor, we'll stipulate to

18      that.

19              THE COURT:  Thank you.

20              MR. ZABELL:  I have nothing further.

21              THE COURT:  Thank you.

22              Redirect, Mr. Rinefierd?

23              Mr. Rinefierd, may I inquire, after Mr. Harte, is that

24      the end of the defense case, to the best of your knowledge?

25              MR. RINEFIERD:  Yes, your Honor.

1           THE COURT:  All right.  I don't have a sense of the

2   length of your redirect, sir.

3           Are people comfortable proceeding without a break?  I

4   don't want any member or anybody in this courtroom to be

5   uncomfortable.

6           MR. ZABELL:  Really?  I'm sorry.

7           MR. RINEFIERD:  We're fine, your Honor.  I anticipate

8   I'll be fairly brief.

9           THE COURT:  That's fine.

10          Sir, you're ready to go forward?

11          THE WITNESS:  I am.

12          THE COURT:  Thank you.

13          Mr. Rinefierd, you may inquire when you are ready.

14          MR. RINEFIERD:  Thank you, your Honor.

15          As an initial matter, before beginning my questioning,

16  I would ask your Honor to provide a counter designation to -- I

17  could ask him about it -- in terms of from his deposition on

18  page 16 that Mr. Zabell read in the course of his examination.

19          THE COURT:  Let's do this.  If you're going to ask him

20  questions about that, then we'll certainly have you either show

21  it to him or read it.

22          Otherwise, why don't you provide to me shortly after

23  today the designated portion and your counter designations that

24  I may have both.

25          Is that fair enough?

1          MR. RINEFIERD:  That sounds great.

2          THE COURT:  We'll do that.  I'll wait for that.

3          Thank you, sir.

4   REDIRECT EXAMINATION

5   BY MR. RINEFIERD:

6   Q.  Mr. Harte, were you missing any documentation in your

7   opinion that prevented you from calculating Ms. Wegmann's

8   benefit?

9   A.  No.

10  Q.  Based on your experience, were there any documents that

11  were missing from what you received from counsel?

12  A.  No.

13  Q.  Did you ever ask for any additional documents and that you

14  failed to receive?

15  A.  No.

16  Q.  Mr. Zabell asked you about the term highest total annual

17  earnings.  I believe you discussed with him the original SERP

18  document and the 2008 plan amendment.

19          In addition to your -- you construed that term based

20  on your expertise?

21  A.  Yes.

22  Q.  Were there any additional documents that you received that

23  you considered in how that term would be construed?

24  A.  Yes.

25  Q.  Do you recall what those additional documents were?

J5TsWEG6                          Harte - Redirect

1   A.   Turning to my expert report, there was -- I'm going to read

2   what it was called -- recommendations regarding executive

3   compensation --

4          THE COURT:  Slow down and repeat for court reporter

5   and judge.  Thank you.

6          THE WITNESS:  I apologize to both.

7          There was a document recommendations regarding

8   executive compensation from the YAI/NIPD executive compensation

9   committee presented to the YAI/NIPD board of trustees.  Then it

10  is listed YAI SERP/Wegmann/0000040203.

11  BY MR. RINEFIERD:

12  Q.   Mr. Harte, do you recall how that document informed how you

13  construed the term highest total annual earnings?

14  A.   That document included the term regular pay plus bonus.

15  Q.   OK.

16         THE COURT:  Counsel, may I inquire?

17         Mr. Harte, just so that I'm clear, is it your

18  testimony that having reviewed a series of documents issued by

19  YAI-related entities or representatives, over a period of time,

20  it is your belief that what was being considered for purposes

21  of benefits did not change, even if the nomenclature changed?

22         THE WITNESS:  That is my belief.

23         THE COURT:  All right.

24         MR. RINEFIERD:  Thank you.

25  BY MR. RINEFIERD:

1   Q.   Do you recall from that document the phrase salary plus YAI

2   bonus?

3   A.   Yes.

4   Q.   Did that term factor into how you construed the term

5   highest total annual earnings?

6   A.   That was consistent with the ultimate calculations and my

7   belief of what should be included.

8   Q.   So based on your understanding, would regular pay be

9   considered within the universe of YAI plus salary plus YAI

10   bonus?

