**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KAREN WEGMANN,<br><br>          Plaintiff,<br><br>v.<br><br>YOUNG ADULT INSTITUTE, INC., *et al.*,<br><br>          Defendants. | Case No. 1:15-cv-03815-KPF<br><br>ECF Case |

## [PROPOSED] AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendants the Young Adult Institute, Inc. ("YAI") and trustees of the Supplemental

Pension Plan and Trust for Certain Management Employees of Young Adult Institute (the

"SERP" and, together with YAI, the "YAI Defendants") respectfully submit these proposed

Amended Findings of Fact and Conclusions of Law following the bench trial on May 29, 2019.

*Facts stipulated to by all parties are italicized.*

## INTRODUCTION

The YAI Defendants previewed for the Court in its pretrial briefing and at the pretrial

conference that they intended to prove at trial that, notwithstanding how one reads the SERP plan

document and its eligibility provisions, Ms. Wegmann is not entitled to a benefit under the

SERP.  Specifically, through trial the YAI Defendants introduced evidence to prove that Ms.

Wegmann's remaining ERISA claim is barred by the applicable six-year statute of limitations, by

laches, and by equitable estoppel.

Based on evidence presented at trial, the YAI Defendants have demonstrated that they

should prevail in this case.  First, Ms. Wegmann's claim is time-barred because she knew or

should have known of clear repudiations of her being a SERP participant (including the 2008

Amendment) before May 18, 2009.  Second, her claim is barred by laches because she knew of YAI's conduct (i.e., its excluding her from the SERP and its demonstrated understanding that she was not a SERP participant), as evidenced by YAI's annual retirement plan allocations and tax filings showing that she was not accruing a SERP benefit; she unreasonably delayed in taking action to correct YAI's understanding; and, as a consequence, YAI has been prejudiced by being deprived of opportunities either to clarify the SERP plan document to specify she was not a participant, or to prepare for paying her a benefit in the future.  Third, Ms. Wegmann is equitably estopped from claiming that she was automatically in the SERP because she misrepresented her understanding that Board approval was required to add SERP participants and was silent in the face of YAI's relying on her shared belief that she was not a SERP participant, and YAI has been prejudiced as a result.

The YAI Defendants ask the Court to adopt their proposed findings of fact and conclusions of law provided below and enter judgment in favor of the YAI Defendants on all claims under Ms. Wegmann's Amended Complaint.

## **FINDINGS OF FACT**

### The Parties

1.      *YAI is a New York not-for-profit and tax-exempt corporation, formed in 1957, that operates a network of agencies that provide programs and services to individuals with intellectual and developmental disabilities in the New York metropolitan area and New Jersey.*

2.      *YAI currently has a team of over 4,000 employees supporting over 20,000 persons in the intellectually and developmentally disabled community.*

3.      *At all relevant times, a Board of Trustees ("Board") has been the governing body of YAI.*

4.      Plaintiff Karen Wegmann is a "smart" and "strategic" businesswoman. Deposition of Stephen Ernest Freeman, Oct. 13, 2017 ("Freeman Dep.")[1] at 15:3-12; *see also* Direct Testimony Declaration of Michael P. Connors ("Connors Decl.") ¶ 22 ("I recall that Ms. Wegmann was sophisticated and well qualified in her role as CFO, including with respect to YAI's budget.").

5.      *Ms. Wegmann holds an undergraduate degree in accounting and earned a master's degree in business administration, with a focus on corporate finance.*

6.      *Ms. Wegmann was hired at YAI to work as Assistant Controller on December 15, 1986.*

7.      *Ms. Wegmann held the title of Controller from July 1, 1992 until June 30, 2003.*

8.      As Controller, among other duties, Ms. Wegmann was responsible for coordinating YAI's process for completing the Form 990, a federal tax filing that YAI submitted under penalty of perjury, which Ms. Wegmann did her best to ensure was accurate and complete. Trial Tr. (Wegmann Test.) 64:8-65:2; *id.* at 65:19-66:3.  Direct Testimony Declaration of Marcella C. Fava ("Fava Decl.") ¶¶ 48-49.

9.      The Form 990 requires nonprofit organizations to disclose compensation and benefits for the organizations' highest compensated employees.  Trial Tr. (Wegmann Test.) 64:8-21.

10.      *Ms. Wegmann held the titles of Controller and Director of Finance from July 1, 2003 until June 30, 2006.*

---

[1] Deposition transcript citations in the YAI Defendants' proposed findings of fact and conclusions of law are to designations disclosed in Section IX.B of the parties' Proposed Joint Pre-Trial Order (Dkt. 145), which the Court admitted before the close of trial.  *See* Trial Tr. 259:17-260:11.

11.     *Ms. Wegmann was Chief Financial Officer ("CFO") at YAI from July 1, 2006 until June 30, 2012.*

12.     Ms. Wegmann's responsibilities as CFO included proposing to Board Committees how much YAI needed to allocate each year to its retirement plans.  Connors Decl. ¶ 20; *see also* Fava Decl. ¶ 51 (testifying that "[a]s Controller and CFO, but especially as CFO, Ms. Wegmann was responsible for putting together YAI's annual budget and proposing it to the Board" and "YAI's budget process included determining how much YAI needed to contribute each year to its retirement plans, including the SERP"); Trial Tr. (Wegmann Test.) 55:15-56:1 (Ms. Wegmann testifying that "my role was to . . . prepare the budget, to manage the budget throughout the year for the organization" and "I was aware of our revenue and expenses and . . . the accrual or set aside in the budget for the pension . . . .").

13.     Ms. Wegmann had responsibilities specifically related to the Original SERP, which included administering the plan, reporting the plan's accruals on the Form 990 and assisting with calculating amounts of annual contributions.  Connors Decl. ¶ 21; *see also* Trial Tr. (Wegmann Test.) 60:9-61:15 (Ms. Wegmann testifying that she provided "all the census information, employees and salaries and number of years" to actuary Craig Miller to calculate annual contributions for YAI's benefit plans); *id.* at 65:3-21 (Ms. Wegmann testifying that her role in preparing YAI's Form 990 included coordinating the process and gathering information related to YAI benefit plan contributions and executives' salary and benefits).

14.     With respect to YAI's budget, Ms. Wegmann worked to ensure that the organization had sufficient funds to pay for all of its expenses.  Trial Tr. (Wegmann Test.) 56:2-17; *see also id.* at 99:24-100:11 (referring to YAI Defendants' Trial Exhibit BJ: "Q. OK. And that included, if you look at page 4901, such things as the paragraph at the top, the first full

paragraph: Ms. Wegmann presented the initial YAI operating budget for fiscal year 2009-2010. It then goes on to explain the initial operating budget includes income, and expense balanced. You made presentations of that sort at these business committee meetings?  A. Yes, yes.  We presented a balanced budget.  Q. So you didn't present a budget that knowingly had a gap: There is a liability accruing out there, but I don't have any money for it.  You didn't do that knowingly at any time, did you?  A. No").

15.     Ms. Wegmann's direct testimony that "I was not concerned that SERP calculations [for her] were not included on YAI's tax returns" and "[n]or did I find it questionable that such information was absent from YAI's financial documents," *see* Affidavit of Karen Wegmann ("Wegmann Aff.") ¶ 51, is not credible given her testimony that she did not prepare budgets with unfunded liabilities and she did her best to ensure that YAI's Form 990 filings (which include disclosures on executive compensation) were complete and accurate.

16.     Ms. Wegmann's testimony is also not reasonable in light of the IRS' Form 990 instructions, which require filers to report "all forms of deferred compensation", including "whether or not funded" and "whether or not vested."  Instructions at p. 28, https://www.irs.gov/pub/irs-prior/i990-ez--2003.pdf (last visited July 1, 2019) (emphasis added).

17.     The SERP trust never had a surplus—it had a funding deficit, which developed because executive compensation grew and YAI's ability to increase funding was limited.  Trial Tr. (Fava Test.) 162:10-17.

18.     Ms. Wegmann's direct testimony that she "was and continue to be of the belief that sufficient resources were being allocated annually by the Board to fully fund the plan for my inclusion," *see* Wegmann Aff. ¶ 50, is not credible given Ms. Fava's testimony about the SERP trust's running a deficit and the fact, year after year, YAI was specifically allocating funds for

SERP benefits to four individuals that did not include Ms. Wegmann, *see, e.g.*, Jan. 29, 2007 L. Miller Email, YAI Defs.' Trial Exhibit S, at YAI SERP-WEGMANN-00002685; Feb. 19, 2008 C. Miller Email, YAI Defs.' Trial Exhibit AF, at YAI SERP-WEGMANN-00001922.

19.     Craig Miller, YAI's outside actuary, calculated an estimate of how much money YAI needed to contribute to the SERP and its other retirement plans each year to fund benefits to participants.  Trial Tr. (Wegmann Test.) 59:24-60:23.

20.     Ms. Wegmann provided Mr. Miller with an employee census and information on employee salaries and years of service in order for him to estimate how much YAI needed to allocate to its plans.  Trial Tr. (Wegmann Test.) 61:5-15.

21.     Mr. Miller needed accurate information from Ms. Wegmann on the number of people in each plan to calculate accurate estimates.  Trial Tr. (Wegmann Test.) 61:16-24; *see id.* at 62:4-21 ("THE COURT: OK. So you had to tell [Mr. Miller] who was in each of the plans? THE WITNESS: Yes.  THE COURT: And by you, I mean you, Ms. Wegmann?  THE WITNESS: Yes, yes.  THE COURT: You told Mr. Miller, here is a plan, here is everybody in the plan, correct?  THE WITNESS: Correct.").

22.     As CFO, Ms. Wegmann would fund retirement benefits in YAI's budget based on Mr. Miller's calculated estimates.  (Wegmann Test.) Trial Tr. 61:5-15.

23.     Mr. Miller never calculated a SERP benefit for Ms. Wegmann.  Trial Tr. (Wegmann Test.) 62:24-63:9.

24.     Ms. Wegmann knew that YAI was not allocating any money to fund a SERP benefit for her.  Trial Tr. (Wegmann Test.) 90:1-3 ("THE COURT: May I ask, I just want to understand what you have just said.  You knew that no money was being set aside for you, correct?  THE WITNESS: Correct.").

- *See* Trial Tr. (Wegmann Test.) 77:14-22 (Ms. Wegmann testifying with respect to Defendants' Trial Exhibit L: "Q. OK. But now here, you see in this Ms. Miller is providing to you for what is the term the supplemental plan, breakdowns by individuals, correct?  A. Yes.  Q. And you see there is no amount for you, right?  A. Yes.  Q. OK. And you took no action at the time to point out to Ms. Miller that you were a participant in the SERP, right?  A. Right.").

- *See id.* at 82:6-13 (Ms. Wegmann testifying with respect to Defendants' Trial Exhibit S: "And there is no actual projection of your personal SERP benefit as part of this document, right?  A. Right. I'm not listed.  Q. All right.  And so here in January of 2007, when you received this document, you didn't say to Linda Miller, Hey, Linda, I'm in the plan, where is my number, anything like that, right?  A. No.").

- *See id.* at 85:11-15 (Ms. Wegmann testifying with respect to Defendants' Trial Exhibit AD: "Q. If I could just focus us, you were passing along information to those individuals at this time setting forth there was no allocation to you or benefits being accrued by you as of December 2007, right?  A. Correct.").

- *See id.* at 94:16-96:2 ("THE COURT: Even if the figure wasn't precise, you're saying they were actuarial, they were estimates, right?  Best estimates?  THE WITNESS: Yes, I mean -- THE COURT: OK.  THE WITNESS: We got them from Craig, from the actuaries.  THE COURT: OK. But they're estimating zero for you.  THE WITNESS: Yeah. Yes.  THE COURT: OK.  BY MR. MEEHAN: Q. So you had to believe the estimate for you should be something above zero, right?  If you are entitled to be in the plan the best estimate was not zero, it had to be some number, right?  A. Yes. They hadn't included an estimate. . . . Q. You didn't point any of that out, correct?  A. No.").

25.    Although she had responsibility for YAI's budget, Ms. Wegmann was not concerned that YAI was not allocating money for her SERP benefit at any time before 2014.  *See* Trial Tr. (Wegmann Test.) 90:14:91:6 ("THE COURT: Yes.  When were you going to be worried that they hadn't started setting money aside?  You weren't in 2009, correct?  THE WITNESS: Correct.  THE COURT: Were you in 2014?  THE WITNESS: Yes, yeah. I was -- yes, starting -- obviously coming, you know, in front of me, to be addressing it and be concerned.").

26.     As CFO, Ms. Wegmann also was responsible for coordinating YAI's process for completing the Form 990.  Fava Decl. ¶ 48-49; Connors Decl. ¶ 20.

27.     As CFO, Ms. Wegmann also signed Form 5500 filings (benefit plan tax returns) for the SERP and other YAI plans, which she tried her best to ensure were complete and accurate, and which she signed under penalty of perjury.  Trial Tr. (Wegmann Test.) 66:8-67:1.