11   A.   I would believe regular pay would be salary.

12   Q.   Would a longevity bonus be included within salary plus YAI

13   bonus?

14   A.   I would not think it would be.

15   Q.   A car allowance?

16   A.   No.

17   Q.   A long-term disability benefit?

18   A.   No.

19   Q.   Would a YAI bonus be included within the universe of salary

20   plus YAI bonus?

21   A.   I believe so.

22   Q.   Would a bonus from the New York League of Early Learning be

23   included within salary plus YAI bonus?

24   A.   It would not be included in that.

25   Q.   Do you have any personal knowledge of whether --

1          THE COURT:  Excuse me, sir.  It would not be included?

2          THE WITNESS:  It would not be included.

3          THE COURT:  Why not?

4          THE WITNESS:  It is not YAI bonus or salary.

5          THE COURT:  OK.

6          THE WITNESS:  He said would it be included in YAI.

7          THE COURT:  OK.

8          THE WITNESS:  Salary or bonus.

9          THE COURT:  Do you have any personal knowledge of

10   whether the New York League of Early Learning is an affiliate

11   of Young Adult Institute?

12         THE WITNESS:  I have no knowledge.

13         THE COURT:  If it were, would that change your answer?

14         THE WITNESS:  His question to me was whether it would

15   be included in YAI earnings, not whether it would be --

16         THE COURT:  Well, let me be more precise.

17         THE WITNESS:  OK.

18         THE COURT:  There is salary and YAI bonus.  If you get

19   a bonus from YAI, it is in your estimation a YAI bonus,

20   correct, sir?

21         THE WITNESS:  Correct.

22         THE COURT:  If you get a bonus from a YAI affiliate,

23   is there a level of interrelationship that would make it a YAI

24   bonus, or is it in your estimation never a YAI bonus unless it

25   comes directly from YAI?

1            THE WITNESS:  I believe for it to be a YAI bonus, it

2       needs to come from YAI.

3            THE COURT:  I understand.

4            THE WITNESS:  That being said, when you read the plan

5       document, the amended version does say to include -- including

6       all cash compensation paid through any agency affiliated.

7            So if it is a salary or bonus from an affiliated for

8       the SERP plan, you would include it, but it is not a YAI

9       salary.  It is a salary that is being included in the

10      calculation.

11           THE COURT:  Counsel, you'll excuse my frolicking

12      detour and you'll excuse me for really --

13           THE WITNESS:  I'm sorry if I'm not clear.

14           THE COURT:  No, no, no.  I'm not saying you're not.

15           I'm just trying to figure out where you came to the

16      determination that YAI bonus meant only YAI, given the language

17      you just read to me from the SERP.

18           THE WITNESS:  Because if you were determining earnings

19      for the plan and you think about each component, you could have

20      YAI earnings, you could have YAI bonus, you could have

21      affiliate earnings, you could have affiliate bonus.

22           THE COURT:  OK.

23           THE WITNESS:  So if the question is what is

24      compensation for the plan, earnings for the plan, you would

25      include all four buckets.

1          OK.  If you were asking what is YAI earnings, that is

2     going to be only paid from YAI.  That's my understanding.

3          THE COURT:  No, I understand that.

4          So if the affiliation had been YAI family bonus, it

5     would be sort of things within the umbrella of YAI including

6     its affiliate; yes?

7          THE WITNESS:  Yes.

8          THE COURT:  OK.  But having defined it as YAI and not

9     YAI plus affiliates, that is why you're limiting your answer in

10    the same way?

11         THE WITNESS:  Absolutely.

12         THE COURT:  Understood.

13         Thank you, counsel.

14    BY MR. RINEFIERD:

15    Q.  Mr. Harte, you were also shown a copy -- we've been

16    discussing the 2008 amendment.  And we looked at -- I think the

17    version in front of you has a Bates number YAISERP-Wegmann

18    ending in the number 96?

19    A.  I have that page.

20    Q.  Page 10 of the amendment.  You had read from the third full

21    paragraph down in subsection G starting with, For purposes of

22    this subsection 2.  Then you read the words, all cash

23    compensation?

24    A.  Yes.

25    Q.  In your experience, would a car allowance be cash

J5TsWEG6                         Harte - Redirect

1   compensation?