28.     *From July 1, 2012 until she left YAI effective June 30, 2014, Ms. Wegmann served as Chief Business Officer ("CBO").*

**YAI's Generous Retirement and Post-Employment Benefit Package**

29.     *While she was employed at YAI, Ms. Wegmann was a participant in the following benefit plans sponsored by YAI that provided retirement or other forms of post-employment benefits:  (a) the Discretionary Defined Contribution Plan ("DC Plan"); (b) the Make-Up Plan for the Young Adult Institute, Inc. ("Make-Up Plan"); (c) the Longevity Plan for the Young Adult Institute ("Longevity Plan"); (d) the Young Adult Institute Employees' Limited Defined Benefit Target Plan ("Target Plan"); and (e) the Young Adult Institute 457(b) Eligible Deferred Compensation Plan ("457(b) Plan").*

30.     The DC Plan was a defined contribution plan established in the 1970s for all YAI employees.  Connors Decl. ¶ 34.

31.     YAI annually contributes to each employee's plan account a discretionary percentage of the employee's compensation, limited to the Internal Revenue Service ("IRS") maximum compensation level, multiplied by the employee's years of service.  Connors Decl. ¶ 34.

32.     The Make-Up Plan was adopted in 1984.  Connors Decl. ¶ 35.

33.     YAI contributed to each participant's account an amount equal to the amount that could not be made to the DC Plan due to the IRS limits on compensation.  Connors Decl. ¶ 35.

34.     YAI established the Longevity Plan in 1984 to encourage long-term service. Connors Decl. ¶ 36.

35.     YAI made contributions to the Longevity Plan based on an employee's years of service.  Connors Decl. ¶ 36.

36.     The Target Plan was established in 1991.  Connors Decl. ¶ 37.

37.     The Target Plan provided annual accruals towards a retirement benefit of 20% of the participants' final annual compensation.  Connors Decl. ¶ 37; Attachment to Feb. 19, 2008 C. Miller Email, YAI Defs.' Trial Exhibit AF, at YAI SERP-WEGMANN-00001921.

38.     YAI created the 457(b) Plan in 2007.  Sept. 27, 2007 Board Minutes, YAI Defs.' Trial Exhibit W, at YAI SERP-WEGMANN-00005585-87; Connors Decl. ¶ 38.

39.     The goal of the 457(b) Plan was to replace accruals which would otherwise have been made for certain highly compensated employees under the Target Plan, the Longevity Plan and/or the Make-Up Plan, but for the July 1, 2007 cessation of accruals under those plans. Connors Decl. ¶ 38.

40.     When Ms. Wegmann resigned in 2014, at the age of 57, the "age 65 value" of the benefits that she had accrued (*i.e.*, assuming an annual 5% investment return on benefits previously accrued or paid to her) under the above-referenced benefit programs was estimated to exceed $1.85 million.  Connors Decl. ¶ 39; Gebhardt Calculation, YAI Defs.' Trial Exhibit DC, at YAI SERP-WEGMANN-00000160.

**The Original SERP**

41.     *YAI adopted the SERP effective July 1, 1985.  Supplemental Pension Plan and Trust for Certain Management Employees of Young Adult Institute ("Original SERP Plan Document"), YAI Defs.' Trial Exhibit A.*

42.     *The SERP is a so-called "top hat" plan:  an employee benefit plan established for a "select group" of an organization's "management or highly compensated employees."  29 U.S.C. §§ 1051(a)(2), 1081(a)(3), 1101(a)(1) (defining top hat plans).*

43.     Regarding "Eligibility," the SERP provides in Section 10.1.2:

Each Management Employee who shall complete 15 years of service with the Institute and whose compensation is not fully considered in the computation of Federal Social Security benefits, shall be eligible to participate in the Plan.  Entry into the Plan as a Plan Participant shall be on the July 1 coincident with or next following the employee's compliance with the Eligibility Requirements.

Original SERP Plan Document, YAI Defs.' Trial Exhibit A, at YAI SERP-WEGMANN-00000380.

44.     The terms "Management Employee," "Eligibility Requirements," and "be eligible to" are undefined in the Original SERP Plan Document.  *See generally* Original SERP Plan Document, YAI Defs.' Trial Exhibit A.

45.     The Board is the administrator of the SERP.  Original SERP Plan Document, YAI Defs.' Trial Exhibit A, at YAI SERP-WEGMANN-00000356; SERP Amendment dated August 6, 2013 ("2013 Amendment"), YAI Defs.' Trial Exhibit DA, at YAI SERP-WEGMANN-00000391.

46.     Under the 2013 Amendment, Section 1.3 of the Original SERP was amended to provide, among other things:  "the Administrator shall have the following powers: . . . (c) to interpret the Plan, and to resolve ambiguities, inconsistencies and omissions, and the determinations of the Administrator in respect thereof shall be binding, final and conclusive upon

all interested parties."  2013 Amendment, YAI Defs.' Trial Exhibit DA, at YAI SERP-WEGMANN-00000391.

47.     The Board was responsible for deciding who qualified as a "Management Employee" and for selecting among the eligible Management Employees and deciding which subset of those employees to put in the SERP.[2]  Fava Decl. ¶¶ 24, 26; *see also* Trial Tr. (Fava Test.) 134:11-22 (testifying that "[i]t was a matter of practice from the very first people who were admitted to the SERP that the board opined that they could be a part of the SERP."); *id.* at 164:13-20.

48.     The Board alone had authority to add individuals to the SERP—YAI executives, including the Chief Executive Officer, could not do so unilaterally.  Fava Decl. ¶ 25.

49.     No "Management Employee" was automatically in the SERP.  Deposition of Joel M. Levy, Nov. 30, 2017 ("Levy Dep.") at 95:14-96:13 ("the practice became that there would be a vote of the board for entry into the SERP, and that would be, you know, the requirement."); *id.* at 110:22-111:12 ("Just because you entered the management team doesn't mean you start from day one into the SERP."); Fava Decl. ¶ 26 ("the Board was responsible for deciding who

---

[2] The YAI Defendants are well aware that the Court previously concluded—based upon evidence presented in the parties' summary judgment briefing—that the Board's interpretation of "eligible to" in the Original SERP such as to require Board approval for SERP participation was unreasonable and not entitled to deference.  *See* Op. & Order, Aug. 14, 2018 (Dkt. 127), at 24-29.  In any event, the YAI Defendants have included the proposed findings in paragraphs 47-51 because, first, the YAI Defendants respectfully submit that evidence elicited at trial (including, in particular, testimony by Ms. Fava and Mr. Connors about the harmful tax and civil consequences to potential SERP participants and YAI Board members if employees were to join the plan without Board consideration and/or approval, *see* ¶¶ 84-85, 90-94 *infra*), (1) supports the YAI Defendants' argument that the Court should defer to the Board's reasonable interpretation of requiring Board approval for SERP participation, and (2) merits the Court's revisiting its previously-established law of the case.  Second, the proposed findings in paragraphs 47-51 evince the Board's mindset and support Board members' reasonable reliance on Ms. Wegmann's shared understanding that Board approval was required to be a SERP participant and entry into the plan did not occur automatically, as is relevant to the YAI Defendants' equitable defenses (as discussed further below).

qualified as a 'Management Employee' and for selecting among the eligible Management Employees and deciding which subset of those employees to put in the SERP"); Trial Tr. (Fava Test.) 137:10-18.

50.     The Original SERP was "vague" and required an amendment to clarify multiple provisions. *See* Trial Tr. (Connors Test.) 189:8-15 (Mr. Connors testifying that he was asked to draft an amendment because "[t]here were several changes in the law that had occurred since 1985 that required updates.  There was several -- the '84 SERP was vague.  It was, you know, not very good.  You know, viewed in 2007, it wasn't very good documentation.  You know, it was probably good in '85, but it wasn't good in 2007.  So we clarified a lot of provisions.  We included some that were missing.  We established eligibility by name.  Probably some other things").

51.     The Original SERP contained numerous undefined terms that required Board interpretation. *See, e.g.*, Trial Tr. (Fava Test.) 164:7-20 (Ms. Fava testifying that the term "Management Employee" is undefined but interpreted by the Board based on "[d]ay-to-day practice, responsibilities"); *id.* at 164:21-165:16 (Ms. Fava testifying that the term "actuarial equivalen[ce]" is undefined in the Original SERP and was interpreted by the Board in the course of its plan administration duties).

52.     Ms. Wegmann did not become a "Management Employee" before July 1, 2006, when she became YAI's CFO.  Op. & Order, Aug. 14, 2018 (Dkt. 127), at 23-24.

53.     A Board vote was required to add anyone to the SERP.  Levy Dep. at 95:14-96:13; Fava Decl. ¶ 24.

54.     Joel Levy did not have authority as CEO to add anyone to the SERP.  Levy Dep. at 4:14-22, 5:16-22.

55.     Joel Levy knew the Board had a consistent practice of requiring approval by the Board's Executive Compensation Committee ("ECC") and then a vote of the full Board.  Levy Dep. at 5:23-6:22, 95:14-96:13.

56.     The Board's practice of voting to approve new SERP participants helped to ensure that proper due diligence was performed and it also furthered the Board's governance role in connection with the agency.  Levy Dep. at 95:14-96:13.

57.     On March 15, 1993, the Personnel Practices Committee ("PPC") recommended to the full Board that "Stephen Freeman, Joseph Rut and Thomas A. Dern be added as participants to YAI's [SERP]."  Agenda & Resolution from Mar. 15, 1993 PPC Meeting, YAI Defs.' Trial Exhibit B, at YAI SERP-WEGMANN-00000329-30.

58.     On April 1, 1993, the Board adopted the PPC's resolution, which provided that "the approved participants in YAI's [SERP] are Joel M. Levy, Philip H. Levy, Joseph Rut, Enid Barbell, Stephen Freeman and Thomas A. Dern."  Agenda & Resolution from Mar. 15, 1993 PPC Meeting, YAI Defs.' Trial Exhibit B, at YAI SERP-WEGMANN-00000330; Apr. 1, 1993 Board Minutes, YAI Defs.' Trial Exhibit C, at YAI SERP-WEGMANN-00000118-19; *see also* Fava Decl. ¶ 27.

59.     The Board described its decision as follows:

> In recognition of long and devoted service to management of the agency, the Committee recommends that Stephen Freeman, Enid Barbell, Joseph Rut and Thomas Dern be added as participants to the Young Adult Institute & Workshop, Inc. Supplemental Pension Plan and Trust for Certain Management Employees (the "Supplemental Plan").  The Committee approved that the participants in the Supplemental Pension Plan are the entire management team including Joel Levy, Philip Levy, Joseph Rut, Enid Barbell, Stephen Freeman and Thomas Dern.  Plan participation for Messrs. Dern and Rut will become effective upon their completion of the required 15 years of employment.

Apr. 1, 1993 Board Minutes, YAI Defs.' Trial Exhibit C, at YAI SERP-WEGMANN-00000118.

60.     The Board did not approve anyone else to be a SERP participant after the Board's April 1, 1993 meeting, because members of the Board understood that the SERP was closed to additional participants due to applicable changes to the Internal Revenue Code and the excessive level of benefit potentially provided under the plan.  Fava Decl. ¶ 29; Trial Tr. (Fava Test.) 149:24-150:17; *see also* Trial Tr. (Connors Test.) 209:2-9 (Mr. Connors testifying that "I don't remember in '07 looking at the plan and saying, gee, it looks open-ended, probably because I was affected by the fact that everyone knew it was closed.  Kind of everyone was educated about the plan being exempt from 457(f).  I think they knew that before I got there.  I certainly made sure everyone understood that").

61.     The Board approved putting Thomas Dern and Joe Rut in the SERP before they satisfied all eligibility requirements, because it would have been impracticable for the Board to add participants once the Internal Revenue Code changes went into effect.  Fava Decl. ¶ 30; *see* Apr. 1, 1993 Board Minutes, YAI Defs.' Trial Exhibit C, at YAI SERP-WEGMANN-00000118 ("Plan participation for Messrs. Dern and Rut will become effective upon their completion of the required 15 years of employment.").

62.     At the time he was added to the SERP, Joe Rut could not have been Controller at YAI, because Ms. Wegmann was already in that same position.  *Compare* Wegmann Aff. ¶ 21 (testifying that "[i]n 1993 Joseph Rut was the Controller for YAI") *with id.* ¶ 5 (testifying that "[i]n 1992 I was promoted to Controller.  I held this position until in or around 2005").

**Ms. Wegmann's Belief that She Became a SERP Participant in December 2001**

63.     Ms. Wegmann met the years of service and Social Security compensation criteria under Section 10.1.2 of the Original SERP as of December 2001.  Trial Tr. (Wegmann Test.) 11:24-12:3.

64.     Ms. Wegmann also believed she was a "Management Employee" under the Original SERP as of December 2001, meaning she believed she was a SERP participant as of that time.  Trial Tr. (Wegmann Test.) 12:4-9; 13:2-13; 14:7-16.

65.     Ms. Wegmann never told anyone at YAI while she was an employee that she viewed herself as a SERP participant as of December 2001.  Trial Tr. (Wegmann Test.) 12:4-18.

66.     Ms. Wegmann never told anyone at YAI while she was an employee that she believed SERP participation was automatic upon meeting the eligibility criteria under Section 10.1.2 of the Original SERP.  Trial Tr. (Wegmann Test.) 16:5-13.

67.     Ms. Wegmann never told Mr. Miller while she was a YAI employee that she was in the SERP.  Trial Tr. (Wegmann Test.) 81:5-8.

**2005 Freeze on SERP Benefit Accruals**

68.     In August 2004, the ECC engaged Towers Perrin ("Towers") for advice on executive compensation issues.  Fava Decl. ¶ 31.