2   A.   No.

3   Q.   Would a long-term disability benefit be cash compensation?

4   A.   No.

5   Q.   And would a longevity bonus be cash compensation?

6   A.   I don't believe so.

7           MR. RINEFIERD:  Your Honor, if I could have just a

8   minute to confer with my co-counsel?

9           THE COURT:  Yes.

10           (Counsel conferring)

11           Perhaps with your client as well, sir.

12           (Counsel conferring)

13           MR. RINEFIERD:  I have no further questions of

14   Mr. Harte.

15           THE COURT:  Thank you, Mr. Harte.  You may step down.

16           Let me take those, please.

17           THE WITNESS:  These as well?

18           THE COURT:  Sure.

19           THE WITNESS:  Thank you.

20           (Witness excused)

21           THE COURT:  Mr. Rinefierd, does your client rest?

22           MR. MEEHAN:  May I address that one, your Honor?

23           THE COURT:  Of course, sir.

24           I should say your clients in plural.  Please excuse

25   me.

J5TsWEG6                          Harte - Redirect

1            MR. MEEHAN:  Of course.

2            We have no other witnesses.  There is one document

3    that we would like to introduce that we think may be

4    informative to the court with respect to this New York League,

5    are they an affiliate or are they not issue.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J5tnweg7

1           MR. MEEHAN:  We have a copy of the 2009 990 form that

2      was filed by New York League with the government, and we

3      believe that document definitively would demonstrate that New

4      York League was not an affiliate.

5           THE COURT:  Sir, is this a document that was produced

6      in discovery?

7           MR. MEEHAN:  It is not.

8           THE COURT:  Is this a document that has been shown to

9      Mr. Zabell at any point ever?

10          MR. MEEHAN:  No, ma'am.

11          THE COURT:  It is not listed in the pretrial order, is

12     that correct?

13          MR. MEEHAN:  That is also correct.

14          THE COURT:  The New York League is something that we

15     have discussed in a prior pretrial conference, is it not?

16          MR. MEEHAN:  It is indeed.  I have an explanation, but

17     I will wait until your Honor is satisfied with your questioning

18     before I do.

19          THE COURT:  Well, Mr. Zabell, what is the position of

20     the plaintiff regarding the admission of this document at this

21     trial?

22          MR. ZABELL:  I would object to it.  There is not a

23     witness in to lay a proper foundation.  I have never seen this

24     document before.  Counsel has known that we were going to be

25     here.  Presumably at some point before today this document came

1    into his possession.  He was never made aware of that, not

2    given an opportunity to address it either at this trial or

3    otherwise.

4             THE COURT:  Sir, would you turn around, please, and

5    look at the document, and tell me if you persist with the

6    objection.

7             MR. ZABELL:  Your Honor.

8             THE COURT:  Sir.

9             MR. ZABELL:  I do persist in my objection.

10            THE COURT:  All right.  Let me please hear from

11   Mr. Meehan on his explanation, and I will decide whether to

12   take consideration of this document.

13            MR. MEEHAN:  Your Honor, as I tried to be throughout,

14   I will be very candid with the Court.

15            THE COURT:  Yes.

16            MR. MEEHAN:  I had thought, based upon what

17   Ms. Wegmann testified to today, that there is no real issue in

18   whether New York League is an affiliate.  I remain of that view

19   because she did identify -- the evidence is now closed I guess

20   on what I am saying, so she did identify that the connection

21   was there was a management contract, and so if that is the

22   entirety of the evidence, which it is, I believe that your

23   Honor will have enough to conclude that it was not an

24   affiliate, and I believe there is no basis to conclude it was

25   an affiliate.  But it did occur to me this afternoon that we

1   had looked up the 990 for 2009 to see, well, did it say

2   anything.  Frankly, I thought it was surplusage and completely

3   unnecessary, but then it occurred to me that perhaps your Honor

4   might find it valuable to see what the New York League filed

5   with the federal government on the issue of whether they have

6   any affiliates.  That's the issue.  I thought the 990 could, to

7   the extent there was any lack of clarity, that it could help

8   reinforce that that is it, your Honor.