69.     Towers issued its final draft report to YAI in February 2005.  Possible Retirement Plan Changes, Feb. 10, 2005 ("February 2005 Towers Report"), YAI Defs.' Trial Exhibit G, at YAI SERP-WEGMANN-00003116-20.

70.     Towers concluded that a SERP benefit that could potentially provide 100% of an employee's highest level of earnings (after 33 1/3 years of service), paid each year for the remaining life of the employee and his/her surviving spouse, plus cost of living adjustments, was excessive.  February 2005 Towers Report, YAI Defs.' Trial Exhibit G, at YAI SERP-WEGMANN-00003118-19; *see* Fava Decl. ¶ 36 ("I recall that [Towers Perrin] analyzed retirement benefits in conjunction with cash compensation levels, noting that typically with lower levels of current cash compensation, retirement plan benefits were sometimes higher; and

vice versa, with higher levels of current cash compensation, retirement plan benefits were

somewhat lower.  That YAI, in their opinion, was unusual to have very high levels of current

cash compensation accompanied by very high levels of retirement plan benefits, and that the two

in combination represented compensation levels in totality that were above the peer industry

group.").

71.     Towers recommended that YAI "[f]reeze all Supplemental Plan accruals at

current service and pay levels."  February 2005 Towers Report, YAI Defs.' Trial Exhibit G, at

YAI SERP-WEGMANN-00003120; Fava Decl. ¶ 35.

72.     In March 2005, the ECC made the following recommendations to the Board with

respect to the SERP:

> (1) Retirement Plan annuity benefits to CEO and President/COO be equal to
>     current dollar value of Salary + YAI Bonus, which presently represents an
>     89% replacement ratio of [total cash compensation] for each executive.
>
> (2) Retirement Plan Replacement Ratios be capped for both Assoc. Executive
>     Directors at current levels, i.e. 81% of highest year's Salary + YAI Bonus
>
> (3) Retirement Plan Replacement Ratio for the current CFO be capped at
>     current levels, i.e. 76.5% of highest year's Salary + YAI Bonus

Recommendations Regarding Executive Compensation From the YAI/NIPD Executive

Compensation Committee Presented to the YAI/NIPD Board of Trustees, March 22, 2005

("2005 ECC Recommendations"), YAI Defs.' Trial Exhibit I, at YAI SERP-WEGMANN-

00000402-03.  With respect to the third recommendation, the ECC specified that it was referring

to the *current* CFO, *see id.*, as opposed to anyone who might assume the position in the future.

73.     The ECC utilized Towers's analysis in forming the committee's

recommendations.  Mar. 22, 2005 Board Minutes, YAI Defs.' Trial Exhibit J, at YAI SERP-

WEGMANN-00000147; Fava Decl. ¶ 38.

74.     The 2005 ECC Recommendations indicate that, at the time, the SERP only covered the "top 5 executives":  the "CEO and President/COO," "Assoc. Executive Director A," "Assoc. Executive Director B," and "CFO."  2005 ECC Recommendations, YAI Defs.' Trial Exhibit I, at YAI SERP-WEGMANN-00000403.

75.     The "top 5 executives" described in the 2005 ECC Recommendations were Joel Levy (CEO), Philip Levy (President/COO), Stephen Freeman (Assoc. Executive Director A), Thomas Dern (Assoc. Executive Director B), and Joseph Rut (CFO).  Fava Decl. ¶ 39.

76.     Ms. Wegmann was not a "Management Employee" in 2005, as the Board interpreted that term, and she was not a SERP participant, therefore the ECC and Marcella Fava, the committee chair, did not know that Ms. Wegmann believed she was a SERP participant at the time.  Fava Decl. ¶ 41.

77.     Because the ECC did not know that Ms. Wegmann considered herself already a SERP participant, the committee's actions and recommendations to the Board consistently named the five specific employees who were participants (*i.e.*, Joel Levy, Philip Levy, Stephen Freeman, Thomas Dern, and Joseph Rut).  Fava Decl. ¶ 41.

78.     The Board considered the 2005 ECC Recommendations at a meeting on March 22, 2005.  Mar. 22, 2005 Board Minutes, YAI Defs.' Trial Exhibit J, at YAI SERP-WEGMANN-00000146-48.

79.     The Board adopted all three of the ECC's recommendations with respect to the SERP.  Mar. 22, 2005 Board Minutes, YAI Defs.' Trial Exhibit J, at YAI SERP-WEGMANN-00000146-48; Fava Decl. ¶ 43.

**September 27, 2007 Board Meeting**

80.     In 2007, Michael Connors was first engaged by YAI to serve as outside counsel on matters involving YAI's employee benefit programs and executive compensation matters, including the SERP.  Connors Decl. ¶ 6-7.

81.     Mr. Connors has expertise in employee benefit and executive compensation law, and he has been working with supplemental executive retirement plans like the YAI SERP since 1989.  Trial Tr. (Connors Test.) 172:6-13.

82.     In particular, Mr. Connors was engaged by YAI to review the Original SERP and YAI's other retirement plans to confirm whether the plans were in compliance with Internal Revenue Code Sections 457(f) ("Section 457(f)"), 409A ("Section 409A"), 4958 ("Section 4958") and other laws.  Connors Decl. ¶ 10.

83.     Mr. Connors was not focused on the plan's eligibility requirements at the time "because everybody knew that the plan was closed."  Trial Tr. (Connors Test.) 214:14-18.

84.     Mr. Connors testified that Section 457(f) was enacted in 1986, and it regulates the timing of taxation of participants in non-qualified plans maintained by tax-exempt entities. Connors Decl. ¶ 10.  Section 4958 was enacted in 1996 and imposes excise taxes on compensation decision-makers and compensation recipients if that compensation (including any benefit) is excessive.  *Id.*  Section 409A was enacted in 2004 and regulates the timing of payment of non-qualified deferred compensation, applying excise taxes for violations.  *Id.*  All of these Code sections have elaborate grandfathering schemes that exempt certain nonqualified plan participants from their provisions.  *Id.*

85.     Mr. Connors testified further that a person who entered a plan in 2006 or later would be subject to all of the rules of these Code sections (*i.e.*, that participant would not be

grandfathered).  Connors Decl. ¶ 10; *see also* (Connors Test.) Trial Tr. 205:5-206:5 (testifying

that the Original SERP was "very unique" and "a great plan for the participants in it because they

get to pay income tax when they receive the distributions," but noting that "[e]ver since [1985],

plans were designed completely differently" because of Section 457(f)").

86.     The Board held a meeting on September 27, 2007, at which Ms. Fava gave a

report from the ECC in which she "explained that, upon review of the SERP (covering only Joel

Levy, Philip Levy, Stephen Freeman and Thomas Dern) . . . counsel made recommendations for

limiting the Agency's liability under certain terms of the SERP" and "recommended an

amendment to the SERP to incorporate the 2005 benefit reductions."  Sept. 27, 2007 BOT

Minutes, YAI Defs.' Trial Exhibit W, at YAI SERP-WEGMANN-00005586.

87.     The September 27, 2007 Board meeting minutes also state that "counsel advised

that the SERP is compliant with all applicable laws."  Sept. 27, 2007 Board Minutes, YAI Defs.'

Trial Exhibit W, at YAI SERP-WEGMANN-00005586; Connors Decl. ¶¶ 11-12.

88.     Mr. Connors's conclusion (that the Original SERP was compliant with all laws at

the time) would have been inaccurate if Ms. Wegmann was also a SERP participant.  Connors

Decl. ¶ 12; Trial Tr. (Connors Test.) 213:19-214:7.

89.     Most importantly, anyone who entered the Original SERP as a participant in 2006

would not have the benefit of grandfathering protection from taxes under Section 457(f).

Connors Decl. ¶¶ 13-14.

90.     Mr. Connors explained that Section 457(f) taxes participants in non-qualified

plans when the participants become vested, even if they will not begin receiving distributions

from that plan until some future date.  Connors Decl. ¶¶ 13-14.  In addition, a participant is

vested when his or her benefit becomes non-forfeitable (in the case of the Original SERP, 15 years after date of hire).  *Id*. at ¶ 13.

91.     Mr. Connors's opinion was that the Original SERP was grandfathered from Section 457(f) and the plan was specifically designed to work only for participants who qualified for Section 457(f) grandfathering protection.  Connors Decl. ¶ 13.

92.     If Ms. Wegmann had entered the Original SERP in 2006 (or 2001), because of the taxed-when-vested rule under Section 457(f), she would have had a huge tax liability in 2006 and no funds made available from the plan with which to pay the tax.  Connors Decl. ¶ 16.

93.     Further, if Ms. Wegmann entered the Original SERP in 2006, her benefit accrual would not have been grandfathered from "intermediate sanctions" under Section 4958, which regulates "excessive" benefits paid to employees of nonprofit organizations.  Connors Decl. ¶ 15; Trial Tr. (Fava Test.) 165:17-166:7; Trial Tr. (Connors Test.) 209:14-210:24.

94.     In addition to subjecting the Board members to excise taxes, a conclusion of excess compensation within the meaning of Section 4958 also would have subjected Ms. Wegmann to excise taxes, generally equal to 125% of her excess benefit.  Connors Decl. ¶ 15-17; Trial Tr. (Connors Test.) 211:7-212:16.

95.     At the time of this meeting, Ms. Wegmann was YAI's CFO and would have satisfied eligibility requirements under the Original SERP.  Ms. Fava testified that Ms. Wegmann was not a SERP participant, however, because the Board had never acted to include her in the SERP.  Fava Decl. ¶ 46.  She testified further that the Board had no knowledge at the time that Ms. Wegmann believed she was in the SERP, and that she had become a participant automatically.  *Id.*  Had the Board known at the time that Ms. Wegmann was of the view that she

was automatically included, the Board would have taken whatever action was necessary to make it clear that that was not the case. *Id.*

**ECC Consideration of Alternative Retirement Benefits for Ms. Wegmann**

96.    A Funding Valuation and Projection Estimate for the SERP as of June 30, 2007, dated June 18, 2008, which was prepared by Craig Miller, does not show how much YAI would have needed to contribute for a SERP benefit to Ms. Wegmann—because she was not a participant—but rather shows, on a completely separate line, what YAI could decide to contribute for a "Proposed Supplemental Defined Contribution Target Plan" for her.  Funding Valuation and Projection Estimate for the SERP as of June 30, 2007, YAI Defs.' Trial Exhibit AM, at YAI SERP-WEGMANN-00001008.

97.    The language of Footnote 3 ("hypothetical contributions," "for purposes of illustration") makes clear that this was a proposed plan and separate from the SERP.  Fava Decl. ¶ 52.

98.    Ms. Wegmann is not listed as a SERP participant in this funding estimate—the only participants are Joel and Philip Levy, Stephen Freeman, and Thomas Dern.  *See generally* YAI Defs.' Trial Exhibit AM.

99.    Neither the ECC nor the Board ever voted to approve such a plan for Ms. Wegmann.  Fava Decl. ¶ 52.

100.    Ms. Wegmann testified that she understood that the SERP formula and resulting calculation of her purported benefit could change.  Trial Tr. (Wegmann Test.) 72:5-20.

101.    This understanding is inconsistent with her direct testimony that "I was always reassured by Mr. Levy that my SERP participation was certain," *see* Wegmann Aff. ¶ 17, because the SERP provides a set formula for calculating a participant's benefit.  Ms. Wegmann's

understanding that the formula could change indicates that she knew the ECC was considering an alternative benefit for her, not participation in "the" SERP.

102.    Ms. Fava testified that she understood from conversations with Joel Levy that Ms. Wegmann was asking for an additional retirement benefit, but the ECC did not agree with creating an additional benefit for her and, in any event, adding Ms. Wegmann to the YAI SERP was not an option.  Fava Decl. ¶ 56; Trial Tr. (Fava Test.) 149:2-14.

103.    Specifically, at a meeting on November 24, 2008, the ECC discussed (among other topics) Ms. Wegmann's retirement benefits, but the committee declined to adopt any additional retirement plan for her at that time.  Fava Decl. ¶¶ 57-59.

104.    The ECC understood Ms. Wegmann to be asking for an additional retirement benefit, not to be added as a participant in "the" SERP.  Trial Tr. (Fava Test.) 156:1-6.

105.    A copy of the agenda for the November 24, 2008 ECC meeting included an item for "Karen: Retirement," and a handwritten note from Ms. Fava stating, "Wants Plan = Supplemental Plan → Tabled."  Nov. 24, 2008 ECC Agenda, YAI Defs.' Trial Exhibit AP, at YAI SERP-WEGMANN-00000199; Fava Decl. ¶¶ 60-61.

106.    By the equals sign in her handwritten note, Ms. Fava "meant [Ms. Wegmann] wanted a benefit that would be equivalent to what she would be getting were [she] a part of the supplemental plan, which she was not."  Trial Tr. (Fava Test.) 156:1-23.

107.    If the Board so chose, it could have created a new supplemental retirement plan for Ms. Wegmann, but it would have been absurd for her to participate in "the" Original SERP.  Connors Decl. ¶ 32; Trial Tr. (Connors Test.) 201:16-202:5, 204:5-15, 206:6-21.  The Board has not voted to adopt such a new plan for Ms. Wegmann.  Connors Decl. ¶ 32.

**2008 Amendment**

108.    On December 18, 2008, SERP trustees Marci Fava and Paul Levitz signed an Amendment to the Supplemental Pension Plan and Trust for Certain Management Employees of Young Adult Institute ("2008 Amendment").  2008 Amendment, Defs.' Trial Exhibit AT, at YAI SERP-WEGMANN-00000430.