9           THE COURT:  I appreciate it.  I don't think I will

10  take the document.  I think it is too late.  I think there were

11  opportunities to make Mr. Zabell aware of it before now.  We

12  will go with the record we have now, sir.

13          MR. MEEHAN:  Thank you, your Honor.

14          With that, we don't have anything further to introduce

15  and I believe our case is closed as well.

16          THE COURT:  Thank you very much.

17          MR. MEEHAN:  Your Honor, I do have one question.

18          THE COURT:  Yes.

19          MR. MEEHAN:  It is a housekeeping one really.

20          THE COURT:  Yes.

21          MR. MEEHAN:  We referred to earlier that there are

22  deposition designations by each side.

23          THE COURT:  Yes.

24          MR. MEEHAN:  We put them all together.  We didn't

25  identify those as exhibits.  I guess in a sense they're sort of

1    joint exhibits, and I wasn't sure how we left it as to how they

2    should be presented to your Honor.

3              THE COURT:  Mr. Zabell, do you agree that those

4    designations and counterdesignations that are identified in the

5    joint pretrial order, as well the one designation that you made

6    today and Mr. Rinefierd's counterdesignation that he is going

7    to give me very soon are things that I may consider as part of

8    the record in this case?

9              MR. ZABELL:  I do.  Counsel and I discussed that.

10             THE COURT:  OK.  Mr. Meehan, those materials are in as

11   far as I am concerned.  I think we are fine on that.

12             MR. MEEHAN:  Your Honor, just so there is no

13   misunderstanding, would it be all right if Mr. Rinefierd just

14   identified now the page and line of the additional designation.

15   It's basically for context if you will.

16             THE COURT:  Of course.

17             MR. RINEFIERD:  Thank you, your Honor.

18             It's page 16, line 22 through page 18, line -- sorry.

19   Page 16, line 23, through page 18, lines 3 through 9.

20             THE COURT:  OK.  Understood.

21             Counsel, now it's my turn for the housekeeping

22   questions.

23             Mr. Zabell, Mr. Meehan, do you want an opportunity to

24   amend your findings of fact and conclusions of law in light of

25   the testimony that has come in at this trial?

J5tnweg7

1          MR. MEEHAN:  Your Honor, yes.  We believe it would be

2     helpful to the Court and for us to be able to spell out the

3     case to supplement those proposed findings and proposed

4     conclusions.

5          THE COURT:  Mr. Zabell, if he is going to, you are not

6     going to not, correct?

7          MR. ZABELL:  I agree as well.

8          THE COURT:  How much time would you like?  You will

9     need time to get the transcript and digest it, and I don't want

10    to wreck anyone's summer plans.

11         How much time do you want.

12         MR. MEEHAN:  Your Honor, we can be flexible.

13         MR. ZABELL:  We are both thinking 30 days.

14         MR. MEEHAN:  At least between counsel we were

15    contemplating, give or take, 30 days, if that is acceptable to

16    the Court.

17         THE COURT:  Sure.  July 1, please.

18         MR. MEEHAN:  OK.  That would be simultaneous I take

19    it, your Honor?

20         THE COURT:  Yes, please.

21         MR. MEEHAN:  Just for planning purposes once we submit

22    those on a simultaneous basis, are we done or would the Court

23    contemplate any sort of responses?

24         THE COURT:  I am not contemplating responses.  If I

25    need you for oral argument or if I need additional information,

J5tnweg7

1    I will let you know, although I think from my perspective I

2    can't ask for the record to be increased.  I can take judicial

3    notice of things, but I think the record I have is the record I

4    am working with.

5              MR. MEEHAN:  Right.  We will provide that Kathleen Rut

6    opinion.

7              THE COURT:  Beg your pardon?

8              MR. MEEHAN:  We will provide that opinion about

9    Kathleen Rut.

10             THE COURT:  That is fine.  Thank you.

11             Mr. Meehan, while you are standing, let me ask you

12   this.  Actually, Mr. Zabell I am going to ask you these

13   questions as well.

14             Mr. Zabell, if I rule in your client's favor, your

15   client is prepared to make the apparently large tax payment she

16   has to make, or do you believe she doesn't have to make it.