109.    The 2008 Amendment was prepared, first, to incorporate into the Original SERP Plan Document the freeze on benefit accruals that the Board had adopted in March 2005.  Fava Decl. ¶ 64; Connors Decl. ¶ 24.

110.    The amendment was also adopted to ensure that the SERP complied with Internal Revenue Code Section 409A and other legal requirements for executive retirement plans.  2008 Amendment, YAI Defs.' Trial Exhibit AT, at YAI SERP-WEGMANN-00000417; *see also* Fava Decl. ¶ 64; Connors Decl. ¶ 24; Levy Dep. at 70:8-24 (Q. Let me give you a question and we will get closure on this -- your understanding of this 2008 amendment was that YAI was doing some sort of tightening up on the plan; is that correct? . . . A. To be specific, what the charge was to the lawyer, as I recall it, was to make sure that the plan was in compliance with the current law that relates to the SERP . . . .").

111.    *Section 10.1.2 of the Original SERP ("Eligibility") was amended to provide: "Effective July 1, 2008, the Plan's sole Participants shall be Joel M. Levy, Philip H. Levy, Stephen Freeman and Thomas Dern.  The benefit being provided in respect of Joseph Rut shall be governed by the version of the Plan in existence on his date of death."  2008 Amendment, YAI Defs.' Trial Exhibit AT, YAI SERP-WEGMANN-00000423.*

**Ms. Wegmann's Conversations with Joel Levy and Michael Connors About SERP Participation**

112.    Between 2004 and 2009, Ms. Wegmann had conversations with Joel Levy in which he told her that "I would do everything in my power to get her into the SERP. . . . I told her that it required the board approval -- board committee approval, and the board."  Levy Dep. at 4:8-5:10; 5:16-6:22.

113.    In this period, Levy explained to Ms. Wegmann:

> There's a SERP agreement, a SERP document, and the document has eligibility. And Karen, as the first requirement, has to meet that eligibility, which she certainly did.  She met all of criteria in the sense that she was a long-term employee, she was critical to the agency, her performance was good, and that she was on the management team.  And that if she made the commitment, that I would recommend her -- you know, if she made the commitment to the agency, which she essentially did, that I would recommend her to Marci, the chairman of the board, which I did, to the E -- executive compensation committee, which I did, and that -- on several occasions over the years.  And that -- that it would require their approval.

Levy Dep. at 6:3-21.

114.    Ms. Wegmann understood that Board approval was required to put her in the SERP.  *See* Trial Tr. (Wegmann Test.) 21:19-23:7 ("Q. And so you say you agreed to that process.  Did you understand that part of that process was that Dr. Levy would recommend you to the board, but the board would ultimately have to approve it, as I read? . . . THE WITNESS: Yes.").

115.    Ms. Wegmann testified that Joel Levy told her consistently in conversations before he retired in June 2009 that she "would be included in the SERP."  Trial Tr. (Wegmann Test.) 119:12-18, 120:10-22.

116.    Ms. Fava and Joel Levy understood, as of 2004, the negative implications should anyone else enter the SERP.  *See* Trial Tr. (Fava Test.) 151:6-18 ("THE COURT: After 2004, you expected no one to ask.  Do you believe Dr. Joel Levy had the same understanding that you

did in 2004, which is that no one would ever be put in the SERP ever again?  THE WITNESS:

We both understood that negative implications of letting somebody into the SERP.  There were

tax consequences.  There were potentially personal liability consequences to trustees of making

those changes.  THE COURT: OK. So you had conversations with Dr. Levy that made clear to

you that he understood, just as you understood, the ramifications or the consequences of adding

someone to the SERP, correct?  THE WITNESS: Correct.").

117.    Three times in the early to mid-2000s, Joel Levy recommended that Ms.

Wegmann be added to the SERP.  Levy Dep. at 13:4-14:22; 15:13-23; 19:4-20:5.

118.    Levy made the third recommendation in 2006 after Ms. Wegmann became CFO.

Levy Dep. at 19:17-20:5.

119.    Each time, the ECC decided not to recommend to the full Board that Ms.

Wegmann be added to the SERP.  Levy Dep. at 68:14-69:4.

120.    The reasons the ECC gave Levy for its decisions included issues such as "the

liability, financial liability of the SERP and . . . the cost of the program."  Levy Dep. at 8:6-9:9.

121.    Ms. Wegmann discussed that she was not a participant in the SERP with Joel

Levy, Philip Levy, and Michael Connors—YAI's outside counsel on employee benefit issues—

beginning in 2007 when he was first retained to represent the organization.  Connors Decl. ¶ 27.

122.    Mr. Connors recalled that Ms. Wegmann's statements to him about her retirement

benefits and the SERP were always "contingent"—"[s]he would not say something to the effect

of 'I am in the SERP,' but rather 'I should have a SERP' or 'I deserve a SERP.'"  Connors Decl.

¶ 28; Trial Tr. (Connors Test.) 190:16-19.

123.     In his conversations with Ms. Wegmann, Mr. Connors would have explained to her that she could not be included in "the" SERP for purposes of providing an additional retirement benefit.  Connors Decl. ¶ 29.

124.     This was because YAI desired to maintain the grandfathered status of the SERP from changes in the tax laws that otherwise would apply and, in maintaining the grandfathered status, preserve the favorable tax treatment of the SERP benefits accrued by the existing participants.  Connors Decl. ¶ 29.

125.     As Mr. Connors explained to Ms. Wegmann, the addition of a new participant would have jeopardized the grandfathered status of the SERP and would have resulted in immediate taxation to that new participant of all SERP accruals even though those distributions would not be paid until the participant's future retirement date.  Connors Decl. ¶ 29.

126.     In other words, being added to the SERP on a non-grandfathered basis was detrimental to a participant while employed and therefore it was never considered as a viable option for Ms. Wegmann or for the organization.  Connors Decl. ¶ 29.

127.     Mr. Connors never told Ms. Wegmann that she was in the Original SERP, or that she was going to be in the Original SERP.  Connors Decl. ¶ 30.

128.     Ms. Wegmann's direct testimony that "Mr. Connors congratulated me on the 'good news' concerning my SERP participation" and "[t]he impression Mr. Connors gave me concerning my SERP participation at this time was that it was a fait accompli," *see* Wegmann Aff. ¶¶ 53-54, is not credible given Mr. Connors' consistent testimony that he never told her she was in the SERP, and moreover he would have explained to her the myriad reasons why it was impracticable for her to be a participant in the SERP.

129.     From her conversations with Mr. Connors beginning in 2007, Ms. Wegmann has understood since then that changes to the Internal Revenue Code and the Original SERP's grandfathered status made it impracticable for her to be added to the Original SERP as a participant.  Connors Decl. ¶ 31; *see also* Trial Tr. (Connors Test.) 216:7-21 ("Q. If I followed you correctly, you said you spoke with Ms. Wegmann about a SERP, but not the SERP.  Did I get that accurately, first of all?  A. I spoke to Karen about her participation -- I talked to Ms. Wegmann about the SERP and a SERP all the time.  Q. OK.  A. But with regard to her participation in a SERP, our conversations were always about a SERP, not about the SERP. THE COURT: Did she understand that, sir?  THE WITNESS: Yes, I think -- I believe so.  THE COURT: What led you to that belief?  THE WITNESS: I thought I made it obvious to everybody all the time.  THE COURT: That the SERP was closed?  THE WITNESS: Yes.").

130.     In 2008, Joel Levy raised the prospect of Ms. Wegmann's retirement benefits a fourth time, which the ECC rejected again.  Levy Dep. at 21:6-17.

131.     At the time Joel Levy discussed an alternative retirement benefit for Ms. Wegmann with Ms. Fava, but never the prospect of adding Ms. Wegmann to the SERP.  Trial Tr. (Fava Test.) 151:14-152:11.

132.     Joel Levy kept Ms. Wegmann updated on each recommendation and rejection. Levy Dep. at 68:14-69:4.

133.     Ms. Wegmann's direct testimony that "any concerns or reservations that I may have had as a result of documents wherein my SERP participation was not represented in financial reports were appeased by Joel Levy, who, on multiple occasions, reassured me, 'Yours is coming,' as concerns my SERP participation," *see* Wegmann Aff. ¶ 52, is not credible in light of Mr. Levy's testimony that he told her multiple times that the ECC had rejected his proposals

to either put her in the SERP or create an alternative benefit for her, and Mr. Connors' testimony

that he explained to her the reasons why it would be impracticable for her to be in "the" SERP.

134.    From 2008 until June 30, 2009, when he retired, Joel Levy served as a co-CEO

with his brother, Philip Levy.  Trial Tr. (Wegmann Test.) 102:7-17.

135.    Ms. Wegmann was aware during this period that it was generally understood that

Philip Levy would succeed his brother as sole CEO upon Joel Levy's retirement.  Trial Tr.

(Wegmann Test.) 102:18-22.

**Ms. Wegmann's Knowledge that She Was Not SERP Participant and Knowledge of 2008 Amendment**

136.    As YAI's Controller, Ms. Wegmann was responsible for coordinating YAI's

process for completing the Form 990, a federal tax filing that YAI submitted under penalty of

perjury, which Ms. Wegmann did her best to ensure was accurate and complete.  Trial Tr.

(Wegmann Test.) 64:8-65:2; *id.* at 65:3-66:3.  Fava Decl. ¶¶ 48-49; *see, e.g.*, 2003 YAI Form

990, YAI Defs.' Trial Exhibit D, at YAI SERP-WEGMANN-00007173 (noting that YAI's

books are in the care of Karen Wegmann); Trial Tr. (Wegmann Test.) 74:8-24.

137.    The IRS instructions for the 2003 Form 990 (publicly available at

https://www.irs.gov/pub/irs-prior/i990-ez--2003.pdf, last visited July 1, 2019) provide under

Column (D) in Part V (List of Officers, Directors, Trustees, and Key Employees) of Schedule B

to "[i]nclude in this column all forms of deferred compensation and future severance payments

(whether or not funded; whether or not vested; and whether or not the deferred compensation is a

qualified plan under section 401(a))."  Instructions at p. 28.

138.    On February 7, 2006, Ms. Wegmann received an email from Linda Miller—an

actuary who worked with Craig Miller at Westminster USA, Ltd.—that attached a worksheet for

YAI's Form 990 for the 2004-2005 plan year with numerical values under the SERP (Column S)

for Joel Levy, Philip Levy, Stephen Freeman, Thomas Dern, and Joe Rut, but not for Ms.

Wegmann or other YAI employees.  Feb. 7, 2006 L. Miller Email, YAI Defs.' Trial Exhibit L, at

YAI SERP-WEGMANN-00005918-21; Trial Tr. (Wegmann Test.) 76:18-77:19.

139.    Ms. Wegmann took no action at the time with respect to the accuracy of the

information reflected in the Form 990 worksheet.  Trial Tr. (Wegmann Test.) 77:20-22.

140.    Ms. Wegmann's direct testimony that "it seemed appropriate" that YAI had

calculated SERP benefits for Joel Levy, Philip Levy, Stephen Freeman, and Thomas Dern—but

not her—because they "had reached a plateau in terms of their compensation with the

organization," *see* Wegmann Aff. ¶¶ 42-44, is not credible in light of a footnote from YAI's

Form 990 schedules, including Exhibit L, indicating that "Annual Supplemental Plan expense

estimated using . . . salary increases of 4% per annum," Feb. 7, 2006 L. Miller Email, YAI Defs.'

Trial Exhibit L, at YAI SERP-WEGMANN-00005919.

141.    On May 3, 2006, Ms. Wegmann sent to Monica Fraczek—an employee at Loeb

and Troeper, YAI's auditor—a version of the Form 990 worksheet for the 2004-2005 plan year

that included numerical values under the SERP (Column S) for Joel Levy, Philip Levy, Stephen

Freeman, Thomas Dern, and Joe Rut, but reported no value for Ms. Wegmann and "0" for other

YAI employees.  May 3, 2006 K. Wegmann Email, YAI Defs.' Trial Exhibit N, at YAI SERP-

WEGMANN-00005950-53; Trial Tr. (Wegmann Test.) 78:15-21.

142.    Ms. Wegmann took no action at the time with respect to the accuracy of the

information reflected in the Form 990 worksheet.  Trial Tr. (Wegmann Test.) 80:1-5.

143.    As CFO, Ms. Wegmann continued to have responsibility for reviewing YAI's

annual Form 990 filings to the IRS.  Connors Decl. ¶¶ 20-21; Nov. 29, 2007 K. Wegmann Email,

YAI Defs.' Trial Exhibit X, at YAI SERP-WEGMANN-00007375 (writing to Monica Fraczek

regarding 2004-2005 Form 990 that "the numbers look good!"); Nov. 29, 2007 K. Wegmann

Email, YAI Defs.' Trial Exhibit Y, at YAI SERP-WEGMANN-00007417 (writing to Monica

Fraczek regarding 2005-2006 Form 990, that "[t]his one is gorgeous"); Nov. 29, 2007 K.

Wegmann Email, YAI Defs.' Trial Exhibit Z, at YAI SERP-WEGMANN-00007476 (writing to

Monica Fraczek that 2003-2004 Form 990 "[l]ooks good!"); May 15, 2008 K. Wegmann Email,

YAI Defs.' Trial Exhibit AK, at YAI SERP-WEGMANN-00007772 (writing to Eva Mruk

(employee at YAI's auditor) that 2006-2007 Form 990 "[l]ooks good").