17             MR. ZABELL:  A, I believe she doesn't have to make it;

18   B, should I be mistaken, there is a provision in the SERP that

19   says if a tax liability comes due on the SERP benefit, they

20   have 60 days to provide you that advance payment.

21             THE COURT:  So that they would have to make enough of

22   a distribution under the plan to pay not only what she might be

23   due for some period of time, but also for that tax consequence?

24             MR. ZABELL:  Yes.

25             THE COURT:  All right.  Mr. Meehan, if I -- and don't

1     read anything into my questions.  I am just trying to

2     understand the worst-case scenario.  If I agree that she is

3     entitled to something under the SERP, will there be an

4     investigation of the board of trustees at the time based on an

5     excessive compensation standard?

6                What I mean to say is does it come into play if a

7     court orders the payment?

8                MR. MEEHAN:  Your Honor, if I can, I don't mean to

9     pretend to be a tax lawyer.

10               THE COURT:  Yes.  I wasn't going to ask Mr. Connors.

11               MR. MEEHAN:  Understood.

12               My understanding of that possibility is that it would

13    become incumbent upon the organization to determine whether in

14    the organization's point of view such an award would result in

15    excessive compensation, and the organization would then be

16    required to reach a conclusion as to whether it needed to

17    report that.

18               THE COURT:  If it reports that, in the worst-case

19    scenario, is Ms. Wegmann paying back 125 percent of that

20    compensation, and then are your board members being tasked with

21    10 to 20 percent penalties for that compensation?

22               MR. MEEHAN:  As I understand Mr. Connors both in his

23    testimony and the benefit of other conversations to understand

24    his point of view, that is a risk for all concerned, and I

25    would also just note I know we're not now arguing about how to

J5tnweg7

1    interpret SERP provisions, including ones that were not

2    testified to.

3              THE COURT:  Yes.

4              MR. MEEHAN:  But I do not recognize any provision in

5    the SERP, amended or not amended, that obligates the

6    organization to pay a participant's taxes.

7              THE COURT:  Well, I didn't see that either, sir.  But

8    it will be, Mr. Zabell, quite the Pyrrhic victory if your

9    client wins and has to pay it all back.

10             MR. ZABELL:  Well --

11             THE COURT:  I am not saying that's what is going to

12   happen.  I just want to understand.  Here's why, in the

13   interest of transparency:  I still think you are all foolish

14   for not settling this case as a legal matter.

15             MR. ZABELL:  I agree.

16             THE COURT:  Why aren't you settling this case in a way

17   that doesn't implicate the tax issues?

18             We are going to stop.  This is going to be off the

19   record.  Thank you.

20             (Discussion off the record)

21             THE COURT:  I think I have the schedule I need.  I

22   think I have the understanding I need.  I think we are done,

23   unless anyone has anything they want to bring to my attention?

24             MR. MEEHAN:  No, your Honor.

25             Thank you.  We appreciate your time and patience with

J5tnweg7

1    us.

2                THE COURT:  Of course.

3                Sir?

4                MR. ZABELL:  No, your Honor.

5                THE COURT:  Thank you very much.  We are adjourned.

6                (Trial concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         INDEX OF EXAMINATION

2    Examination of:                              Page

3    KAREN WEGMANN

4    Direct By Mr. Zabell . . . . . . . . . . . . . 5

5    Cross By Mr. Meehan  . . . . . . . . . . . . . 7

6    Redirect By Mr. Zabell . . . . . . . . . . . 117

7     MARCELLA FAVA

8    Direct By Mr. Meehan . . . . . . . . . . . . 123

9    Cross Mr. Zabell . . . . . . . . . . . . . . 124

10   Redirect By Mr. Meehan . . . . . . . . . . . 163

11   MICHAEL P. CONNORS

12   Direct By Mr. Meehan . . . . . . . . . . . . 169

13   Cross By Mr. Zabell  . . . . . . . . . . . . 170

14   Redirect By Mr. Meehan . . . . . . . . . . . 204

15    VICTOR P. HARTE

16   Direct By Mr. Rinefierd  . . . . . . . . . . 221

17   Cross By Mr. Zabell  . . . . . . . . . . . . 221

18   Redirect By Mr. Rinefierd  . . . . . . . . . 249
```