144.    Also as CFO, Ms. Wegmann was responsible for determining what amounts YAI

needed to allocate each year to its retirement plans, including the SERP.  Connors Decl. ¶¶ 20-

21.

145.    On January 29, 2007, Ms. Wegmann received from Linda Miller a "Funding

Valuation and Projection Estimates" for the YAI SERP that included projected future

contributions for benefits for Thomas Dern, Stephen Freeman, Joel Levy, and Philip Levy.  Jan.

29, 2007 L. Miller Email, YAI Defs.' Trial Exhibit S, at YAI SERP-WEGMANN-00002684-85.

For Mr. Dern's SERP benefit, for example, the projections show that YAI was allocating

$100,000 to $500,000 per year for over ten years ahead of his anticipated retirement date.  *Id.* at

YAI SERP-WEGMANN-00002685.

146.    Ms. Wegmann did not say anything to Ms. Miller about Ms. Wegmann's not

being listed in the funding schedule.  Trial Tr. (Wegmann Test.) 82:9-13.

147.    Ms. Wegmann acknowledged, however, that YAI needed to be prepared to fund

benefits for all of its employees in case they retired at the earliest possible date.  *See* Trial Tr.

(Wegmann Test.) 92:17-93:3 ("THE COURT: Are you saying that YAI could bank or have

complete confidence that you were going to retire at some much later date?  I would have

thought they would have had to start accruing just in case you decided to retire at the first available opportunity.  That's my question.  THE WITNESS: Retirement is not even something I think about, so -- THE COURT: Well, I appreciate that you don't.  But wasn't it incumbent on YAI to be thinking about all of its employees and basically being prepared so that they could retire if they wanted to at the earliest eligible date?  THE WITNESS: Yes.").

148.    On December 14, 2007, Ms. Wegmann sent three years' worth of Form 990 schedules to Ms. Fava (YAI's Board Chair), and none of the schedules showed that Ms. Wegmann was accruing a benefit under the SERP.  Dec. 14, 2007 K. Wegmann Email, YAI Defs.' Trial Exhibit AD, at YAI SERP-WEGMANN-00007195-98; *see also* Trial Tr. (Wegmann Test.) 85:11-15 ("Q. If I could focus us, you were passing along information to those individuals at this time setting forth there was no allocation to you or benefits being accrued by you as of December 2007, right?  A. Correct.").

149.    The Form 990 schedules show that, in all three years, Ms. Wegmann did not have a reportable benefit under the SERP.  Fava Decl. ¶ 50.

150.    On February 19, 2008, Ms. Wegmann received a preliminary draft of an "Allocation of 2005-06 Fringe Allotment" report from Craig Miller (YAI's actuary), which he described as "for your review with the committee."  Feb. 19, 2008 C. Miller Email, YAI Defs.' Trial Exhibit AF, at YAI SERP-WEGMANN-00001919-23.

151.    Specifically, the allocation document provided that "[t]he total contributed to the Supplemental Plan for the 2005-06 Plan Year was $1,924,947.  This resulted in a funding of 100% of the annual Normal Cost for the two Participants closest to retirement and 55% of the annual Normal Cost for the remaining two Participants."  Feb. 19, 2008 C. Miller Email, YAI Defs.' Trial Exhibit AF, at YAI SERP-WEGMANN-00001922.

152.    Ms. Wegmann was not one of the "Participants" referenced in the allocation document.  Trial Tr. (Wegmann Test.) 87:17-25.

153.    Ms. Wegmann did not tell anyone at YAI after receiving the February 19, 2008 email that she was in the SERP.  Trial Tr. (Wegmann Test.) 88:1-3.

154.    February 20, 2008, Ms. Wegmann received from Craig Miller a "Funding Valuation and Projection Estimates as of June 30, 2006" for the YAI SERP that included projected future contributions for benefits for Thomas Dern, Stephen Freeman, Joel Levy, and Philip Levy.  Feb. 20, 2008 C. Miller Email, YAI Defs.' Trial Exhibit AG, at YAI SERP-WEGMANN-00002498-500.

155.    Ms. Wegmann attended meetings of the YAI Business Committee, at which the committee discussed annual retirement plan allocations.  Mar. 26, 2008 Business Committee Report, Defs.' Trial Exhibit AJ, at YAI SERP-WEGMANN-00004874-77.

156.    On occasion Ms. Wegmann would present fringe benefit projections and retirement plan allocations to the Business Committee.  *See, e.g.*, June 18, 2008 Business Committee Report, Defs.' Trial Exhibit AL, at YAI SERP-WEGMANN-00004878-79; *see also* Trial Tr. (Wegmann Test.) 99:15-23 ("Q. Just briefly, the minutes of the June 1 -- my observation, every paragraph other than the one at the end about what the committee recommends -- so, I don't know, let's say a dozen, we can all count -- it begins with Ms. Wegmann, Ms. Wegmann presents, Ms. Wegmann reviews, Ms. Wegmann provides, right?  Was this typical at these business committee meetings that you would be the dominant presenter?  A. Well, I gave -- I presented, you know, the nuts and bolts of all the reports.  So I was the presenter, yes.").

157.    Ms. Wegmann was aware of the SERP through her duties as CFO, which included dealing with YAI's actuary on annual allocations for the SERP and other retirement plans.  Levy Dep. at 83:5-84:5; *see also* Freeman Dep. at 54:17-55:3 (testifying that Ms. Wegmann "had records that included all kinds of information about the SERP," and that "it was under her purview as CFO to understand the SERP, the amount of the SERP, [and] make contributions to the SERP").

158.    Ms. Wegmann maintained a copy of the SERP plan document, along with amendments.  Levy Dep. at 123:13-124:4.

159.    Ms. Wegmann would have received the 2008 Amendment in the normal course of her duties because, as CFO, she was responsible for holding contracts and similar documents. Levy Dep. at 123:13-124:4.

160.    Ms. Wegmann also would have needed a copy of the 2008 Amendment to complete her duties with respect to administering the SERP.  Connors Decl. ¶ 26.

161.    Ms. Wegmann was upset upon reading the amended eligibility provisions in the 2008 Amendment.  Trial Tr. (Wegmann Test.) 43:17-44:14; *see id.* (testifying that the 2008 Amendment "said that, according to the criteria [in Section 10.1.2], I was includable, and then it named individuals. . . . [I]t didn't reconcile, so I was – I did feel upset").

162.    Ms. Wegmann did not take any action in response to reading that Section 10.1.2 in the 2008 Amendment listed participants and did not include her.  Trial Tr. (Wegmann Test.) 45:23-46:2.

163.    Ms. Wegmann's direct testimony that "Mr. Miller's July 9, 2010 e-mail was the first instance wherein I was provided with copy of the purported 2008 SERP amendment," Wegmann Aff. ¶ 30, is not credible given testimony from Joel Levy, Stephen Freeman, and

Michael Connors that she would have needed a copy of the amendment to perform her administrative duties with respect to the SERP in her position as CFO.

164.    On February 23, 2009, Ms. Wegmann was copied on an email from Craig Miller to David Samuels—YAI's outside counsel—in which Mr. Miller wrote that "Karen Wegmann is not included in the YAI Supplemental Plan."  Feb. 23, 2009 C. Miller Email, YAI Defs.' Trial Exhibit AU, at YAI SERP-WEGMANN-00010466.

165.    Ms. Wegmann did not take any action to correct Mr. Miller or to explain that she was in the SERP.  Trial Tr. (Wegmann Test.) 88:10-16.

166.    Ms. Wegmann's direct testimony that "it seemed appropriate" that YAI had calculated and funded benefits for Joel and Philip Levy, Stephen Freeman, and Thomas Dern, but not her, because "the other SERP participants were older than I and closer to retirement," *see* Wegmann Aff. ¶¶ 42, 44, is not credible.  In addition to reasons in paragraph 140 *supra*, YAI was funding a SERP benefit for Thomas Dern by at least 2005, *see* Jan. 29, 2007 L. Miller Email, YAI Defs.' Trial Exhibit S, at YAI SERP-WEGMANN-00002685, over ten years before his anticipated retirement date on June 30, 2018, *see* Feb. 23, 2009 C. Miller Email, YAI Defs.' Trial Exhibit AU, at YAI SERP-WEGMANN-00010466.  Ms. Wegmann would be expected to begin receiving SERP benefits only four years after Mr. Dern's expected retirement date, on January 25, 2022.  Trial Tr. (Wegmann Test.) 89:3-12.  Ms. Wegmann was not so much younger than other YAI executives that it was reasonable for her to not be concerned about the organization's not funding a SERP benefit for her if she believed she was a participant.

167.    On February 25, 2009, Ms. Wegmann received an email from Mr. Miller attaching a spreadsheet of "cash compensation, cash contributions to employee benefit plans and deferred compensation" that included values in Column Q for SERP contributions in fiscal years

2005-2007 for Stephen Freeman and Thomas Dern, but shows "0" in the same column for all three years for Ms. Wegmann.  Feb. 25, 2009 C. Miller Email, YAI Defs.' Trial Exhibit AV, at YAI SERP-WEGMANN-00002476-79.

168.   There are also zeroes in columns for plans in which Ms. Wegmann admits she did not participate, such as the Executive Life Insurance plan in Column Y.  Feb. 25, 2009 C. Miller Email, YAI Defs.' Trial Exhibit AV, at YAI SERP-WEGMANN-00002478.

169.   Ms. Wegmann did not contest Mr. Miller's calculations, even though Mr. Miller was calculating an estimated contribution of "0" for her under the SERP.  *See* Trial Tr. (Wegmann Test.) 94:16-96:2 ("THE COURT: Even if the figure wasn't precise, you're saying they were actuarial, they were estimates, right?  Best estimates?  THE WITNESS: Yes, I mean -- THE COURT: OK.  THE WITNESS: We got them from Craig, from the actuaries.  THE COURT: OK. But they're estimating zero for you.  THE WITNESS: Yeah. Yes.  THE COURT: OK.  BY MR. MEEHAN: Q. So you had to believe the estimate for you should be something above zero, right?  If you are entitled to be in the plan the best estimate was not zero, it had to be some number, right?  A. Yes. They hadn't included an estimate. . . . Q. You didn't point any of that out, correct?  A. No.").

170.   On May 1, 2009, Ms. Wegmann sent an email to YAI actuaries attaching a Form 990 worksheet for the 2007-2008 plan year, and in the column of the worksheet for the SERP she left blanks for benefit accrual values for Joel and Philip Levy, Stephen Freeman, and Thomas Dern, but included "0" for her and all other listed YAI employees.  May 1, 2009 K. Wegmann Email, YAI Defs.' Trial Exhibit AZ, at YAI SERP-WEGMANN-00006781-84.

171.   After she received an updated version of the worksheet from the actuaries, Ms. Wegmann wrote on May 2, 2009, "I noticed that your spreadsheet did not have any amounts for

the Supplemental Plan for Joel, Phil, Steve and Tom. . . . In past years, there were amounts for

these benefits.  Please confirm that the amounts for these benefits for Joel, Phil, Steve and Tom

are zero for 2007-2008."  May 2, 2009 K. Wegmann Email, YAI Defs.' Trial Exhibit BA, at YAI

SERP-WEGMANN-00002494.

172.     The worksheet Ms. Wegmann attached has blank values in the column labeled

"Supplemental Plan" (Column V) for SERP participants Joel Levy, Philip Levy, Stephen

Freeman and Thomas Dern, but already includes a "0" for Ms. Wegmann and other YAI

employees.  May 2, 2009 K. Wegmann Email, YAI Defs.' Trial Exhibit BA, at YAI SERP-

WEGMANN-00002497; *see* Trial Tr. (Wegmann Test.) 96:3-10 ("[Y]ou are looking for

information on the SERP, and you're questioning the absence of amounts for the Levys and Mr.

Dern and Mr. Freeman, but you raised no question about the absence of an amount for yourself,

correct?  A. Correct.")

173.     The same day, Mr. Miller responded that "As your review suggests, the values for

the supplemental plan and life insurance plans [are] not zero, just not yet inserted into the table."

May 2, 2009 Email String, YAI Defs.' Trial Exhibit BB, at YAI SERP-WEGMANN-00006218.

Ms. Wegmann acknowledged Mr. Miller's email, writing back that she would "look for the

values of those items to be completed on Tuesday."  May 2, 2009 Email String, YAI Defs.' Trial

Exhibit BC, at YAI SERP-WEGMANN-00006220.

174.     On May 6, 2009, Mr. Miller sent Ms. Wegmann another email attaching an

"updated 990 worksheet" for the 2007-2008 plan year that included numerical values for in the

SERP column for Joel Levy, Philip Levy, Stephen Freeman and Thomas Dern, but still showed

"0" for Ms. Wegmann and other YAI executives listed.  May 6, 2009 C. Miller Email, YAI

Defs.' Trial Exhibit BF, at YAI SERP-WEGMANN-00005945-49.

175.    That same day, Ms. Wegmann sent an email to Monica Fraczek attaching a 2007-2008 Form 990 worksheet that also included numerical values in the SERP column for Joel Levy, Philip Levy, Stephen Freeman and Thomas Dern, but still showed "0" for Ms. Wegmann and other YAI executives listed.  May 6, 2009 K. Wegmann Email, YAI Defs.' Trial Exhibit BG, at YAI SERP-WEGMANN-00006156-59.

176.    Given testimony from Joel Levy and Mr. Connors about conversations with Ms. Wegmann, as well as emails she exchanged with YAI's outside actuaries and auditors, Ms. Wegmann's direct testimony that her conversation with Eliot Green on July 1, 2014 was "the first time that it was ever stated to me by any individual associated with YAI that I would not be a participant in the SERP," *see* Wegmann Aff. ¶ 67, is not credible.

177.    On May 27, 2009, Ms. Wegmann attended a meeting of the Board's Business Committee, during which it discussed "the amounts to be funded for the Supplemental Plan for the four executives"—Joel Levy, Philip Levy, Stephen Freeman and Thomas Dern.  May 27, 2009 Business Committee Minutes, YAI Defs.' Trial Exhibit BJ, at YAI SERP-WEGMANN-00004898; Fava Decl. ¶¶ 68-69.

178.    Ms. Wegmann did not raise at this meeting her view that she was also a SERP participant, nor did she discuss her view with committee members outside the meeting.  Trial Tr. (Wegmann Test.) 99:9-14.

179.    On September 29, 2009, Craig Miller sent an email to Ms. Wegmann attaching for her review several exhibits for an upcoming Pension Committee meeting.  Sept. 29, 2009 C. Miller Email, YAI Defs.' Trial Exhibit BM, at YAI SERP-WEGMANN-00002428-54.  One exhibit, an "Allocation of Retirement and Longevity Plan Allotment" report, provided with respect to the SERP that it "provides benefits for Philip Levy, Joel Levy, Stephen Freeman and

Thomas Dern" and described how their benefits would be calculated.  *Id.* at YAI SERP-WEGMANN-00002431-32.

180.    Ms. Wegmann did not take any action to correct the allocation report or otherwise raise the issue that she believed she was a SERP participant.  Trial Tr. (Wegmann Test.) 101:11-23.

181.    On March 11, 2010, Ms. Wegmann emailed Linda Miller a draft executive compensation schedule for YAI's 2008-2009 Form 990.  Mar. 11, 2010 K. Wegmann Email, Defs.' Trial Exhibit BT, at YAI SERP-WEGMANN-00006167-73.  Ms. Wegmann described the attachment as a "worksheet with compensation info. completed" and she asked Ms. Miller to "review and add the pension information."  *Id.* at YAI SERP-WEGMANN-00006167.  Under the column for SERP benefits within the schedule, Ms. Wegmann had left blanks for benefits for Joel and Philip Levy, Stephen Freeman, and Tom Dern, and she had already included "0" for herself and all other listed YAI employees.  *Id.* at YAI SERP-WEGMANN-00006170.

182.    On March 18, 2010, Ms. Wegmann attended a Pension Committee meeting, and the minutes indicate that the committee discussed "a report showing the current cost to purchase commercial annuities to fund Supplemental Plan amounts for three participants."  Mar. 18, 2010 Pension Committee Minutes, YAI Defs.' Trial Exhibit BW, at YAI SERP-WEGMANN-00005076.

183.    Ms. Wegmann was involved in drafting and revising the March 18, 2010 Pension Committee meeting minutes.  Mar. 23, 2010 K. Wegmann Email, YAI Defs.' Trial Exhibit BX, at YAI SERP-WEGMANN-00010105-11; Fava Decl. ¶¶ 74-75.

184.    The draft minutes that Ms. Wegmann sent to Ms. Fava provide that "Mr. Craig Miller presented a report showing the current cost to purchase commercial annuities to fund

Supplemental Plan amounts for three participants"—none of the "three participants" were Ms. Wegmann, because she was not a SERP participant.  Mar. 23, 2010 K. Wegmann Email, YAI Defs.' Trial Exhibit BX, at YAI SERP-WEGMANN-00010107-08; Fava Decl. ¶ 75.

185.    As the Pension Committee was considering whether to purchase commercial annuities for SERP participants' benefits, Ms. Wegmann reviewed multiple drafts of quotes, which were provided for annuities for Joel and Philip Levy, Stephen Freeman, Tom Dern, and Kathleen Rut (Joe Rut's widow).  *See, e.g.*, May 5, 2010 C. Miller Email, YAI Defs.' Trial Exhibit BY, YAI SERP-WEGMANN-00001644-46; May 24, 2010 C. Miller Email, YAI Defs.' Trial Exhibit BZ, YAI SERP-WEGMANN-00001659-64.

186.    Upon receiving this email, Ms. Wegmann did not tell Mr. Miller or anyone at YAI that the organization should be bidding a commercial annuity for a benefit to her under the SERP.  Trial Tr. (Wegmann Test.) 105:10-106:8.

187.    The minutes of a Pension Committee meeting on May 26, 2010 (which Ms. Wegmann attended) provide that "Ms. Wegmann presented the recent requests for proposal from three brokers regarding the purchase of commercial annuities for the Supplemental Plan."  May 26, 2010 Pension Committee Minutes, YAI Defs.' Trial Exhibit CB, at YAI SERP-WEGMANN-00010025-26; Fava Decl. ¶¶ 78-79.

188.    In this meeting, the committee was considering bids for commercial annuities to fund benefits for Joel Levy, Philip Levy, Stephen Freeman, Thomas Dern, and Kathleen Rut. Fava Decl. ¶ 79.  Ms. Wegmann did not present a bid for a commercial annuity for her, nor did the committee ever consider whether to purchase a commercial annuity for a benefit to Ms. Wegmann under the SERP because she was not a participant.  *Id.*

189.    On July 26, 2010, Craig Miller sent Ms. Wegmann an email to which he attached a description of YAI's retirement plans, which provided with respect to the SERP that "[c]urrent participants include the CEO and President and two Chief Operating Officers."  July 26, 2010 C. Miller Email, YAI Defs.' Trial Exhibit CF, at YAI SERP-WEGMANN-00001691-94.

190.    Ms. Wegmann emailed the retirement plan summary to an executive compensation consultant on July 29, 2010.  July 29, 2010 K. Wegmann Email, YAI Defs.' Trial Exhibit CG, at YAI SERP-WEGMANN-00010118-21.

191.    On September 14, 2010, Craig Miller sent an email to Ms. Fava, copying Ms. Wegmann and others, to which Mr. Miller attached a copy of an Insurance Policy Schedule for the SERP.  Sept. 14, 2010 C. Miller Email, YAI Defs.' Trial Exhibit CJ, at YAI SERP-WEGMANN-00001781-85; Fava Decl. ¶¶ 81-82.

192.    The schedule lists multiple insurance policies that YAI purchased on the lives of the four SERP participants at the time: Philip Levy, Joel Levy, Stephen Freeman, and Thomas Dern.  Sept. 14, 2010 C. Miller Email, YAI Defs.' Trial Exhibit CJ, at YAI SERP-WEGMANN-00001785; Fava Decl. ¶ 82.

193.    The schedule also indicates that YAI purchased the policies at times between 1992 and 2002.  Sept. 14, 2010 C. Miller Email, YAI Defs.' Trial Exhibit CJ, at YAI SERP-WEGMANN-00001785.

194.    In addition, the policies had cash values that YAI could have realized to defray the organization's potential liabilities under the SERP, including for underfunded benefits owed to participants.  Sept. 14, 2010 C. Miller Email, YAI Defs.' Trial Exhibit CJ, at YAI SERP-WEGMANN-00001785.

195.    Ms. Fava testified that the Board never approved the purchase of an insurance policy on Ms. Wegmann's life with respect to the SERP and, if the Board believed that she was a participant, the Board would have done so.  Fava Decl. ¶ 82.

196.    On September 23, 2010, Ms. Wegmann sent Philip Levy and Ms. Fava a draft of minutes from the September 15, 2010 Pension Committee meeting that Ms. Wegmann had prepared, in which she wrote that "The Committee reviewed the materials which addressed the purchase of a commercial annuity to fund the supplemental pension plan liability for the four executives in the plan and Kathleen Rut."  Sept. 23, 2010 K. Wegmann Email, YAI Defs.' Trial Exhibit CM, at YAI SERP-WEGMANN-00010244-46; Fava Decl. ¶¶ 83-84.

197.    Ms. Fava testified that she understood "the four executives in the plan" to be Joel and Philip Levy, Stephen Freeman, and Thomas Dern.  Fava Decl. ¶ 85.

198.    On May 10, 2011, Ms. Wegmann sent an email to Linda and Craig Miller attaching a Form 990 worksheet for the 2009-2010 plan year, and writing, "I need the pension amounts and the executive life and disability amounts."  May 10, 2011 K. Wegmann Email, YAI Defs.' Trial Exhibit CO, at YAI SERP-WEGMANN-00007019-26.

199.    The worksheet attached to Ms. Wegmann's email had blanks under Column X for the SERP for Philip Levy, Stephen Freeman, and Thomas Dern, but already had "0" for Ms. Wegmann.  May 10, 2011 K. Wegmann Email, YAI Defs.' Trial Exhibit CO, at YAI SERP-WEGMANN-00007022.

200.    As provided in minutes from a June 1, 2011 Pension Committee meeting (which Ms. Wegmann attended), the committee considered a resolution on allocations to YAI's retirement plans "[w]ith input from Karen Wegmann, Mike Connors, Craig Miller, and Linda Miller on the funds available for the retirement programs of approximately $6 million, and the

requirements of each of the plans." June 1, 2011 Pension Committee Minutes, YAI Defs.' Trial Exhibit CS, at YAI SERP-WEGMANN-00001509-10; Fava Decl. ¶¶ 87-89.

201.    Ms. Fava testified that, as CFO, Ms. Wegmann participated in advising the Pension Committee on what amounts were available to contribute to YAI retirement plans, which included the SERP.  Fava Decl. ¶ 89.

202.    On August 1, 2013, Ms. Wegmann sent a letter to the United States Department of Labor about the SERP and the YAI Life Insurance Plan for Certain Management Employees of YAI, in which she wrote that "[t]hese plans cover only one (1) individual – a former executive of YAI." Aug. 1, 2013 K. Wegmann Letter, YAI Defs.' Trial Exhibit CZ, at YAI SERP-WEGMANN-00000499; Trial Tr. (Wegmann Test.) 111:3-5, 112:13-25.

203.    At the time, Philip Levy, Stephen Freeman, Thomas Dern, and Kathleen Rut (Joe Rut's widow) had already settled their potential SERP claims with YAI, *see* Trial Tr. (Wegmann Test.) 114:13-115:5, meaning Joel Levy was the only possible "former executive of YAI" that Ms. Wegmann was referring to as the one remaining SERP participant.  *See* Wegmann Aff. ¶ 11 (testifying that Ms. Wegmann did not resign from YAI until June 30, 2014).

**Discussions of Additional Retirement Benefits for Ms. Wegmann in 2014**

204.    Ahead of Ms. Wegmann's resignation from YAI in 2014, Matthew Sturiale (YAI's Interim Chief Executive Officer) asked Mr. Connors to prepare an informal set of calculations of a possible retirement package for her.  Connors Decl. ¶ 41.

205.    The calculation provided a "high water mark" of what the ECC could legally decide to provide to Ms. Wegmann as retirement benefits without incurring intermediate sanctions under Section 4958.  Connors Decl. ¶ 41.  This "high water mark" would enable the Board to make a business decision on whether to provide Ms. Wegmann with any benefits

following her resignation with knowledge of the level of benefits above which the benefits would be unlawful.  *Id.*

206.    The "high water mark" (being the value of an annuity that paid her, from all sources, total retirement benefits in excess of 60% of her final earnings at age 65) was based on Mr. Connors's opinion that YAI's providing to Ms. Wegmann a benefit at the time over this number would have created risk of the IRS deeming her total compensation excessive under Section 4958.  Connors Decl. ¶ 41.

207.    Mr. Sturiale was not asking Mr. Connors to calculate Ms. Wegmann's benefit under "the" Original SERP, because it would have been "absurd" for her to participate in that plan.  Connors Decl. ¶ 32; Trial Tr. (Connors Test.) 201:16-202:5; *id.* at 204:5-15.

208.    An actuarial analysis prepared in 2014 by Gebhardt Pension Consulting (the "Gebhardt Analysis") reflects $179,150 as the single sum amount which would be necessary, in addition to the $1.85 million already provided, to give Ms. Wegmann total retirement benefits from YAI during her career equal in value to an annuity paying her 60% of her final earnings, each year commencing at age 65 for the rest of her life.  Connors Decl. ¶ 44; Gebhardt Analysis, YAI Defs.' Trial Exhibit DC, at YAI SERP-WEGMANN-00000160.

209.    Mr. Connors presented the Gebhardt Analysis at an ECC meeting, where he advised the ECC that the $179,150.00 figure was the "high water mark" in Ms. Wegmann's case; payment above this amount would put the ECC members and Ms. Wegmann at risk of penalty taxes for excessive compensation under Section 4958.  Connors Decl. ¶ 45.

210.    Upon final review, the ECC decided to provide no further retirement benefits to Ms. Wegmann in light of the fact that she had resigned, that she received other generous benefits

at time of her resignation, and that the Board concluded that the retirement benefits provided to her already ($1.85 million) were more than adequate.  Connors Decl. ¶ 46.

### Interpretation of "Highest Annual Earnings"[3]

211.    The Original SERP does not define the term "highest total annual earnings" under Section 10.2.1(c).  *See generally* Original SERP Plan Document, YAI Defs.' Trial Exhibit A; Fava Decl. ¶ 17.

212.    Because the term is undefined, the Board is empowered to interpret it under the SERP.  *See* 2013 Amendment, YAI Defs.' Trial Exhibit DA, at YAI SERP-WEGMANN-00000391-92 (providing that "the Administrator [which is the Board] shall have the following powers: . . . (c) to interpret the Plan, and to resolve ambiguities, inconsistencies and omissions, and the determinations of the Administrator in respect thereof shall be binding, final and conclusive upon all interested parties").

213.    A draft compensation report by Towers Perrin, prepared in January 2005, describes the benefit formula under the Original SERP as "3% of highest total annual earnings (base plus bonus) times service, maximum 33 1/3 offset by Discretionary DC Plan, Employees' Limited DB Plan and the Make-Up DC Plan."  Competitive Compensation and Benefits Review, YAI Defs.' Trial Exhibit F, at YAI SERP-WEGMANN-00003074.

214.    Towers Perrin's description is based on the Board's interpretation that, although the term "highest total annual earnings" is undefined under the Original SERP, the term means a

---

[3] The YAI Defendants maintain that the facts presented at trial meet all elements of the YAI Defendants' affirmative defenses, and that judgment should be entered in their favor and Ms. Wegmann is entitled to no damages whatsoever.  Accordingly, the YAI Defendants' proposed findings at paragraphs 211 through 236 should be unnecessary.  In an abundance of caution, however, the YAI Defendants present the following proposed findings on aspects of how a purported benefit to Ms. Wegmann should be calculated.

participant's highest total of salary plus YAI bonus from any given year of employment.  Fava Decl. ¶ 33.

215.    In the 2005 ECC Recommendations, the committee stated that the SERP "provides annuity benefit of 100% of highest total earnings (Salary + YAI Bonus) after 33-1/3 years of service," and the committee recommended freezing SERP benefit levels for plan participants at current levels of the participants' "Salary + YAI Bonus," based on the ECC's interpretation of the term "highest total annual earnings" in the Original SERP.  2005 ECC Recommendations, YAI Defs.' Trial Exhibit I, at YAI SERP-WEGMANN-00000403; Fava Decl. ¶ 40.

216.    At times while she was at YAI, Ms. Wegmann received bonuses from the New York League ("NYL")—as did other YAI executives.  Fava Decl. ¶ 18.

217.    NYL is a separate entity from YAI.  *See* Trial Tr. (Wegmann Test.) 52:3-6 ("Q. All right.  Now, the New York League is an entity that is distinct from YAI, is it not?  A. Yes. It is part of the YAI network, but just as Young Adult Institute is separate, New York League is separate.").

218.    NYL's relationship to YAI is defined by a management agreement.  Trial Tr. (Wegmann Test.) 52:13-19.

219.    NYL is a 501(c)(3) nonprofit that does not have an owner.  Trial Tr. (Wegmann Test.) 53:25-54:6.

220.    YAI was not a member of NYL.  Trial Tr. (Wegmann Test.) 54:9-11.

221.    According to the Board, NYL bonuses should not be included as "highest total annual earnings" under the SERP, which instead consisted solely of a participant's salary and YAI Bonus.  Fava Decl. ¶ 19.

222.    The "YAI Bonus" that certain executives received is a separate form of compensation from any "NYL Bonus."  Fava Decl. ¶ 20.

**Calculation of Ms. Wegmann's Purported SERP Benefit**

223.    The Original SERP provides for benefits to be paid as an annual annuity, as indicated in Sections 10.1.5 (Basic Form of Benefit) and 10.2.l (Benefit Levels).  Original SERP Plan Document, YAI Defs.' Trial Exhibit A, at YAI SERP-WEGMANN-00000381-82; Fava Decl. ¶ 16; Connors Decl. ¶ 9.

224.    The Original SERP does not provide for benefits to be paid as a lump sum.  Fava Decl. ¶ 16.

225.    Section 10.1.5 of the Original SERP also provides for "a specified monthly amount" to be paid to a participant "with payments continuing for his lifetime, and, after his death, to his spouse for her lifetime" and "[n]otwithstanding anything to the contrary herein contained, in the event that a Participant and his spouse both die prior to 120 monthly payments having been made, benefits shall continue to be paid among any surviving children, per capita, until a total of 120 monthly payments have been made."  Original SERP Plan Document, YAI Defs.' Trial Exhibit A, at YAI SERP-WEGMANN-00000381.

226.    Ms. Wegmann is not married, and she does not have any children.  Trial Tr. (Wegmann Test.) 93:21-24, 94:5-11.

227.    The YAI Defendants engaged Victor P. Harte, a Principal and Consulting Actuary for Milliman, to calculate the benefit that Ms. Wegmann would have been due had she been covered under the SERP.  Direct Testimony Declaration of Victor P. Harte ("Harte Decl.") ¶¶ 5, 12.

228.     In performing his calculation, Mr. Harte considered applicable laws and Actuarial Standards of Practice, as well as his own professional experience and expertise.  Harte Decl. ¶ 14.

229.     For purposes of his calculations, Mr. Harte interpreted the term "highest total annual earnings" to include only Ms. Wegmann's salary and "YAI bonus," based on the 2005 ECC Recommendations (listed in his report), as well as his experience in calculating benefits. Trial Tr. (Harte Test.) 249:16-251:7; *see also id.* 240:5-16 (Mr. Harte testifying: "Q. Now, isn't it your normal practice to just use base pay in calculating highest annual earnings?  A. In what determination of my regular practice?  Q. In issuing an expert report like you did here.  A. My regular practice is to rely upon the plan document.  THE COURT: Is there a default position that you have, sir?  THE WITNESS: Um, such as the case with the 1985 document, where it says earnings and nothing further than that.  THE COURT: Yes.  THE WITNESS: My default would be to use regular pay and regular bonus"); *id.* at 245:3-12 (Mr. Harte testifying that "[a]s an actuary, calculating a benefit from a nonqualified plan, [the term 'earnings'] means regular pay and bonus.  It means excluding any values received for fringe benefits, it means excluding any values received for other qualified plans, other nonqualified plans, etc.").

230.     According to Mr. Harte, "highest total annual earnings" would not include non-cash compensation, such as Ms. Wegmann's car allowance, long term disability benefit, and Longevity Bonus.  *See* Trial Tr. (Harte Test.) 230:2-18 ("Mr. Harte testifying that, with respect to the term "highest total annual earnings," the Original SERP and 2008 Amendment were "both pointing at regular pay plus bonus, excluding other extraneous items, excluding other LTD coverage, life insurance coverage, all of those other -- those other ancillary components that are paid to an employee or a employee may receive and may pay tax on, but those benefits and the

47

compensation that you might deem related to that those fringe benefits are not included

traditionally in a SERP benefit calculation.  You are looking at base earnings, you're [looking] at

bonus.  You're not giving a nonqualified SERP benefit on top of another benefit.  You're not

giving fringes on top of fringe."); *id.* at 254:15-255:6.

231.    Mr. Harte calculated, in the first instance, how Ms. Wegmann's purported benefit

would be calculated under the terms of the Original SERP and as amended by the 2008

Amendment.  Harte Decl. ¶ 17-22.

232.    In other words, Mr. Harte first calculated Ms. Wegmann's purported benefit using

the formula in the 2008 Amendment, and he assumed that the gross annual annuity benefit would

be limited to the greater of Ms. Wegmann's accrued benefit as of June 30, 2008, or 65% of her

highest total annual earnings.  Harte Decl. ¶¶ 18-19.

233.    Mr. Harte calculated that, if Ms. Wegmann were determined to be entitled to a

benefit under the 2008 Amendment, her benefit would be no more than a net annual annuity,

commencing on January 25, 2022, of $157,469.52.  Harte Decl. ¶ 22; Victor P. Harte EA.,

MAAA Expert Report ("Harte Report"), Schedule I; Trial Tr. (Wegmann Test.) 89:3-8.

234.    Ms. Wegmann testified that she understands (and has always understood) that the

2008 Amendment applies to her.  Trial Tr. (Wegmann Test.) 33:3-25.

235.    Mr. Harte also calculated Ms. Wegmann's purported benefit solely under the

Original SERP, and he concluded would be no more than a net annual annuity of $224,787.55.

Harte Decl. ¶ 24; Harte Report, Schedule II.

236.    The question of how to interpret the term "highest total annual earnings" is the

only difference between Mr. Harte's calculation under the Original SERP and Ms. Wegmann's

calculation of her purported benefit.  Trial Tr. (Wegmann Test.) 34:11-16; *see id.* at 35:23-36:2

("THE COURT: I thought I understood you to be saying because you do not consider yourself to be an actuary, you simply adopted certain factors or certain figures that Mr. Harte created, is that correct? THE WITNESS: That's precisely it. Thank you."); *see also* Wegmann Aff. ¶ 74.

## CONCLUSIONS OF LAW

### The SERP is a Top Hat Plan for Purposes of ERISA

237.    *YAI is a not-for-profit corporation exempt from taxation pursuant to IRC § 501(c)(3) and is a public charity which files a Form 990 annually with the IRS based on a fiscal year which ends on June 30 of each year.*

238.    *The SERP is a "top-hat" pension plan "maintained by an employer for a select group of management or highly compensated employees." 29 C.F.R. § 2520.104-23(a)(1).*

239.    *As a top-hat plan, the SERP is "'exempt from many provisions of ERISA, including the participation and vesting, funding, and fiduciary responsibility requirements . . . but like qualified plans, [it is] subject to disclosure requirements, to civil enforcement, and to the duty to have a claims procedure.'" Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 108 (2d Cir. 2008) (citations omitted).*

240.    *As a top-hat plan, the SERP is a contract enforced under ERISA's civil enforcement scheme and interpreted in accordance with the federal common law of contracts.*

241.    *As defined under ERISA § 3(3), 29 U.S.C. §1002(3), the SERP is an "employee benefit plan."*

242.    *As defined under ERISA § 3(16), 29 U.S.C. § 1002(16), YAI's Board is the plan administrator of the SERP.*

**Ms. Wegmann's ERISA Claim (Count IV of Her Amended Complaint) is Barred by the Applicable Six-Year Statute of Limitations**

243.    A six-year statute of limitations applies to Ms. Wegmann's ERISA claim, and "a cause of action under ERISA accrues 'upon a clear repudiation by the plan that is known, or should be known, to the plaintiff—regardless of whether the plaintiff has filed a formal application for benefits.'"  Op. & Order at 6-7, Mar. 2, 2016 (Dkt. No. 27) (quoting *Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44, 49 (2d Cir. 1999)).

244.    Ms. Wegmann's ERISA claim would be time-barred if she knew or should have known of a repudiation of her claim before May 18, 2009.

245.    Section 10.1.2 of the 2008 Amendment, which was signed on December 11, 2008, constituted a "clear repudiation" of Ms. Wegmann's claim under ERISA that she is a SERP participant and entitled to a benefit under the plan, because the section lists the SERP's "sole Participants" and does not include Ms. Wegmann.  *See* ¶ 111 *supra*.

246.    Because Ms. Wegmann had responsibilities for YAI retirement plans, including the SERP, and she would have received a copy of the 2008 Amendment in the course of her duties as CFO, she knew or should have known about the Amendment before May 18, 2009.  *See* ¶¶ 13-14, 157-60 *supra*.

247.    Ms. Wegmann's testimony that she did not see the 2008 Amendment before July 2010, *see* Wegmann Aff. ¶ 30, is not credible in light of consistent testimony from knowledgeable fellow YAI executives (Joel Levy and Stephen Freeman) and Mr. Connors that Ms. Wegmann would have needed a copy of the amendment to perform her administrative duties with respect to the SERP.

248.    Moreover, Ms. Wegmann should have seen and read the 2008 Amendment shortly after its enactment (i.e., before May 18, 2009) because it profoundly impacted the SERP,

which she was responsible for administering.  If she did not know about the 2008 Amendment in a timely manner, it is only because she was negligent in performing her duties as CFO, and she failed to inform herself of a document to which she would need to refer to do her job.

249.    In addition, before May 18, 2009, Ms. Wegmann received clear statements from individuals who were intimately knowledgeable about the SERP—including Craig Miller, YAI's outside actuary—that she was not a SERP participant.

250.    Most notably, on February 23, 2009, Ms. Wegmann was included on an email from Mr. Miller in which he wrote that "Karen Wegmann is not included in the YAI Supplemental Plan."  *See ¶¶* 164-65 *supra*.

251.    Although Ms. Wegmann testified that she had "relatively limited" conversations with Joel Levy about her participating in the SERP, *see* Wegmann Aff. ¶ 17, she has not testified that any such conversations took place after February 23, 2009.

252.    Even if Ms. Wegmann had testified that she had conversations with Joel Levy between February and May 2009 in which he "reassured" her that her "SERP participation was certain," any reliance she would have put in Mr. Levy's assurances was of no value because at the time he was co-CEO with Philip Levy and months away from retirement.  *See ¶¶* 101, 134-5 *supra*.

253.    Ms. Wegmann's knowledge before May 18, 2009 that she was not a SERP participant is shown by, among other evidence, her email exchange with Craig Miller about YAI's Form 990 schedules in early May 2009.  She sent Mr. Miller a schedule in which he would enter calculations for SERP participants' benefit accruals, but she had already entered "0" for herself because she knew that she was not accruing a SERP benefit.  *See ¶* 170 *supra*.  When Mr. Miller returned the form and the SERP values for Joel and Philip Levy, Stephen Freeman,

and Thomas Dern were still blank, she sought clarification for why—but was silent as to her "0" value. *See ¶¶ 171-73 supra*. The manner in which she prepared the schedule and sought clarification from Mr. Miller is only explained plausibly if she knew at the time that she was not a SERP participant and was not accruing a benefit under the SERP.

254.    Further, Ms. Wegmann claims that she was automatically enrolled in the SERP, but she was informed consistently by Joel Levy (specially, multiple times before May 18, 2009) that the Board needed to approve her participation. *See ¶¶ 112-14 supra*.

255.    Accordingly, Ms. Wegmann's ERISA claim is time-barred under the applicable six-year statute of limitations.

**Ms. Wegmann's ERISA Claim is Barred by Laches**

256.    "The elements of the defense of laches are (1) plaintiff's knowledge of defendant's conduct; (2) plaintiff's unreasonable delay in filing suit; and (3) prejudice to defendant." *Wagner v. Metro. Life Ins. Co.*, No. 08 CIV. 11284 GBDHBP, 2011 WL 2638143, at *7 (S.D.N.Y. Feb. 28, 2011).

257.    Ms. Wegmann knew, from conversations with Michael Connors, that changes to the Internal Revenue Code and the SERP's grandfathered status made it impracticable for her to be added to the SERP as a participant. *See ¶¶ 121-29 supra*.

258.    On at least four occasions between 2004 and 2009, Ms. Wegmann asked Joel Levy to advocate for her to be included in the SERP (or to receive an alternative benefit), and after each time he presented her case to the ECC, he reported back to her that the committee had declined his proposal. *See ¶¶ 112-20, 131-33 supra*.

259.    Ms. Wegmann also knew—from working on YAI's annual retirement plan allocations and Form 990 filings, and reviewing SERP contribution projections that YAI's

actuaries sent her—that no amounts were being set aside to fund a SERP benefit for her in the future.  *See* ¶¶ 8, 12-14, 19-24, 136-37 *supra*.

260.     Ms. Wegmann therefore knew as early as 2004 that she would need to take action in order for her to become a SERP participant, and her knowledge was reinforced multiple times before May 18, 2009.

261.     For years before May 18, 2009, Ms. Wegmann coordinated the preparation of YAI's Form 990 filings to the IRS, and none of the forms disclosed that Ms. Wegmann was accruing a SERP benefit—despite her professed belief that she had become a SERP participant as of December 2001.  *See* ¶¶ 24, 143, 148-49 *supra*.  Further, despite Ms. Wegmann's knowledge that the Form 990's would be inaccurate (to the extent she believed she was accruing a SERP benefit), *see* Wegmann Aff. ¶ 51, she approved the forms for YAI's CEO, Joel Levy, to sign under penalty of perjury, *see* ¶¶ 8, 136, 143, 261 *supra*.

262.     Accordingly, Ms. Wegmann unreasonably delayed in bringing her ERISA claim by not filing the instant litigation until May 2015.

263.     Ms. Wegmann prejudiced YAI by depriving the organization of an opportunity prior to July 2006 (i.e., before she became a "Management Employee" as the Board interpreted that term under the SERP) to amend the SERP to provide expressly that Board approval was required to become a SERP participant or specify which YAI employees were SERP participants (as the Board did in the 2008 Amendment).  *See* ¶ 95 *supra*.

264.     Further, after July 2006, Ms. Wegmann's continued silence and misrepresentations prejudiced YAI by depriving the organization of notice that it would need to take steps to limit its liability for a SERP benefit to Ms. Wegmann in the future.  For instance, with knowledge that Ms. Wegmann believed she was a SERP participant, the Board could have

(1) amended the SERP to freeze accruals of Ms. Wegmann's SERP benefit, in the same manner as the Board did for Joel and Philip Levy, Stephen Freeman, and Thomas Dern, *see* ¶¶ 109, 215 *supra*; (2) purchased life insurance contracts (like YAI did for four SERP participants between 1992 and 2002) to protect the organization from liability should she have passed away unexpectedly, and which would have provided cash value as an additional funding source for a SERP benefit to her; *see* ¶¶ 191-95 *supra*; (3) begun allocating amounts annually to fund Ms. Wegmann's SERP benefit (as the Board was doing for other SERP participants), *see* ¶¶ 24, 145, 148-49 *supra*; and/or (4) attempted to settle Ms. Wegmann's potential SERP claim, as YAI was able to accomplish with Philip Levy, Stephen Freeman, Thomas Dern, and Joe Rut's widow, *see* ¶¶ 202-03 *supra*.

265.    Because Ms. Wegmann knew of the YAI Defendants' conduct (i.e., excluding her from SERP participation); she unreasonably delayed in bringing her ERISA claim (from at least 2004 until May 18, 2015); and the YAI Defendants have suffered prejudice due to her delay, Ms. Wegmann's ERISA claim is barred under the equitable doctrine of laches.

**Ms. Wegmann's ERISA Claim is Barred by Equitable Estoppel**

266.    "The three elements defendants must establish to invoke equitable estoppel are (1) a misrepresentation by the plaintiff, (2) reasonable reliance by the defendant, and (3) prejudice." *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004).

267.    Equitable estoppel "'is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct.'"  *Id.* (citations omitted).

268.    "Silence may in some cases be sufficient to establish a misrepresentation."  *Id.*; *see also Kurt H. Volk, Inc. v. Found. for Christian Living*, 534 F. Supp. 1059, 1084 (S.D.N.Y. 1982) (noting that an "essential element[]" of equitable estoppel is "[s]ilence by the other party

where there is a duty to speak, amounting to a misrepresentation or concealment of a material fact").

269.    Ms. Wegmann's conduct—including preparing YAI's budgets and retirement plan allocations, and compiling and approving executive compensation schedules for YAI's Form 990 filings, none of which provided for an eventual SERP benefit to her, *see* ¶¶ 8, 12-14, 19-24, 136-37 *supra*—constitutes a misrepresentation to YAI that she understood she was not a SERP participant, and she had not become a participant automatically upon meeting "Eligibility" criteria under the Original SERP.

270.    In addition, to the extent Ms. Wegmann believed she automatically became a SERP participant in 2001 or any other time, her responsibilities as CFO to YAI to properly prepare the organization's budgets and government filings created a duty for her to speak and raise her position to the YAI Board.  *See* ¶¶ 8, 12-14, 19-24, 26-27, 136-37 *supra*.

271.    Ms. Wegmann never told anyone at YAI in the time she was an employee that she viewed herself as a SERP participant as of December 2001, or that she believed SERP participation was automatic after satisfying the plan's eligibility criteria.  *See* ¶¶ 63-67 *supra*.

272.    Given that she had a duty as YAI's CFO to speak and alert the Board to unfunded liabilities that could cost the organization millions of dollars in the future, her failure to speak up to notify anyone at YAI about the organization's needing to contribute annual amounts to her SERP benefit and/or report her benefit accruals on the organization's Form 990s, *see, e.g.*, ¶¶ 138-39, 141-42, 145-53, 161-65, 167-69 *supra*, constitutes a misrepresentation by silence.

273.    YAI's reliance on Ms. Wegmann's silence and misrepresentations with respect to her SERP participation is evidenced by (1) her not being mentioned in the ECC's 2005 Recommendations for freezing accruals of benefits to SERP participants, *see* ¶¶ 72-75 *supra*; (2)

the statement in minutes from the Board's September 27, 2007 meeting that the SERP at the time only covered Joel Levy, Philip Levy, Stephen Freeman, and Thomas Dern, *see* ¶ 86 *supra*; and (3) the ECC's consideration of additional retirement plans for Ms. Wegmann as an alternative to the SERP, *see* ¶¶ 96-99, 102-07 *supra*.

274.    YAI reasonably relied on Ms. Wegmann's conduct and silence because she was a well-qualified, capable CFO who had responsibilities to the organization for budgeting and government reporting from at least July 1, 2006 to June 30, 2012, when she was YAI's CFO. *See* ¶¶ 4-5 *supra*.

275.    In addition, YAI's reliance was reasonable because of Ms. Wegmann's consistent actions evincing her understanding that she was not a SERP participant, as well as her silence to the contrary, from at least 2006 (before she became YAI's CFO) through 2013—for instance, her compiling Form 990 filings that did not disclose that she was accruing a SERP benefit, and her representation to the Department of Labor that, as of August 2013, Joel Levy was the only remaining participant in the SERP. *See* ¶¶ 134-203 *supra*.

276.    YAI has been prejudiced, in the same manner described in paragraphs 263 and 264 above.

277.    Because Ms. Wegmann made multiple misrepresentations, on which the YAI Defendants reasonably relied, and because of which the YAI Defendants have been prejudiced, Ms. Wegmann's ERISA claim is barred under the doctrine of equitable estoppel.

**Reconciling Trial Evidence**

278.    Taking the evidence from trial as a whole, there appears to be dispute between Ms. Wegmann's alleged belief that she is a SERP participant and automatically entered the plan (either in 2001, or 2006 when she because a "Management Employee" as interpreted by the Board and the Court), contrasted with the testimony of Ms. Fava, Mr. Connors, and Joel Levy

that everyone at YAI understood the organization's practice of the Board having to approve participants.

279.    Ms. Wegmann's testimony about conversations she had with Joel Levy and others (including Mr. Connors) is reconciled if one concludes that everyone was discussing the prospect of an alternative retirement plan for Ms. Wegmann, rather than her participation in "the" SERP.

280.    For instance, Ms. Wegmann's testimony that Joel Levy told her "Yours is coming," and Ms. Fava's testimony that Joel Levy understood the reasons why the SERP was closed to additional participants after 1993, can be interpreted consistently if one concludes that Mr. Levy was discussing with Ms. Wegmann an additional retirement benefit (separate from the SERP) that he would convince the ECC to approve.

281.    In addition, Ms. Wegmann's testimony at trial that she understood the salary replacement percentage of her benefit could vary, *see* ¶¶ 100-01 *supra*, as well as her email exchanges with Matt Sturiale and Eliot Green in 2014 about her calculation of the additional contribution necessary to provide her with a 50% replacement benefit, *see* Pl.'s Trial Exhibits 13, 14, 15, supports an interpretation that, while she was at YAI, Ms. Wegmann was continuing to follow up about and pursuing an additional benefit aside from the SERP.

282.    Ultimately, even though Ms. Wegmann and others believed she deserved an additional retirement benefit, the ECC concluded that she had been sufficiently compensated and did not approve an alternative SERP or other plan for her.  And Ms. Wegmann is not alleging in this case that YAI had an obligation to provide such an additional benefit to her.

**Calculating Ms. Wegmann's Purported SERP Benefit**

283.    If Ms. Wegmann were determined to be entitled to a benefit under the SERP (which she should not, for reasons provided in paragraphs 243 to 282 above), such benefit would

be at most a net annual annuity of $157,469.52, paid in monthly installments commencing on January 25, 2022.  *See* ¶¶ 223, 233 *supra*.

284.     Given Ms. Wegmann's unreasonable delay in informing anyone at YAI that she believed she was automatically a SERP participant as of December 2001—which prejudiced YAI by depriving the Board of the opportunity to limit accruals to her purported SERP benefit in the same manner as YAI accomplished for other plan participants—in the interests of equity, her purported benefit should be calculated under the terms of the SERP as amended by the 2008 Amendment.

285.     Accordingly, Ms. Wegmann's purported benefit should be calculated as provided in Schedule I of the Harte Report.

286.     The term "highest total annual earnings" should be construed as consisting of Ms. Wegmann's highest annual salary and YAI Bonus, as interpreted by the Board in the 2005 ECC Recommendations and as comports with Mr. Harte's professional experience.  *See* ¶¶ 211-15, 228-29 *supra*.

287.     Ms. Wegmann therefore received her highest total annual earnings in 2009, which amounted to $317,146.57 ($270,885.53 salary plus $46,261.04 YAI Bonus).  *See* Harte Report Schedule IV.

288.     Other elements of Ms. Wegmann's 2009 compensation—specifically, her car allowance, long term disability benefit, and Longevity Bonus—are not "cash compensation" as that term is used in Section 10.2.1 of the 2008 Amendment and therefore should be excluded from her "highest total annual earnings."  *See* ¶ 230 *supra*.

289.    The term "affiliate" is defined as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."  Black's Law Dictionary (11th ed. 2019).

290.    The New York League of Early Learning ("NYL"), which has no members and was only related to YAI through a management agreement, is not an "affiliate" of YAI.  *See* ¶¶ 217-21 *supra*.

291.    Accordingly, the bonus that Ms. Wegmann received from the NYL in 2009 is not "cash compensation (salary plus bonuses) paid through any agency affiliated with the YAI National Institute for People with Disabilities Network," as that phrase is used in Section 10.2.1 of the 2008 Amendment, and the bonus should be excluded from her "highest total annual earnings."


Dated: July 1, 2019                              **GROOM LAW GROUP, CHARTERED**

                                                     By: */s/ Edward J. Meehan*
                                                     Edward J. Meehan
                                                     Michael J. Prame
                                                     Paul J. Rinefierd
                                                     1701 Pennsylvania Avenue, NW
                                                     Washington, D.C. 20006
                                                     Telephone: (202) 861-2602
                                                     Facsimile: (202) 659-4503
                                                     Email: emeehan@groom.com

                                                     *Attorneys for Defendants*